UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B., | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:00CV835 (CFD) |
| v. | : | |
| | : | |
| MOSTAFA REYAD and WAFA REYAD, | : | DECEMBER 21, 2004 |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S POST-TRIAL MEMORANDUM

Plaintiff IndyMac Bank, F.S.B. ("Plaintiff" or "IndyMac") submits the instant

memorandum, setting forth proposed findings of fact and conclusions of law, following

the bench trial of the above-captioned matter held on April 6, 7 and 29, 2004.[1]

**CLAIMS AND DEFENSES**

IndyMac[2] brings the instant action, filed on May 8, 2000, against Defendants

Mostafa Reyad and his wife, Wafa Reyad, alleging that Mostafa Reyad breached

certain Credit Facility Documents (individually and through his agents) by forging and

---

[1] After the conclusion of the bench trial of this action, Defendants filed several motions seeking to revisit the evidence admitted at trial and to reopen the evidence to offer further documentary evidence, including affidavits from the Defendants themselves. (See doc. ## 381, 382, 384, 386, 390.) Plaintiff opposes these motions. (See doc. ## 385, 389, 397, 398, 401.) In the event that the Court revisits or reopens the evidence, Plaintiff requests the opportunity to supplement this Post-Trial Memorandum.

[2] The original named plaintiffs in this action were IndyMac Mortgage Holdings, Inc. d/b/a Warehouse Lending Corporation of America, and IndyMac, Inc. On August 10, 2001, the Court dismissed the claims of IndyMac, Inc., without prejudice to those claims being brought in the state of California, due to the presence of a forum selection clause in the operative contracts upon which those claims were based. (8/10/01 Rulings on Various Motions.) On September 22, 2003, the Court ordered that IndyMac Bank, F.S.B., the successor in interest to IndyMac Mortgage Holdings, Inc., be substituted as the plaintiff in this action. (9/22/03 Rulings on Various Pending Motions.)

922340.DOC

falsifying documents and intentionally providing false and misleading information to IndyMac, in reliance upon which IndyMac loaned money to Mostafa Reyad under a warehouse line of credit and as a result of which IndyMac suffered damages.  Wafa Reyad is sued as the guarantor of her husband's obligations under the Credit Facility Documents.  IndyMac also alleges that Mostafa Reyad's conduct in connection with the warehouse line of credit violates the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq.

Mostafa Reyad pleads special defenses that IndyMac Mortgage Holdings, Inc. never did business as Warehouse Lending Corporation of America and it was not the proper party to bring this case against Defendants.  (8/14/02 Claimant Mostafa Reyad's Amended Answer and Counterclaim to Counter-Defendants Amended Complaint.) Mostafa Reyad also has alleged counterclaims of: (1) false pretenses against the United States; (2) false pleadings; (3) monies due claimant; (4) abuse of process; (5) vexatious litigation; (5) breach of fiduciary duty; (6) theft; (7) civil conspiracy; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; and (10) loss of consortium.  (8/14/02 Claimant Mostafa Reyad's Amended Answer and Counterclaim to Counter-Defendants Amended Complaint.)

Wafa Reyad has alleged counterclaims of: (1) abuse of process; (2) vexatious litigation; (3) intentional misrepresentation; (4) defamation; (5) intentional infliction of emotional distress; and (6) loss of consortium.  (8/14/02 Wafa Reyad Amended Answer and Counterclaim.)

Plaintiff pleads affirmative defenses to Defendants' counterclaims that: Defendants' claims fail to state a claim upon which relief may be granted; Defendants'

claims are barred by the doctrine of unclean hands; Defendants' claims are barred by

the doctrine of estoppel; and to the extent that Defendants assert any claims against

IndyMac, Inc., this Court lacks jurisdiction over said party due to insufficient service of

process. (10/3/03 Plaintiff's Answer, Affirmative Defenses and Reply to Claimant

Mostafa Reyad's Counterclaim and Special Defense; 10/3/02 Plaintiff's Answer and

Affirmative Defenses to Wafa Reyad's Counterclaim.)

**STIPULATED FACTS**

The parties have stipulated to the following facts.  (11/18/03 Joint Trial

Memorandum, Section 5; 4/6/04 Trial Transcript ("Tr."), at 22-23.[3])

1.     On or about December 6, 1996, Mostafa Reyad and Independent Lending

Corporation d/b/a Warehouse Lending Corporation of America ("WLCA") entered into a

written Master Revolving Loan and Security Agreement (the "Loan Agreement"), and

Promissory Note ("Note").  Pursuant to the terms of the Loan Agreement and Note,

WLCA agreed to lend to Mostafa Reyad, subject to certain terms and conditions, money

which Mostafa Reyad would in turn use to fund qualified residential mortgage loans.

The money advanced to Mostafa Reyad would be made under a "warehouse line".

Mostafa Reyad agreed to pay to WLCA, within certain prescribed time periods, principal

---

[3] At the outset of the bench trial of this action, the Court confirmed that the parties
stipulated to the facts set forth in the Joint Trial Memorandum:

> THE COURT:  It's the Joint Trial Memorandum, November 2003.  And I'm looking at
> section five which has Stipulations of Fact and Law.
> MR. REYAD:  Yes, your Honor, I agree.
> THE COURT:  I'm sorry.
> MR. REYAD:  Yes, I agree, because I signed it.
> THE COURT:  So you agree those are to be considered by me as true, right?
> MR. REYAD:  Yes, your Honor.

(4/6/04 Tr., at 23.)

922340.DOC

and interest borrowed against this warehouse line in accordance with WLCA's requirements, all as more fully set forth in the Loan Agreement.

2.      As part of the same transaction, Mostafa Reyad executed a Variable Terms Letter ("Letter"), which gave effect to and established certain lending criteria between Mostafa Reyad and WLCA.

3.      Under the Loan Agreement and Letter, Mostafa Reyad granted to WLCA, among other things, a first lien security interest in the mortgage loans originated by Mostafa Reyad using WLCA's loan funds.  This lien provided WLCA with security for Mostafa Reyad's obligations under the Loan Agreement and the Letter.

4.      In addition, by written Credit Guaranty (individual) Agreements dated December 6, 1996 ("Credit Guarantees"), Mostafa Reyad and Wafa Reyad guaranteed payment when due of all obligations to WLCA under the Loan Agreement and Letter. The Loan Agreement, Note, Letter and Credit Guarantees are collectively referred to hereinafter as the "Credit Facility Documents".

5.      Among other things, the Credit Facility Documents provide that Mostafa Reyad must supply accurate and complete information regarding the collateral that secured Mostafa Reyad's credit facility.

6.      At the time this action was initiated, the outstanding balance on the warehouse line was approximately $5,700,000.  Mostafa Reyad had borrowed this $5,700,000 under his warehouse line to fund a total of 33 mortgage loans, identified as follows:

922340. DOC

| Loan Number | Borrower | Fund Date | Warehouse Line Advance Amount |
|---|---|---|---|
| 3254906 | Drzal | 4/19/00 | 138,946.00 |
| 1580191058 | Barran | 3/30/00 | 152,800.32 |
| 1580196710 | Tahir | 4/18/00 | 184,500.00 |
| 1580196379 | Bakry | 4/19/00 | 96,566.51 |
| 1580193188 | Smorczewski | 4/05/00 | 184,646.42 |
| 3251289 | Zbylut | 3/31/00 | 58,914.77 |
| 652058 | Lyons | 4/05/00 | 480,183.29 |
| RW6800784 | Abreu | 3/21/00 | 34,624.24 |
| 602203 | Moazed | 4/19/00 | 487,403.00 |
| 3243524 | Browne | 4/17/00 | 178,486.00 |
| 3254639 | Browne | 4/17/00 | 9,800.00 |
| 3252099 | Antoine | 4/05/00 | 50,685.52 |
| 627700 | Dellasalla | 4/03/00 | 48,740.30 |
| 624775 | Elseedy | 4/04/00 | 64,386.00 |
| 600120 | Mishall | 3/10/00 | 255,886.42 |
| 644301 | Nyakana | 3/29/00 | 202,896.29 |
| RW625872 | Wilkinson | 3/29/00 | 39,067.21 |
| 613211 | Babinski | 4/17/00 | 240,294.61 |
| 650184 | Champagine | 4/14/00 | 47,715.88 |
| 630890 | Kirby | 3/24/00 | 84,960.11 |
| 648121 | Ortiz | 4/11/00 | 224,189.70 |
| 644195 | Perez | 4/17/00 | 126,230.01 |
| 645391 | Marlewski | 4/06/00 | 80,974.13 |
| 613068 | Silva | 3/23/00 | 10,327.25 |
| 348913 | Tarzia | 4/14/00 | 646,555.00 |
| 599162 | Zuiewski | 4/03/00 | 312,626.78 |
| 3251298 | Calderon | 3/31/00 | 148,917.96 |
| 649447 | Casella | 4/07/00 | 153,374.30 |
| 629522 | Flores | 3/14/00 | 230,985.25 |
| 611728 | Giraldo | 4/11/00 | 261,747.94 |
| 644170 | McEnroe | 4/13/00 | 312,086.60 |
| 463489 | Tarzia | 4/14/00 | 100,000.00 |
| 652205 | Jaku | 4/19/00 | 58,476.83 |
| | **Total:** | | **5,707,994.64** |

7.      Effective May 11, 1994, Warehouse Lending Corporation of America, Inc.

was incorporated in the State of Delaware.

8.      Effective October 5, 1994, Warehouse Lending Corporation of America, Inc. changed its name to Independent Lending Corporation.

9.      Effective January 31, 1997, Independent Lending Corporation merged with and into CWM Mortgage Holdings, Inc.

10.     Effective July 1, 1997, CWM Mortgage Holdings, Inc. changed its name to INMC Mortgage Holdings, Inc.

11.     Effective May 19, 1998, INMC Mortgage Holdings, Inc. changed its name to IndyMac Mortgage Holdings, Inc.

12.     Effective June 30, 2000, IndyMac Mortgage Holdings, Inc. changed its name to IndyMac Bancorp., Inc.

13.     On or about July 3, 2000, substantially all of the assets held by IndyMac Bancorp., Inc., including those previously held by the entity formerly known as IndyMac Mortgage Holdings, Inc., were assigned to IndyMac Bank F.S.B.

14.     On October 13, 1994, Independent Lending Corporation registered to do business under the trade name of Warehouse Lending Corporation of America in California by filing a Fictitious Business Name Statement in Los Angeles County, California.

15.     In August 1998, IndyMac Mortgage Holdings, Inc. registered to do business under the trade name of Warehouse Lending Corporation of America in California, Delaware and Connecticut by filing a Fictitious Business Name Statement in Los Angeles County, California, a Registration of Trade Names form in New Castle County, Delaware, and a Trade Name Certificate in Hartford, Connecticut.

16.     Plaintiff IndyMac Bank, F.S.B. is the successor in interest to WLCA.

6

**PROPOSED FINDINGS OF FACT**

In addition to the foregoing stipulated facts, IndyMac requests that the Court find the following facts based upon the evidence admitted at the bench trial of this action.

1.      The Credit Facility Documents were renewed on or about November 10, 1998.  The renewal of the Credit Facility Documents was memorialized by the original Loan Agreement (Pl.'s Trial Exhibit ("Pl.'s Ex.") 1; 4/6/04 Tr., at 34), which had no expiration date (4/6/04 Tr., at 60), as modified by a renewed Letter and Credit Guarantees dated November 10, 1998.  (Pl.'s Exs. 6, 7, 8; 4/6/04 Tr., at 60, 62.)  By letter dated November 11, 1999, the warehouse line of credit was extended until February 11, 2000.  (Pl.'s Ex. 9; 4/6/04 Tr., at 63.)  By letter dated March 6, 2000, the warehouse line of credit was extended until April 30, 2000. (Pl.'s Ex. 10; 4/6/04 Tr., at 63.)

2.      IndyMac required individual credit guarantees in order to do business with a mortgage banker such as Mostafa Reyad to provide recourse back to the individual responsible for the mortgage company, particularly in instances of fraud.  (4/6/04 Tr., at 56.)  While IndyMac typically did not require guarantees from spouses, in this particular case, because Mostafa Reyad's financial statement was prepared jointly with his wife and he was using primarily assets owned solely by his wife to demonstrate his credit worthiness, Wafa Reyad also executed an individual credit guaranty, guaranteeing payment when due of all obligations to WLCA under the Loan Agreement and Letter. (4/6/04 Tr., at 56-58; Pl.'s Ex. 28.)

3.      The Loan Agreement was "by and between Independent Lending Corporation, a Delaware corporation, doing business as Warehouse Lending

Corporation of America ("Lender"), and Mostafa Reyad, a sole proprietor, doing business as Federal Mortgage Company of Connecticut (the "Borrower")."  (Pl.'s Ex. 1, at 1.)  The Letter dated December 6, 1996 confirms the terms of the Loan Agreement between the "Borrower" and the "Lender", as set forth in the Agreement.  The Letter states that "Capitalized terms are used herein . . . , unless otherwise defined herein, with the same meanings as in the Agreement."  (Pl.'s Ex. 2, at 1.)  The renewal Letter dated November 10, 1998 contains identical language.  (Pl.'s Ex. 6.)  The Credit Guarantees executed by Mostafa Reyad and Wafa Reyad reiterate that, subject to the terms and conditions of the Loan Agreement, the "Lender" has agreed to extend credit to the "Borrower" in the form of a revolving loan facility, and that "Capitalized terms not otherwise defined herein shall have the meanings given such terms in the Credit Agreement." (Pl.'s Exs. 3,4,7,and 8, all at 1.)

4.      As part of the Loan Agreement, as an inducement to IndyMac to enter into the Agreement and to make the loans on the warehouse line as provided in the Agreement, Mostafa Reyad represented and warranted to IndyMac that, inter alia, all information contained in the mortgage loan packages sent by or on behalf of Mostafa Reyad to a permanent investor would be complete and accurate.  (4/6/04 Tr., at 47-51; Pl.'s Ex. 1, at 17-18, 29.)  Mostafa Reyad also represented and warranted that each Eligible Mortgage Loan that he procured was genuine in all respects and all information set forth therein would be accurate and complete.  (4/6/04 Tr., at 108; Pl.'s Ex. 1, at 38.) If any information contained in the credit file provided by or on behalf of Mostafa Reyad to a permanent investor contained inaccurate or incomplete information, such a

8

circumstance would constitute an event of default under the Loan Agreement.  (4/6/04 Tr., at 52-53; Pl.'s Ex. 1, at 23, 43.)

5.      Additionally, it would be an event of default under the Loan Agreement if Mostafa Reyad failed to repay any loan under the warehouse line within forty (40) days of the initial advance.  (4/6/04 Tr., at 51-52; Pl.'s Ex. 1, at 23.)

6.      Under the Loan Agreement, Mostafa Reyad specifically agreed that he would be responsible for paying all IndyMac's reasonable out-of-pocket expenses, including fees and disbursements of its attorneys, incident to the protection of IndyMac's rights under the Loan Agreement and related documents and to the enforcement of Mostafa Reyad's payment of his obligations under the Loan Agreement and related documents.  Mostafa Reyad also agreed, pursuant to the Loan Agreement, that the attorneys' fees and disbursements incurred in enforcing, or on appeal from, a judgment pursuant to the Loan Agreement shall be recoverable separately from and in addition to any other amount included in such judgment.  (4/6/04 Tr., at 51; Pl.'s Ex. 1, at 20.)

7.      Similarly, under the Credit Guarantees executed by Mostafa Reyad and Wafa Reyad, the defendants expressly agreed to pay reasonable attorneys' fees and all other costs and expenses incurred by IndyMac in enforcing the Guarantees.  (Pl.'s Exs., 3,4,7,8, all at 3.)

8.      Even though IndyMac (d/b/a Warehouse Lending Corporation of America) did not purchase any of the mortgages that Mostafa Reyad entered into with property owners, it nevertheless relied upon the accuracy of the credit file that Mostafa Reyad compiled with respect to each mortgage loan, because the quality of the credit package determines ultimately whether an investor is prepared to buy the underlying collateral,

9

i.e., the mortgage loan, and thereby repay the warehouse loan advanced by IndyMac for such mortgage loan within the requisite period (in this case, forty days).  (4/6/04 Tr., at 63-64.)  Under the Loan Agreement, IndyMac advanced funds under the warehouse line to Mostafa Reyad without performing a credit check because IndyMac relied upon Mostafa Reyad and the investor to confirm the credit worthiness of each mortgage applicant.  (4/6/04 Tr., at 69.)

9.    One important component of the credit file for each mortgage loan is the credit report, which provides a credit history of the mortgage applicant and summarizes the credit performance of the individual by assigning that individual a credit score. There are three different credit repositories that compile an individual's credit scores, each using their own scoring system.  The more favorable a borrower's credit score (e.g., prime borrower versus subprime borrower), the greater the amount that an investor may be willing to pay for a mortgage loan.  In some instances, such as no documentation loans, an investor may be willing to purchase for a lower premium a mortgage loan based only upon the credit score reflected in the credit file and the loan-to-value on the underlying property.  (4/6/04 Tr., at 64-68.)  In no event, however, would an investor accept a loan package without a credit report.  (4/7/04 Tr., at 15-16.)

10.    IndyMac, Inc. (formerly known as Independent National Mortgage Corporation) was one of the investors to which IndyMac permitted Mostafa Reyad to sell mortgages procured with the warehouse line of credit.  Mostafa Reyad was not required to sell his mortgages to IndyMac, Inc., and in fact, sold mortgages to other investors as well.  (4/6/04 Tr., at 37-38.)

11.     On or about April 20, 2000, IndyMac, Inc., was in the process of performing a quality control audit prior to its purchase of certain loans from Mostafa Reyad, funded with IndyMac's warehouse line of credit, when it identified misrepresentations in several loan files submitted by or on behalf of Mostafa Reyad. (See Pl.'s Exs. 32-39.)  Representatives of IndyMac, Inc. informed Brian Ainslie, Credit Manager of IndyMac's Warehouse Lending Division, of the discrepancies.  Mr. Ainslie immediately thereafter initiated an investigation into the circumstances as it related to the thirty-three (33) then-outstanding loans on Mostafa Reyad's warehouse credit line, totaling approximately $5.7 million dollars at the time.  At the same time, IndyMac ceased making additional advances to Mostafa Reyad on the credit line.  (4/6/04 Tr., at 27, 109-110, 160.)

12.     IndyMac ultimately determined that there were widespread misrepresentations in the loan files for the thirty-three loans that were outstanding on Mostafa Reyad's warehouse line as of April 19, 2000.  (4/6/04 Tr., at 110; Pl.'s Ex. 39.) Those thirty-three loans are set forth above in the parties' stipulation of facts, and also are listed on Pl.'s Ex. 40A.

13.     IndyMac offered as evidence at the bench trial of this matter numerous examples of the misrepresentations and false and/or inaccurate information contained in the loan files at issue, which this Court finds to be indicative of the widespread nature of the fraudulent and/or inaccurate representations and documents contained in such files.

14.     For example, the credit reports contained in the loan files for Francisco Ortiz (loan # 648121), Richard Lyons (loan # 652058) and Farzad Moazed (loan #

602203) had been altered from their original form, reflecting significantly better credit history and overall credit score than actually was the case.

15.     Prabhat Kumar, of Credit Research, Inc., credibly testified that the credit reports contained in the loan files for the above referenced loans, which on their face stated that they were generated by Credit Research, Inc., were <u>not</u> the same as the reports that had been generated by Credit Research, Inc. for those individuals, and in fact had been altered in such a way as to significantly improve the borrower's credit history and credit score.  (4/6/04 Tr., at 75-77, 95; Pl.'s Exs. 78-83.)  For example, the credit reports contained in these loan files reflected numerical designations not of the type generated by Credit Research, Inc.  (4/6/04 Tr., at 78-79, 86-87, 89; Pl.'s Exs. 78-83.)  Additionally, negative credit information, such as the fact that a borrower was not paying certain debts in a timely fashion, had been deleted from the original credit reports generated by Credit Research, Inc. (4/6/04 Tr., at 87-89; Pl.'s Exs. 80, 81.).  This information, if included in the credit reports ultimately submitted by Mostafa Reyad to prospective purchasers, would have impacted negatively the terms under which a lender would offer a mortgage to a borrower.  (4/7/04 Tr., at 47-48.)  Conversely, additional credit information that would improve a borrower's credit history, such as an additional mortgage, was added to the credit reports.  (4/6/04 Tr., at 90-91; Pl.'s Exs. 82, 83.)

16.     Most significantly, the altered credit reports reflected significantly higher credit scores than did the reports generated by Credit Research, Inc.  (4/6/04 Tr., at 85, 89, 91; Pl.'s Ex. 78-83.)  The credit scores reflected in an individual's credit report are the backbone of most lending decisions.  (4/7/04 Tr., at 46.)  The altered credit scores

would have had a significant impact on the terms under which a lender such as IndyMac, Inc. would be willing to purchase the loans at issue, and thereby repay the warehouse credit line advance for the loan.  (4/7/04 Tr., at 46-48.)

17.     The Court finds that Mostafa Reyad, or his employees under his direction, had the means to, and in fact did, access and alter the credit reports.  Credit Research, Inc. provided Mostafa Reyad's company, Federal Mortgage Company, with computer software that Federal Mortgage Company utilized to access the credit reports generated by Credit Research, Inc.    (4/6/04 Tr., at 104.)  Using the software, Federal Mortgage Company could access, view and print out the reports on its own printer at the offices of Federal Mortgage Company.  (4/6/04 Tr., at 105.)  The Court concludes, based on all the evidence before it, that the credit reports were altered by Mostafa Reyad, or his employees under his direction, and placed in the loan files submitted to potential investors.

18.     In addition to altered credit reports, many of the loan files submitted by Mostafa Reyad contained altered, and in some cases forged, verification of deposit ("VOD") forms, indicating that borrowers had substantially more funds on deposit at banks than was the case.

19.     For example, a VOD contained in the loan file submitted for Francisco Ortiz (loan # 648121) indicates that Mr. Ortiz maintained a checking account at People's Bank, account number 61-0046905, with a balance on March 24, 2000 of $14,601.98. (Pl.'s Ex. 62.)  In fact, bank records provided by People's Bank reveal that checking account number 61-00465905 was not held in the name of Francisco Ortiz.  (Pl.'s Ex. 63.)  Moreover, the account was not active on March 24, 2000; it had been closed on

13

February 7, 2000.  (Pl.'s Ex. 63.)  The Court finds that this VOD was either altered or a forgery.

20.     The loan file for Francisco Ortiz also contained a separate VOD indicating that Mr. Ortiz maintained a savings account at Fleet Bank, account number 0067082242, with a balance on March 23, 2000 of $23,100.00. (Pl.'s Ex. 51.)  Bank records provided by Fleet Bank reveal that account number 0067082242 is not a savings account maintained by Mr. Ortiz.  Rather, it is a business account for Stamford Best Painting, with a balance on March 23, 2000 of $1,093.24.  (Pl.'s Ex.52.) Additionally, the VOD appears to be signed by Richard R. Tortora.  Mr. Tortora testified credibly at the trial of this action that it was not his signature on this document, and that he would not have authorized a VOD for an individual reflecting a business account balance.  (4/7/04 Tr., at 73-74.)  The Court finds that this VOD was a forgery.

21.     The loan file submitted for Kimberly Ziewski (loan # 599162) also contained a forged VOD. The VOD indicates that Ms. Ziewski maintained checking and savings accounts at People's Bank, 95 Main Street, New Canaan, with balances on March 7, 2000 of $27,982.06 and $194,371.45, respectively.  (Pl.'s Ex. 72.)  Account records from People's Bank reveal that Ms. Ziewski's checking account balance on March 6, 2000 was $685.54 (there was no account activity on March 7th); her savings account balance on March 7, 2000 was $12,285.64. (Pl.'s Ex. 74.)  Moreover, the VOD purports to have been signed by Marion Watson, C.B.R. at People's Bank.  An employee named Marion Watson never worked at People's Bank.  (4/6/04 Tr., at 154.)

22.     The loan files for borrowers Richard Lyons (loan # 652058), Tomasz Marlewski (loan # 645391), Tadeusz Zyblut (loan # 3251289), Clement Champagnie

14

(loan # 650184), Morgan Kirby (loan # 630890), Alberto Perez (loan # 644195) and Heraquido Silva (loan # 613068) similarly contained VOD's that reflect bank account balances significantly greater than was actually the case, and in some cases, reflect balances for accounts that did not exist.  (Pl.'s Exs. 47-50, 53-54, 64-71.)  Additionally, while the VOD's for borrowers Champagnie (Pl.'s Ex. 64), Kirby (Pl.'s Ex. 66) and Perez (Pl.'s Ex. 68) all purportedly were signed by an Annith Byrd at People's Bank, the signatures on each of the three documents appear to be different.  (4/6/04 Tr., at 151-152.)  Moreover, Alice Patrignelli, of People's Bank, 850 Main Street, Bridgeport, credibly testified at trial that, while it is her signature authorizing the VOD for borrower Silva (Pl.'s Ex. 70), the document had been altered after she signed it. (4/6/04 Tr., at 158.)  Finally, Richard Tortora of Fleet Bank credibly testified that the signature on the VOD for borrower Lyons (Pl.'s Ex. 47) was not his. (4/7/04 Tr., at 68.)  Based on the foregoing, the Court concludes that these VOD's also were altered and/or forged.

23.    The Court finds that Mostafa Reyad's employees, under his direction, altered and/or forged the VOD's and submitted them to IndyMac.  Richard Tortora credibly testified that when he realized that someone had forged his signature on VOD's, he confronted Mostafa Reyad's employee, Ayeshah Malik, who processed the forms.  Ms. Malik told Mr. Tortora that Mostafa Reyad forced her to do it.  (4/7/04 Tr., at 76-77.)  Mostafa Reyad himself admitted at his deposition on April 19, 2000, that two of his employees, Ayeshah Malik and Zeba Mohib, had forged documents, and that more of his employees may have been involved.  (4/7/04 Tr., at 114-115.)  Mostafa Reyad also testified at his deposition that he had previously admitted to IndyMac that one of his employees had submitted false VOD's, that another employee threw away three months

922340.DOC

of bank statements and forged a VOD to make it easier on herself, and that another of his independent contractors made up a VOD rather than performing the analysis of the bank statements to provide an accurate number.  (4/7/04 Tr., at 117-118.)  Further, Mostafa Reyad testified at his deposition that he agreed with IndyMac that the VOD for the Cassella loan also was inaccurate.  (4/7/04 Tr., at 120-121.)

24.     In addition to the altered and forged credit reports and bank account information, at least one of the loan files submitted by Mostafa Reyad contained false information regarding a borrower's employment and income.  The loan application for Alberto Perez (loan # 644195) dated April 12, 2000 indicated that Mr. Perez was employed as a senior supervisor at Rex Marina, Inc., and his gross monthly employment income was $5,500.  (Pl.'s Ex. 41.)  Additionally, the loan file for Mr. Perez contained a Verbal Verification of Employment form, indicating that Ayeshah Malik had confirmed with Steven Cosgrove at Rex Marina on March 22, 2000 that Mr. Perez was a senior supervisor and that he had been employed at Rex Marina since 1997.  (Pl.'s Ex. 42.)  Suzanne Brown, comptroller at Rex Marina, credibly testified that she responded to a written request for verification of employment for Mr. Perez from Federal Mortgage Company on February 14, 2000, informing Federal Mortgage Company that Mr. Perez was employed as a boat bottom painter/maintenance worker and his gross pay was approximately $1,600 per month.  (4/7/04 Tr., at 52-58; Pl.'s Ex. 128.)  Additionally, Ms. Brown credibly testified that Mr. Perez had been employed at Rex Marina only since March 2, 1999, and that a Steven Cosgrove never worked at Rex Marina.  (4/7/04 Tr., at 59-60.)

922340.DOC

25.     Based upon the evidence provided the Court, it is apparent that many, if not all, of the 33 loans outstanding on the warehouse line were obtained based on fraudulent and/or inaccurate representations and documents.  The false representations and documents include, but are not limited to, forged and/or altered documents regarding bank deposits, falsified credit histories, false information regarding borrowers' employment, and false representations of borrowers' income.

26.     Based upon the evidence before the Court, including the testimony of unbiased third-party witnesses Richard Tortora, Alice Patrignelli and Suzanne Brown, as well as the deposition testimony of Mostafa Reyad himself, the Court finds that Mostafa Reyad's employees prepared and submitted these falsified documents to IndyMac.  Given the pervasive misrepresentation involved, the Court further concludes that Mostafa Reyad either directed or condoned these fraudulent activities.

27.     In addition to submitting the fraudulent and/or inaccurate documents contained in the loan files, the Court finds that Mostafa Reyad also failed to repay the advances under the warehouse line of credit as required under the Credit Facility Documents.  As reflected in Pl.'s Ex. 40A, Mostafa Reyad failed to repay all but one of the thirty-three loans within forty days.[4]  Fourteen of the thirty-three loans advanced under the warehouse credit line were not repaid until well over one year from the date the loans were funded.  Moreover, in the case of one loan to borrower Jaku (loan # 652205), Mostafa Reyad subsequently refinanced the loan with another lender, but he

---

[4] At the time of the trial of this action, one loan advanced under the warehouse line to borrower Tarzia (loan # 463489) had not yet been repaid.  Since the trial, the borrower refinanced this loan, and the warehouse line advance was repaid.  Because IndyMac did not claim a loss with respect to this loan at the time of trial, the repayment of the Tarzia loan does not have a significant impact on IndyMac's damages in this action.

kept the proceeds and did not remit any monies to IndyMac to repay the amount advanced on the warehouse line for that loan ($58,476.83).  (4/6/04 Tr., at 119-120; Pl.'s Ex. 40A.)  Additionally, Mostafa Reyad failed to forward to IndyMac the credit files for two outstanding loans, including a loan in the amount of $100,000 to borrower Tarzia (loan # 463489), making it difficult for IndyMac to sell those loans to third parties.  (4/7/04 Tr., at 115-116, 120.)

        28.    Finally, the Court notes Mostafa Reyad's credibility in this matter.  Mostafa Reyad submitted a signed Personal Financial Statement dated February 2, 2000 to IndyMac, in which he indicated that he did not at that time have any outstanding or pending litigation, asserted or unasserted claims, contingencies, judgments, liens, defaults with creditors, or tax delinquencies.  (Pl.'s Ex. 28.)  Yet, Mostafa Reyad had settled a lawsuit brought against him by RFC for losses that RFC had incurred on eleven loans that it had purchased from Mostafa Reyad because the investment quality of the loans did not meet RFC's requirements, and, as of May 26, 2000, Mostafa Reyad still owed RFC $42,000 out of $227,000 that he agreed to pay RFC in settlement of the action.  (4/7/04 Tr., at 122-124.)  Additionally, Mostafa Reyad indicated on his Personal Financial Statement that he owned a cooperative apartment in Fort Lee, New Jersey, jointly with his wife, when his name was not, in fact, listed on the title for the cooperative apartment.  (4/7/04 Tr., at 124-124; Pl.'s Ex. 28.)  Mostafa Reyad also indicated in his Personal Financial Statement that there were no mortgages on the cooperative apartment, when he later testified that there were two mortgages on the property totaling $110,000 at that time.  (4/7/04 Tr., at 126; Pl.'s Ex. 28.)  Mostafa Reyad also indicated in his Personal Financial Statement that he received $133,000 of rental

18

income on property located in Edgewater, New Jersey and Greenwich, Connecticut. He failed, however, to indicate that one of the properties was owned by one of his children at the time. (4/7/04 Tr., at 125-126; Pl.'s Ex. 28.) It is apparent to the Court that Mostafa Reyad was not truthful with IndyMac during the course of their dealings.

29.     Mostafa Reyad's credibility is further undermined by his actions at the initiation of this litigation. On May 10, 2000, State Marshal Sanford P. Levine personally served Mostafa Reyad with the summons and complaint in this action, as well as an Order for Hearing and Temporary Restraining Order issued by this Court, restraining Mostafa Reyad and his wife, Wafa Reyad, from transferring or otherwise disposing of their property out of the ordinary course of business pending the hearing on Plaintiff's application for a prejudgment remedy and motion to disclose property, scheduled to be held on May 16, 2000. (Pl.'s Ex. 97, 98; 4/29/04 Tr., at 23-25.) State Marshal Levine credibly testified at the trial of this action that it was his usual practice to point out to an individual that he or she is being served with a restraining order. (4/29/04 Tr., at 26.) Notwithstanding the issuance and service of said restraining order, on May 11, 2000, Mostafa Reyad's wife, Wafa Reyad, executed in Fairfield County, Connecticut, a quit claim deed transferring property located in Greenwich, Connecticut, to the Reyads' son, David Sherif Reyad. (Pl.'s Ex. 99.)[5] On the same day, Wafa Reyad also executed—in Westchester County, New York—an indenture transferring her interest in property located in New York, New York, to David Sherif Reyad. (Pl.'s Ex. 129.)[6] Mostafa Reyad

---

[5] On their Personal Financial Statement dated February 4, 2000 submitted to IndyMac, the Reyads estimated the present market value of this property to be $250,000. (Pl.'s Ex. 28, at 3.)
[6] On their Personal Financial Statement, the Reyads estimated the present market value of this property to be $300,000. (Pl.'s Ex. 28, at 3.)

922340.DOC

denies that he informed his wife of the restraining order when he was served on May 10th. (4/7/04 Tr., at 104.)  The Court does not find this testimony credible, and concludes that Mostafa Reyad informed his wife of the restraining order on May 10, 2004, and directed or condoned Wafa Reyad's transfer of her property to their son on the following day (requiring Wafa Reyad to travel to two states to effectuate such transfer).


**PROPOSED CONCLUSIONS OF LAW**

**I.**     <u>**Plaintiff's Claims**</u>

The legal issues presented by Plaintiff's factual contentions are:

- Whether Mostafa Reyad's actions (individually and/or through his agents), by forging and falsifying documents and intentionally providing false and misleading information to IndyMac, and by failing to repay advances under the warehouse line when due, are breaches of the Credit Facility Documents, and if so, what damages should be assessed;

- Whether Mostafa Reyad and Wafa Reyad are liable to IndyMac under the Guarantees for the damages IndyMac has suffered as a result of Mostafa Reyad's breaches of the Credit Facility Documents; and

- Whether Mostafa Reyad's conduct as alleged is an unfair or deceptive practice carried out in trade or commerce in violation of the Connecticut Unfair Trade Practices Act, and if so, what damages should be assessed.

IndyMac requests that the Court enter conclusions of law with respect to these legal claims as follows.

A.     <u>Breach of Credit Facility Documents</u>

1.     The Loan Agreement provides that it "shall be governed by and construed in accordance with the laws of the state of California". (Pl.'s Ex. 1, at 26.)

922340.DOC

The Court therefore will apply California law in its analysis of Plaintiff's breach of contract claim.

2.     The elements of a breach of contract claim are the existence of the contract, performance by the plaintiff or excuse for nonperformance, breach by the defendant and damages.  <u>First Commercial Mortgage Co. v. Reece</u>, 108 Cal. Rptr. 2d 23, 34 (Cal. Ct. App. 2001) (citing 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading § 476, p. 570).  The Court concludes that Plaintiff has proven each of the elements of its breach of contract claim against Mostafa Reyad by a preponderance of the evidence.

3.     It is undisputed that Mostafa Reyad entered into the Loan Agreement and other Credit Facility Documents with Independent Lending Corporation d/b/a Warehouse Lending Corporation of America on or about December 6, 1996, and that Mostafa Reyad was bound by its terms.  (11/18/03 Joint Trial Memorandum, Section 5, Paragraph 1; 4/7/04 Tr., at 87-88.)  The Court concludes that the Loan Agreement and other Credit Facility Documents were in full force and effect through April 30, 2000.[7]

4.     The Court further concludes that Plaintiff, and its predecessors in interest, performed its obligations under the Credit Facility Documents.  Indeed, Mostafa Reyad has offered no evidence to the contrary.

5.     With respect to the defendant Mostafa Reyad's breach of contract, the Court concludes that the above described actions of Mostafa Reyad, individually

---

[7] The Court addresses Defendants' argument that Plaintiff is not the proper party to bring these claims against Defendants below in the Court's analysis of Defendants' affirmative defenses.

922340.DOC

and/or through his agents, are breaches of the Credit Facility Documents for which Mostafa Reyad is liable to Plaintiff.

6.     More particularly, the preparation by Mostafa Reyad's employees or agents of mortgage loan packages, funded by the warehouse line of credit, containing false representations and documents, including forged and/or altered documents regarding bank deposits, falsified credit histories, false information regarding borrowers' employment and false representations of borrowers' income, and the submission of that information to permanent investors, constitute egregious violations of subsections 10(l) and 10(n) of the Representations and Warranties of the Borrower set forth in the Loan Agreement, as well as the requirements for Eligible Mortgage Loans set forth on pages 38-41 of the Loan Agreement.  Each example of inaccurate, incomplete and falsified information contained in the credit files provided by Mostafa Reyad to investors constitutes an event of default under Paragraph 13(b) of the Loan Agreement.

7.     Additionally, Mostafa Reyad's failure to repay thirty-two (32) of the thirty-three (33) loans that were outstanding on the warehouse credit line as of April 19, 2000 within forty (40) days of their respective fund dates, and Mostafa Reyad's improper retention of the proceeds from the refinancing of the loan to borrower Jaku (loan # 652205), violate Paragraph 13(a) of the Loan Agreement.  Further, Mostafa Reyad's failure to forward to IndyMac the credit files for two outstanding loans, including the loan to borrower Tarzia (loan # 463489), violates Paragraph 7(i)(5) of the Loan Agreement.

8.    Mostafa Reyad offered no credible evidence at the trial of this action disputing the conduct outlined above that establishes Mostafa Reyad's breaches of the Credit Facility Documents.  He did not testify as part of his defense case, and he offered no other witnesses in his defense.

9.    Turning to the element of damages, the Court concludes that as a result of Mostafa Reyad's breaches of the Credit Facility Documents as aforesaid, Plaintiff has suffered damages.  See Cal Civ. Code § 3300 (2004) (the measure of damages for a breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom").

10.    IndyMac's losses on the warehouse line due to Mostafa Reyad's conduct consist of: (i) losses on loans purchased by IndyMac or its affiliated entities with the consent of Mostafa Reyad at prices agreed to by Mostafa Reyad, which prices were less than the amounts owed on the warehouse line with respect to those loans; (ii) losses due to Mostafa Reyad's retention of funds due to IndyMac when the loan for borrower Jaku was paid off by the borrower, which funds were the property of IndyMac but were never paid to IndyMac; (iii) losses suffered when IndyMac sold some or all of the remaining loans to third parties at prices less than the amounts owed on the warehouse line with respect to those loans; and (iv) losses suffered when the mortgage loans were paid off by the residential borrower and IndyMac suffered a loss due to unpaid interest or other fees and costs.

11.     Brian Ainslie credibly testified at trial concerning each of these elements of IndyMac's losses,[8] and the Court concludes that IndyMac's losses as of April 6, 2004 are accurately reflected on Plaintiff's Trial Exhibit 40A.[9]

12.     In addition, IndyMac has incurred substantial attorneys' fees as a result of Mostafa Reyad's breaches of the Credit Facility Documents, for which fees Mostafa Reyad is responsible pursuant to Paragraph 13 of the Loan Agreement.

B.     Liability under Credit Guarantees

1.     The Credit Guarantees executed by Mostafa Reyad and Wafa Reyad both provide that they "shall be governed by the laws of the state of California". (Pl.'s Exs. 3-4, 7-8, all at 4.)  The Court therefore will analyze Plaintiff's claim of liability under the Credit Guarantees pursuant to the California contract law set forth above.

2.     The Court concludes that the Credit Guarantees executed by Mostafa Reyad and Wafa Reyad are valid and binding.  Indeed, the defendants offered no credible evidence at the trial of this matter disputing this fact.  Neither Mostafa Reyad nor Wafa Reyad testified as part of their defense case, and they offered no other witnesses in their defense.

3.     As set forth above, the Court has determined that Mostafa Reyad has defaulted under the Credit Facility Documents.

---

[8] In this regard, the Court concludes that IndyMac acted properly to mitigate its damages by selling the outstanding loans at a reduced price.  (4/6/04 Tr., at 160-165.) See Questo v. Dorado, 136 Cal. App. 2d 332, 336 (Cal. Ct. App. 1955) (party to contract has duty to exercise reasonable care to minimize anticipated damages growing out of breach of contract, but has not to assume burden of wrongdoer nor to incur relatively large expenses on that account).

[9] Since April 6, 2004, Plaintiff has incurred additional attorney's fees, and prejudgment interest has continued to accrue.

922340.DOC

4.    Mostafa Reyad and Wafa Reyad each waived their right of notice of any non-performance under paragraph 9 of the Guarantees.  Further, pursuant to paragraph 7 and 9 of the respective Guarantees, Mostafa Reyad and Wafa Reyad each waived, among other things, their right to have IndyMac proceed against the Borrower first.

5.    The Court concludes that Mostafa Reyad and Wafa Reyad are joint and severally liable to IndyMac under the Credit Guarantees for the damages IndyMac has suffered as a result of Mostafa Reyad's breaches of the Credit Facility Documents.

6.    Additionally, pursuant to Paragraph 11 of the Credit Guarantees, Mostafa Reyad and Wafa Reyad are joint and severally responsible for the payment of IndyMac's reasonable attorneys' fees and all other costs incurred by IndyMac in enforcing the Guarantees.

C.    Violation of Connecticut Unfair Trade Practices Act

1.    The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).[10]

2.    The test for whether conduct is an unfair act or practice in violation of CUTPA consists of three parts: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the

---

[10] The choice of law provision in the Loan Agreement does not preclude a claim for wrongful conduct in violation of CUTPA.  See McKeown Distributors, Inc. v. Gyp-Crete Corp., 618 F. Supp. 632, 643 n.5 (D. Conn. 1985) (Cabranes, J.) (the parties' election to have the agreement "interpreted and governed by" Minnesota law does not preclude the plaintiff's CUTPA claim).

penumbra of some common law, statutory, or other established concept of unfairness;
(2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes
substantial injury to consumers [(competitors or other businessmen)]." <u>Willow Springs
Condominium Assn., Inc. v. Seventh BRT Development Corp.</u>, 245 Conn. 1, 43 (1998)
(alterations in original; internal quotation marks omitted); <u>see</u> <u>Thames River Recycling,
Inc. v. Gallo</u>, 50 Conn. App. 767, 785-86 (1998).   "A practice may be unfair because of
the degree to which it meets one of the criteria or because to a lesser extent it meets all
three . . . ." <u>Cheshire Mortgage Service, Inc. v. Montes</u>, 223 Conn. 80, 105-06 (1992);
<u>see</u> <u>Thames River Recycling, Inc.</u>, 50 Conn. App. at 786.  A violation of CUTPA can
also be established by showing conduct that is deceptive.  <u>Id.</u>; <u>Bailey Employment
System, Inc. v. Hahn</u>, 545 F. Supp. 62, 67-68 (D. Conn. 1982).  "Thus a violation of
CUTPA may be established by showing either an actual deceptive practice . . . or a
practice amounting to a violation of public policy."  <u>Cheshire Mortgage Service, Inc.</u>, 223
Conn. at 106.

   3. While a simple breach of contract claim may not support a CUTPA
violation, where there are substantial aggravating circumstances surrounding the
breach, a CUTPA claim will lie.  <u>Bowmont Corp. v. Krombacher Brauerei Bernhard
Gmbh & Co.</u>, Civil Action No. 3:02 CV 1969 (CFD), 2003 U.S. Dist. LEXIS 16606, at *
18-19 (D. Conn. Sept. 8, 2003).  The Court finds that such aggravating circumstances
are present in the instant action.

   4. The Court concludes that Mostafa Reyad's wrongful and fraudulent
conduct set forth above constitutes both unfair and deceptive practices carried out in
trade or commerce in violation of CUTPA.

5.    In this regard, the Court particularly notes Mostafa Reyad's role in directing or condoning his employee's preparation and submission of mortgage loan packages containing forged and/or altered documents regarding bank deposits, falsified credit histories, false information regarding borrowers' employment, and false representations of borrowers' income.  The widespread, pervasive and fraudulent misrepresentations involved in this scheme clearly satisfy the criteria set forth in the Federal Trade Commission's cigarette rule, adopted by the Connecticut Supreme Court in determining whether a practice is unfair in violation of CUTPA.  See Gebbie v. Cadle Co., 49 Conn. App. 265, 279 (1998).  Such conduct also clearly is deceptive in violation of CUTPA.  Indeed, the seriousness of the fraudulent conduct at issue led this Court to advise Mostafa Reyad of his Miranda rights before proceeding with his examination by Plaintiff's counsel.  (4/7/04 Tr., at 83-85.)

6.    Further evidence of Mostafa Reyad's wrongful conduct in violation of CUTPA is his collusion with his wife, Wafa Reyad, to transfer valuable assets out of her name the day immediately following the service upon Mostafa Reyad of a restraining order issued by this Court, prohibiting exactly such conduct.  The Court also notes that the provision to Plaintiff of the deceptive and untruthful financial information by Mostafa Reyad and Wafa Reyad in their Personal Financial Statement dated February 2, 2000 was both deceptive and unfair in violation of CUTPA.

7.    As outlined in the Court's Conclusions of Law with respect to Plaintiff's breach of contract claim, IndyMac has suffered ascertainable loss and damages as a result of Mostafa Reyad's wrongful conduct in violation of CUTPA, for which damages Mostafa Reyad is liable.  See Conn. Gen. Stat. § 42-110g(a).

922340.DOC

8.    In addition to compensatory damages, in light of the pervasive fraudulent conduct involved in this matter, the Court finds it appropriate to impose punitive damages upon Mostafa Reyad, in an amount equal to double the compensatory damages awarded.  See Conn. Gen. Stat. § 42-110g(a) ("The court may, in its discretion, award punitive damages . . . ."); Bailey Employment System, Inc. v. Hahn, 545 F. Supp. 62, 73 (D. Conn. 1982) (awarding punitive damages for CUTPA violation in double the amount of the actual damages in light of the blatantly intentional deceptive representations made to the plaintiff and others), aff'd, 723 F.2d 895 (2d Cir. 1983); see also Gargano v. Heyman, 203 Conn. 616, 622 (1987) (punitive damages may be awarded where evidence reveals reckless indifference to rights of others or an intentional and wanton violation of those rights); Nielsen v. Wisniewski, 32 Conn. App. 133, 137-38 (1993)(recovery of punitive damages under CUTPA required proof by only a preponderance of the evidence).

9.    The Court also concludes that Mostafa Reyad is responsible for the payment of IndyMac's reasonable attorneys' fees and costs incurred in connection with its pursuit of this claim.  See Conn. Gen. Stat. § 42-110g(d) ("In any action brought by a person under this section, the court may award, to the plaintiff, *in addition to the relief provided in this section*, costs and reasonably attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery.") (emphasis added).

## II.    Defendants' Affirmative Defenses

In "Claimant Mostafa Reyad's Amended Answer and Counterclaim to Counter-Defendants Amended Complaint" dated August 14, 2002, Mostafa Reyad pleads

922340.DOC

"special defenses" that IndyMac Mortgage Holdings, Inc. (one of the two original named plaintiffs in this action, and the predecessor in interest to the current plaintiff, IndyMac Bank, F.S.B.) never did business as Warehouse Lending Corporation of America and it was not the proper party to bring this case against Defendants.[11]  The Court's conclusions of law with respect to this contention follow.

1.    As the Court indicated in its Findings of Fact above, the Loan Agreement was "by and between Independent Lending Corporation, a Delaware corporation, doing business as Warehouse Lending Corporation of America ("Lender"), and Mostafa Reyad, a sole proprietor, doing business as Federal Mortgage Company of Connecticut (the "Borrower")."  (Pl.'s Ex. 1, at 1.)

2.     At the time it entered into the Loan Agreement on or about December 6, 1996, Independent Lending Corporation (which had legally changed its corporate name from Warehouse Lending Corporation of America, Inc., effective October 5, 1994) was properly registered to do business under the trade name of Warehouse Lending Corporation of America.  (See Stipulated Facts, supra, ¶¶ 7-8, 14; Def.'s Ex. 13, 14.)[12]

3.    Thereafter, as a result of a series of mergers and properly registered name changes, Independent Lending Corporation ultimately changed its name to IndyMac Mortgage Holdings, Inc., one of the initial named plaintiffs in this action.  (See Stipulated Facts, supra, ¶¶ 9-12; Def.'s Ex. 14, 15.)  IndyMac Mortgage

---

[11] Wafa Reyad does not plead any affirmative defenses in her operative pleading. (See 8/14/02 Wafa Reyad Amended Answer and Counterclaim.)

[12] The Court expressly rejects any argument by Mostafa Reyad that the Loan Agreement was invalid because Independent Lending Corporation of America continued to operate under the trade name Warehouse Lending Corporation of America after it had changed its legal corporate name.

922340.DOC

Holdings, Inc. also was properly registered to do business under the trade name of Warehouse Lending Corporation of America.  (See Stipulated Facts, supra, ¶15.)

4.    The Court finds, therefore, that the initial named plaintiff, IndyMac Mortgage Holdings, Inc., was entitled to enforce the obligations of the Credit Facility Documents against Mostafa Reyad.  See Texaco Ref. & Mktg., Inc. v. Delaware River Basin Comm'n, 824 F. Supp. 500, 507 (D. Del. 1993) (a statutory merger results in a combination of two corporations, with the surviving corporation attaining the property, rights, and privileges of the absorbed corporation, as well as retaining its own property, rights and privileges), aff'd, 30 F.3d 1488 (3d Cir. 1994); Argenbright v. Phoenix Finance Co., 21 Del. Ch. 288, 292 (Del. Ch. Ct. 1936) (when a consolidation or merger has taken place, the old corporations have their identity absorbed into that of the new corporation or the one into which they were merged); see also Heit v. Tenneco, Inc., 319 F. Supp. 884, 887 (D. Del. 1970) (all assets of the merged corporation, including any causes of action which might exist on its behalf, pass by operation of law to the surviving company).[13]

5.    Accordingly, the Court finds in favor of Plaintiff on Mostafa Reyad's "special defenses" that IndyMac Mortgage Holdings, Inc. (one of the two original named plaintiffs in this action, and the predecessor in interest to the current plaintiff, IndyMac Bank, F.S.B.) never did business as Warehouse Lending Corporation of America and it was not the proper party to bring this case against Defendants.

---

[13] Although the Loan Agreement provides that it is governed by California law, one California court has observed that "California law recognizes that the continuing legal existence of a corporation depends on the law of the state of incorporation."  CM Record Corp. v. MCA Records, Inc., 168 Cal. App. 3d 965, 967 (Cal. App. Ct. 1985) (looking to the law of the state of incorporation to determine whether appellant had capacity to maintain suit).

### III.   Defendants' Claims

Defendants have plead numerous counterclaims: (1) false pretenses against the United States; (2) false pleadings; (3) monies due claimant; (4) abuse of process; (5) vexatious litigation; (5) breach of fiduciary duty; (6) theft; (7) civil conspiracy; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; (10) loss of consortium; (11) intentional misrepresentation; and (12) defamation.

Plaintiff requests that the Court enter the following conclusions of law with respect to Defendants' counterclaims.

1.      Defendants presented absolutely no testimonial evidence in support of their counterclaims at the trial of this action.  Wafa Reyad did not testify at all at the trial, and Mostafa Reyad's limited testimony in response to direct examination by Plaintiff's counsel had no bearing on Defendants' counterclaims.  No other witnesses testified on Defendants' behalf.  At Defendants' request, the Court continued the trial for an additional day specifically to permit Defendants to present a witness in support of their counterclaims.  (4/7/04 Tr., at 159-160.)  When the Court reconvened for this purpose, not only did Defendants fail to call any witnesses in support of their counterclaims, but Wafa Reyad declined to come to court at all. (4/29/04 Tr., at 3-7.)[14]

2.      The only evidence offered by Defendants at the trial of this action in support of their counterclaims are the Defendants' exhibits admitted into evidence.[15] The Court finds such exhibits wholly unsupportive of any of Defendants' counterclaims.

---

[14] Wafa Reyad did not request an additional continuance of the trial due to her absence. (4/29/04 Tr., at 7.)

[15] The Court made clear the need to offer evidence in support of Defendants' counterclaims.  "THE COURT: Well, for your counterclaim, just so you're clear, you have to present evidence at this trial.  In other words, if you've attached something to a

3.     Accordingly, the Court concludes that Defendants have failed to meet their burden of proof with respect to each and every counterclaim alleged.

**CONCLUSION**

Plaintiff requests that the Court enter judgment in its favor on all counts of the operative Complaint, as well as with respect to all claims and affirmative defenses of Defendants.  Plaintiff requests that the Court award it compensatory damages in the amount of **$243,849.78** (IndyMac's losses of $322,553.37, less the $78,703.59 cash collateral retained by IndyMac), plus prejudgment interest at the rate of ten (10%) percent per annum accrued through the date of judgment.[16]  Through April 6, 2004, the prejudgment interest accrued on Plaintiff's damages totaled **$69,622.37** (the interest of $100,586.30 accrued on Plaintiff's losses, less the interest of $30,963.93 accrued on the cash collateral retained by IndyMac).  After April 6, 2004, prejudgment interest continues to accrue at the per diem rate of **$66.81**.[17]  Plaintiff requests that the Court

---

document you filed with the court previously, it's not evidence that I'm going to consider during the trial.  So if you've got any evidence on your counterclaim that you want to present to me, you've got to present it now."  (4/29/04 Tr., at 42-43.)

[16] The awarding of prejudgment interest in diversity actions is considered a substantive issue and is, therefore, governed by state law.  Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999).  Both Connecticut and California law provide for prejudgment interest at the rate of 10% per annum.  Conn. Gen. Stat. § 37-3a; Cal. Civil code § 3289(b) (2004); see also Pitney Bowes, Inc. v. Manufacturers Bank, No. 3:94CV01375(WWE), 1997 U.S. Dist. LEXIS 7701, at * 21-22 (March 7, 1997 D. Conn.) ("Under California law, the right to prejudgment interest is not discretionary. It must be awarded as a matter of right if the damages are certain or capable of being made certain by calculation.").

[17] This amount is arrived at by subtracting the value of the cash collateral ($78,703.59) from IndyMac's losses ($322,553.37), multiplying the resulting figure by 10%, and dividing the result by 365 days.

32

also award punitive damages in the amount of double Plaintiff's compensatory

damages, plus reasonable attorneys' fees and costs.[18]


                                    PLAINTIFF INDYMAC BANK, F.S.B.


                              By:   /s/ David R. Schaefer
                                    David R. Schaefer (ct04334)
                                    Rowena A. Moffett (ct19811)
                                    BRENNER, SALTZMAN & WALLMAN LLP
                                    Its Attorneys
                                    271 Whitney Avenue
                                    P.O. Box 1746
                                    New Haven, CT  06507-1746
                                    Tel. (203) 772-2600
                                    Fax. (203) 772-4008
                                    Email: dschaefer@bswlaw.com
                                            rmoffett@bswlaw.com

---

[18] At the pretrial conference in this action, the parties agreed to address at a separate hearing the amount of attorney's fees to be awarded, should the Court determine that such an award is appropriate.

922340.DOC

## **CERTIFICATE OF SERVICE**

This is to certify that a true and accurate copy of the foregoing was served by

United States first-class mail, postage prepaid, this 21st day of December, 2004 upon:


Mostafa Reyad
2077 Center Ave
#22D
Fort Lee, NJ  07024

Wafa Reyad
2077 Center Ave
#22D
Fort Lee, NJ  07024



    /s/ David R. Schaefer
David R. Schaefer

34

922340.DOC