**UNITED STATES COURT**
**DISTRICT OF CONNECTICUT**

_____

INDYMAC BANK, F.S.B.
                                        Plaintiff

              v.

                                                **DATE: June 16, 2005**

MOSTAFA REYAD AND WAFA REYAD
                                        Defendant
_____

**DEFENDANTS' PROPOSED FINDINGS OF FACTS AND**
**CONCLUSION OF LAW**

Defendants Mostafa Reyad [hereafter Defendant] and Wafa Reyad [hereafter Co

Defendant] respectfully submit the instant proposed findings of fact and

conclusion of law. Defendant filed on October 20, 2004 with the Second Circuit

Court of Appeals for a writ of mandamus and served all parties, and filed on

October 21, 2004 a motion to stay pending mandamus (Doc # 434); pending

before this Court. The Second Circuit denied Defendant's mandamus and issued

its Mandate on March 9, 2005. Defendant's filed on March 16, 2005 his motion

with the Circuit to stay the mandate pursuant to FRAP 41(2)(A) pending filing

with the Supreme Court of the United States. Defendant's Petition for Mandamus

was filed on April 6, 2005 and docketed on April 21, 2005. Todate no orders

issued from the Supreme Court. Thus, From October 20, 2004 to the present

date, Defendants believe that it is improper to file proposed findings of facts and

1

conclusions of law for the same issues which are subject to the Appeal in the Second Circuit and in the Supreme Court.

On April 21, 2005, Honorable Droney, U.S.D.J. Granted Defendant's motion doc # 437 to extend the time to retroactive date, as of 12/21/04 to file proposed findings of fact and conclusion of law (Doc # 454). Defendants became confused and now filing the instant proposed and conclusion, despite the facts that the jurisdiction now rests with the Supreme Court, however, Plaintiff filed on December 21, 2004 his post-trial memorandum (Doc # 441) and at p. 1 reserved his right to supplement his memorandum, Defendants have no objection and Plaintiff can file his supplement, in the due time.

## SECOND CIRCUIT LAWS BARRS ENTIRE ACTION

It is impossible to believe that the same Court and the same Judge who ordered that California law is the substantive law governs this action. It is the same Court's orders which garnished Defendants assets in the amount of $ 12.8 million, and did not leave a single dollar to Defendants to meet their normal life obligations. It is the same Judge who issued prejudgment remedy on April 30, 2004 calculating attorney's fees in this District, District of New Jersey and the Third Circuit Court of Appeals, and calculating more than $ 500,000 in predisposition of punitive damages pursuant to Connecticut CUTPA. And it is the same Court and the same Judge who reviewed the original and the amended complaints when it were filed. Now, the same Court and the same Judge, pursuant to the Federal Common law and pursuant to the Second Circuit laws

must dismiss Plaintiff's entire complaint, and to award Defendants all their actual

damages, and award Defendants punitive damages for Plaintiff's nuclear

malicious prosecution.


Judge Droney ordered on August 10, 2001, that this contract dispute is governed

by California law. Simple reading to all Plaintiff's filing before August 10, 2001

and after that date reveals that Plaintiff framed the entire claims based on

Connecticut Unfair Trade Practices Act "CUTPA". Plaintiff did not offer any basis

or relation to or even pled any of California law, and rested one hundred percent

on "CUTPA", **see** Plaintiff's Amended Complaint dated September 7, 2001 (Doc

# 165), and all its 9 pages. The only provision of law stated by Plaintiff in the 9

pages of the amended complaint is C.G.S. Sec 42-110 a **et seq** affirming that the

entire complaint is based only on the legal ground of CUTPA provisions, by the

simple application of FRCP, Rule 12(b)(6); Plaintiff fails to state a claim upon

which relief can be granted, and the entire complaint must be dismissed as a

matter of law. **See Valley Juice Ltd., Inc. v. Evian Waters of france**, docket

numbers 94-7813, 7817 and 95-7709 (2nd Cir. 1996)

 D. <u>Massachusetts Unfair Trade Practices Act</u>

Valley also brings a claim under MUTPA. **See** Mass. Gen. L. ch. 93A, Section 1
**et seq**. The district court directed a verdict against Valley on this claim, following
the authority of **Northeast Data Sys., Inc. v. McDonnell Douglas Computer
Sys**. Co., 986 F. 2d 607 (1st Cir. 1993), and **Worldwide Commodities, Inc. v. J.
Amicone Co**., 630 N.E.2d 615, 36 Mass. App. Ct. 304 (1994). In **Northeast
Data**, the court reasoned that, with respect to MUTPA claims that are in essence
reframed contract claims, a contractual choice of law clause specifying that the
"rights and obligations of the parties. . .  shall be governed by and construed in
accordance with the laws of California," would apply to MUTPA claims as well as
ordinary contract claims. **Northeast Data**, 986 F. 2d at 609. Since California had

no statute that paralleled MUTPA, the **Northeast Data** court affirmed dismissal of the claims. **Id**. at 611. The district court ruled that this was a parallel case, and directed verdict against Valley - - finding that since "the valid written agreement provides that New York law shall apply, a claim based on Massachusetts law is barred . . . . "

Similarly, the instant action based on California law. Defendant has filed in

pretrial stage at least 12 motions citing California law and its precedents, and

included several defenses pursuant to California law, and Plaintiff never respond

to any, it means that Plaintiff insisting upon his complaint pursuant to Connecticut

law of CUTPA. Judgment for Defendants favor should be issued.

**PLAINTIFF'S AMENDED COMPLAINT IS NOT ACTIONABLE**

Plaintiff's Post-Trial memorandum stipulated facts p. 3-6 may be frustrating,

however, Plaintiff is unethically attempts to implement that he did not read or he

does not understand the Joint Trial Memorandum dated November 18, 2003

"Article "B".   Indeed, Defendant admitted in the Court that he signed the

stipulation of fact and law, Article number 5. Defendant affirms that he signed

that stipulation only to the extend explained thoroughly in Article "B" p. 3-43, of

the Joint Trial Memorandum, Article number 5 and Article number 4 section "B"

are supporting and complementing each other. Thus Defendant signed Article 5

as explained in section "B", affirming the validity and the authenticity of the

documents assuring that this action is not actionable. It should be noted that

Plaintiff did not respond to any legal issues raised in Defendants' Trial

Memorandum, not to certain issues raised repeatedly, specifically related to

standing which intern relevant to subject matter jurisdiction pursuant to the

Second Circuit precedents and the applicable provisions of California law which

govern the choice of law of this action ordered by this Court.

**PLAINTIFF CANNOT MAINTAIN ANY ACTION PURSUANT TO CALIFORNIA CORPORATIONS CODE SECTION 2203 (c), AND SECTION 2105 (a) AND (b)**

Plaintiff is a criminal corporation violates the laws, Plaintiff entered into

agreements using corporate names different from its certificate of qualification

issued by California Secretary of State, and transacted business without that

certificate, and as a matter of law cannot maintain any action or proceeding

pursuant to **Cal. Corp. C. section 2203 (c).**

**California Corporation Code 2203 (c)**

A foreign corporation subject to the provisions of Chapter 21 (commencing with Section 2100) which transacts intrastate business without complying with Section 2105 **shall not maintain any action or proceeding** upon any intrastate business so transacted in any court of this state, commenced prior to compliance with Section 2105, until it has complied with the provisions thereof and has paid to the Secretary of State a penalty of two hundred fifty dollars ($250) in addition to the fees due for filing the statement and designation required by Section 2105 and has filed with the clerk of the court in which the action is pending receipts showing the payment of the fees and penalty and all franchise taxes and any other taxes on business or property in this state that should have been paid for the period during which it transacted intrastate business.

The records of this Court; Defendant's Exhibit # 14 show that all IndyMac

corporations are Delaware corporations having the principal place of business in

California; all are foreign corporations for the State of California, and are subject

to the provisions of **Cal. Corp. C. Chapter 21 (section 2100-2117),** and all are

transacting intrastate business. **See section  2105.**

**California Corporation Code 2105 (a), it stipulates in part.**

A foreign corporation shall not transact intrastate business without having first obtained from the Secretary of State a **certificate of qualification**.

## California Corporations Code 2105 (b)

Annexed to that statement and designation shall be a certificate by an authorized public official of the state or place of incorporation of the corporation to the effect that such corporation is an existing corporation in good standing in that state or place or, in the case of an association, and officers' certificate stating that it is a validly organized and existing business association under the laws of a specified foreign jurisdiction.

Chapter 21 forbid foreign corporations to maintain any action without obtaining first from California Secretary of State a **certificate of qualification** stating its name, and the state or place of its incorporation or organization. The section allows foreign corporations to register its corporate name, by filing an application, and a certificate by an authorized public official of the state or place in which it is organized [in this action, the authorized public official should be the Department of corporation of the State of Delaware], stating that such corporation is in good standing under those laws, and such registration shall be effective until the close of the calendar year in which the application for registration was filed. It is undisputely that Plaintiff transacted business with Defendant for the first time on December 6, 1996, and the records show that WLCA ceased to exist October 5, 1994 there was no registration, and there was no certificate of qualification mandated by section 2105, and WLCA is a nonqualified foreign corporation cannot maintain any action for any contract, it entered to after October 5, 1994, **see**, **United Medicial Management Ltd. v. Gatto** (1996) 49 Cal. App. 4th 1732 [57 Cal. Rptr. 2d 600], (Once a nonqualified foreign corporation commences an

6

action regarding intrastate business, the defendant may assert by demurer or as an affirmative defense in the answer the Lack of Capacity to maintain an action arising out of intrastate business) **Id**. 1740; **Timberline, Inc. v. Jaisinghani** (1997) 54 Cal. App. 4th 1361 [64 Cal Rptr. 2d4]. Accordingly, WLCA cannot maintain any action for any contract, it entered into after it ceased to exist pursuant to the law; **see 8 Del**. **C. sections 259 (a)**; pursuant to the above authorities, all these contracts are illegal and cannot be assigned to any other entity, because of its illegality, and **see 8 Del. C. 278**, it cannot sue or be sued. The law leaves all parties to an illegal agreement where it finds them and gives no relief. **See**, Second Circuit Ruling in **Celardo v. Preferred Choice MGT**, docket No. 02-7209 decided January 27, 2003 (while Celardo would have us hold that "illegal" means "criminal", this interpretation contravenes the plain, common-sense meaning of "illegal". The Dictionary definition of "illegal" is contrary to or violating a law or rule or regulation having the force of the law). **Id.** ; **Kaiser Steel v. Mullins** 455 U.S. 72, 77; it Ruled "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way toward carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it" **Id.**; **NLRB v. Local 46**, case No. 97-4021 (2nd Cir) it Ruled "in such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties". **Id. See Golden v. Bellevue** civil action No. 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, Court of Common Pleas of Delaware, New Castle, it

Ruled "Unlike the Delaware Corporation law, which provides that unchartered or defectively chartered domestic corporations and unregistered foreign corporations may not have access to the Delaware Courts". **Id**. Thus WLCA has no access to Delaware courts, and consequently has no access to any court.

**See** also **CM Record Corp. v. MCA Records, Inc**. (1985) 168 Cal. App. 3d 965, 968 [214 Cal. Rptr. 409] "No corporation shall maintain an action . . . . for the enforcement of a contract, made . . . . . after the forfeiture of its certificate; **Id**.; **Cappiello, Hoffman & Katz v. Boyle** 2001, Cal. App. 4th No. A089477 (Only lawful enterprises are entitled to the protection of the courts when wrongfully disrupted). **Id**.

Plaintiff cited in their opposition to summary judgment (Doc # 288) three (3) precedents  1) **Texaco Ref. & Marketing, Inc. v. Delaware River Basin Comm'n**, 824 F. Supp. 500, 507 (D Del. 1993), **Argenbright v. Phoenix Finance**, 21 Del. Ch 288, 292 (1936), and **Heit v. Tenneco Inc**. 319 F. Supp. 884, 887 (D Del. 1970), all the three (3) cases are misplaced, all these cases are for legal transactions while corporations were in good standing before merger or consolidation. This action is different; WLCA transacted contrary to the law while it had no charter or power to enter into contracts. Accordingly, WLCA lacks capacity to sue and Plaintiff lacks standing, and consequently, this Court lacks subject matter jurisdication.


**See**, also **Victor Rayhall v. Akin Company, Inc. et al**, Conn. Supreme Court (SC 16685); April 29, 2003.

An appellant, like the plaintiff her, still must, however, satisfy other prerequisites to jurisdiction, such as the final judgment rule; *Cantoni v. Xerox Corp.*, 251 Conn. 153, 160, 740 A. 2d 796 (1999); standing; *Connecticut Business & Industries Assn., Inc. v. Commission on Hospitals & Health Care*, 214 Conn. 726, 729-30, 573 A.2d 736 (1990); exhaustion of administrative remedies*; Polymer Resources, Ltd. v. Keeney*, 227 Conn. 545, 563, 630 A. 2d 1304 (1993); and ripeness. *Waterbury v. Washington*, 260 Conn. 506, 543, 800 A.2d 1102 (2002); cf. *Sasso v. RAM Property Management*, 431 So. 2d 204, 208 (Fla. App. 1983) (court has jurisdiction to consider appeal raising constitutional challenge to statute despite administrative agency's lack of jurisdiction over issue; court lacks jurisdiction if appellant lacks standing or controversy not ripe), aff'd 452 So. 2d 932, appeal dismissed, 469 U.S. 1030, 105 S. Ct. 498, 83 L. Ed. 2d 391 (1984).

Simply put, Plaintiff lacks standing and the Court must dismiss Plaintiff's

amended complaint; **Lerner v. Fleet Bank, N.A**. docket Number 01-7755

(January 22, 2003, 2nd Circuit). The Second Circuit remanded the case to the

District Court for state-law claims. In the instant action, California law makes it

clear that Plaintiff cannot maintain any action.


**INDEPENDENT LENDIING CORPORATION D/B/A WLCA, AND INDYMAC MORTGAGE HOLDINGS, INC. D/B/A WLCA ARE ILLEGAL REGISTRATIONS PURSUANT TO CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 14415.**


## Cal. Bus. & Prof. Code section 14415

The filing of articles of incorporation pursuant to Section 200 of the Corporations Code, in the case of a domestic corporation, or the obtaining of a certificate of qualification pursuant to Section 2105 and 2106 of the Corporation Code, in the case of a foreign corporation, shall establish a **rebuttable presumption** that the corporation has the exclusive right to use a trade name, in the state the corporate name set forth in the articles or certificate, as well as any confusingly similar trade name, if the corporation is the first to have filed the articles or obtained the certificate containing the corporate name, and is actually engaged in a trade or business utilizing that corporate name or a confusingly similar name.
If a foreign corporation continues to have authority to transact intrastate business pursuant to Section 2102 of the Corporations Code, the foreign corporation shall be considered to have obtained its certificate of qualification pursuant to law for

the purposes of this section on the date it first qualified to transact intrastate business in this state.

The **rebuttable presumption** created by this section affects the burden of producing evidence.

And more specifically <u>see</u> **Cal. Corp. C. Section 2106 (b)(2);** stipulates in Part:

> **"the foreign corporation agrees that it will transact business in this state under an assumed name disclosed to the Secretary of State and that assumed name in all of its dealings with the Secretary of State and in the conduct of its affairs in this State"**

The illegality of a corporation by entering into contract while it has no charter, no corporate power, and no certificate of qualification cannot be curred by any other mean. The illegal contract cannot be claimed as a legal document in case of future merger or future consolidation as Plaintiff trying to consider. It is unenforceable, null and void. Merger or consolidation will not change its illegality status, and does not survive a defunct corporation.

Courts records, and the records of the State of Delaware do not show, a dual corporate name for Independent Lending Corporation or IndyMac Mortgage Holdings, Inc. Neither corporation has or had doing business name in its certificate. The name of Independent Lending Corporation doing business as WLCA, and the name of IndyMac Mortgage Holdings, Inc. doing business as WLCA, are fraudulent names, the names are contrary to California law and Delaware law. Plaintiff admits that Independent Lending Corporation as well as IndyMac Mortgage Holdings Inc. did transact business under the trade name WLCA, at the time it filed the instant action, and Plaintiff filed a declaration affirming that statement, is a declaration that Plaintiff admits corporate crimes.

**See** **Cal. Bus. & Prof. C. Division 6 Chapter 3** Trade names and designations

**(Section 14401-14418). Section 14411** allows filing any fictitious business name

pursuant to **section 17910** will establish a *rebuttable presumption* that the

registrant has the exclusive right to use as a trade name the fictitious business

name, and **section 14415** explains the *rebuttable presumption*;  the obtaining

of a certificate of qualification pursuant to **section 2105** and **2106** of the

Corporations Code, in the case of foreign corporation will establish the

*rebuttable presumption* that the corporation has the exclusive right to use a

trade name in the state the corporate name set forth in the articles or certificate,

as well as any confusingly similar trade name, and the foreign corporation shall

be considered to have obtained its certificate of qualification pursuant to the law.

The *rebuttable presumption* created by this section affects the burden of

producing evidence; however, the records show different material evidence

indicating fraud upon registrations' authorities, in California, Delaware and

Connecticut.


Court's records show that Plaintiff acted contrary to the law and abused the

"*rebuttable presumption rule*" by filing two (2) certificates contrary to this rule.

Plaintiff filed contrary to the law 1) fictitious business name of Independent

Lending Corporation doing business as WLCA, and 2) fictitious business name of

IndyMac Mortgage Holdings, Inc. doing business as WLCA, both are illegal. The

filing of the fictitious business names also, are contrary to the law pursuant to

**Cal. Bus. & Prof. C. section 17910.5 (a)**, it forbid filing a name includes

"corporation" unless that fictitious business named corporation is organized pursuant to the laws of California or some other jurisdiction. Thus, the names of the two (2) fictitious business names for Independent Lending Corporation doing business as WLCA and IndyMac Mortgage Holdings, Inc. doing business as WLCA, are illegal names, because there are no certificate of qualification issued from California Secretary of State having theses names, and pursuant to **Cal. Corp. C. section 2203 (c),** neither stated name can maintain any action, and all contracts including these names as stated above are illegal contracts unenforceable. Plaintiff provided a trade name registration in New Castle County, Delaware. Plaintiff registered a trade name in the place designated for partnerships and associations, which is a county recorder office; the place has nothing to do with corporations. A corporation is a state creature, not county or town creature, and that illegal registrations collectively does not change the State records.

<u>See</u>, also Black's Law Dictionary for the definition of "**Corporate Entity**", "**Corporate name**",  and "**Fictitious name**".

**Corporate entity**. The distinct status of a corporation which sets its existence apart from the status of its shareholders; **its capacity to have a name of its own, to sue and be sued in its own name** as well as the right to buy, sell, lease and mortgage its property in **its own name**.

**Corporate name**. When a corporation is formed state statues require that such be given a name and **such name is kept on record** with the proper state authority (e.g. Secretary of State's office). Only by and under such name may the corporation sue or be sued **and do all legal acts**.

**Fictitious name**. Name of unincorporated business. Statutes usually require owner to file certificate of fictitious name; e.g. Joe Smith (real name); Joe's Pizza Place (fictitious name).

The legal authorities demonstrated above render, that Neither Independent Lending Corporation, Nor Indymac Mortgage Holdings, Inc. has the authority to transact business under the fictitious business name or the trade name of WLCA. Accordingly, Plaintiff's entire complaint is defective, warrant complete dismissal, and Plaintiff is not entitled to discovery, and is not entitled to provide evidence without regard to the underlying factual merits.  **See** **Allen Dotson v. The Honorable Thomas P. Griesa**, et al, No. 01-6248 (February 2, 2005 Second Circuit)

> *The first three points may be disposed of without discussion. First, a district court acts well within its discretion in deciding dispositive motions on the parties' written submissions without oral argument. **See generally AD/SAT v. Associated Press**, 181 F. 3d. 216, 226 (2nd Cir. 1999). Second, a plaintiff is not entitled to discovery if his pleadings are fatally and incurably defective as a matter of law. See, e.g., M.B. # 11072-054 v. Reish, 119 F. 3d 230, 232 (2d Cir. 1997) (per curiam); **Flaherty v. Coughlin**, 713 F. 2d 10, 13 (2d Cir. 1983). Third, contrary to Dotson's argument, the district court's ruling assumes the truth of all allegations pleaded in Dotson't complaint. In any event, where pleadings are legally defective, dismissal is warranted without regard to the factual merits of a plaintiff's underlying claim. **See, e.g., Steel Co. v. Citizens for a Better Env't**, 523 U.S. 83 (1998). **Id**. p. 3 of 49*

**DEFENDANTS' DUE PROCESS HAVE BEEN VIOLATED**

Although this action is not actionable, it charcherized by deprivation of Constitutional rights granted by the Eighth and Fourteenth Amendments.

These depriviations invalidate any judgment; order; or proceeding as a matter of law.


**THE EIGHTH AMENDMENT VIOLATIONS**


It is fact evinces by documents provided to this Court, that, Defendant and Co-Defendant severally and collectively are under seize for a period of more than five years for every dollar they claim. The documents read the total of eighteen and half million dollar ($ 18.5 million) in garnishments against Defendants, while Plaintiff claiming falsely $ 243,849.78 in actual damages. Simple calculation reveal that this District and New Jersey District garnishment orders for the same cause of action, are equal to a little more than seventy-five (75) times of plaintiff's false unactionable claims, and even if it actionable claims, is still grossly excessive, and therefore unconsistutional.


**See Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,** No. 99-2035, U. S. Supreme Court  May 14, 2001.

The Court has enforces those limits in cases involving deprivation of life, *Emmund v. Florida* 458 U.S. 782, 787, 801 (1982) (death is not "a valid penalty under the Eighth and Fourtheen Amendments for one who neither took life, attempted to take life, nor intended to take life"); *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (opinion of White, J.)(sentence of death is "grossly disproportionate" and excessive punishment for the crime of rape); deprivations of liberty, *Solem v. Helm*, 463 U.S., at 279, 303 (life imprisonment without a possibility of parole for nonviolent felonies is "significantly disproportionate"); and deprivations of property, *United States v. Bajakajian*, 524 U.S. 321, 324 (1998)(punitive forfeiture of $

357,144 for violating reporting requirement was "grossly disporporational"
to the gravity of the offense); Gore, 517 U.S.,
At 585-586 ($ 2 million punitive damages award for failing to advise
customers of minor predelivery repairs to new automobiles was "grossly
excessive" and therefore unconstitutional).  **Id**. page 5 of 14.

Plaintiff who lacks capacity to sue pursuant to California law; Cal. Corp. C.

Sec. 2203 (c) falsely claiming $ 243,849.78, based on Connecticut

CUTPA, and never cites a single provision of California law is precluded to

invoke California law after the expiration of the California Statute of

limitation of contract claims, in other words Plaintiff is precluded to amend

his complaint by citation of Cal. Civ. C. Sec 3300. Plaintiff's post-trial

memorandum p. 23. Nevertheless, Plaintiff's attorney sanctionably citing

the provision and deleting "except where otherwise expressly provided by

this Code", see Cal. Civ. C. Sec. 3301; it stipulates.

> No damages can be recovered for a breach of contract which are
> not clearly ascertainable in both their nature and origin.

The section is making it clear, that, in a dispute of breach of contract like

the unactionable allegations of Plaintiff in this action, a plaintiff would not

recover any damages unless he provides ascertainable evidence. Plaintiff

provides at Trial Plaintiff's Exhibit 40A is not an ascertainable evidence.

Plaintiff was successful to acknowledge certain exhibits for only 10 loans

out of the 33 loans, and Defendant was successful to acknowledge

exhibits obtained from Plaintiff's premarked exhibits obtained from

Plaintiff's premaked exhibits for 3 loans out of the 10 loans acknowledged

for Plaintiff. The end result, Plaintiff owes Defendant $ 23,176.94 as per

Plaintiff's exhibits alone. That same Plaintiff destroyed Defendant, Co-Defendant and their children by the devastated nuclear attachments and garnishment for a period exceeding five years.

## THE FOURTEENTH AMENDMENT VIOLATIONS

It is undisputed fact that Defendant suffered actual damages in the amount of fifteen million dollar caused by closing his business for the past five years when his business bank account was garnished. The Court had been provided by documents evincing that Honorable William I. Garfinkel, U.S.M.J., issued eight garnishment orders in the total amount of $ 12.8 million. These eight orders undisputedly issued not only without notice to Defendants, but also without the knowledge of the United States. Surprisingly, Defendants appear in Court at all times, and more surprisingly that there is no records in the Court of these eight orders. Shuckingly, the District Judge knows nothing about it for a period of four years, and when he became aware about it, he denied reviewing it, that denial is another deprevation of equal protection of law granted by the Fourteenth Amendment, Section 1., **see Peralta v. Heights Medicial Center, Inc**. 485 U.S. 80, 84-85 (1988)

In opposition to summary judgment, appellant denied that he had been personally served and that he had notice of the judgment. The case proceeded through the Texas courts on that basis, and it is not denied by appellee that under our cases, a judgment entered without notice or service is constitutional infirm. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded

finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objection." "Mullan v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). <u>Failure to give notice violates "the most rudimentary demands of due process of law." Armstrong v. Manzo, 380 U.S. 545, 550 (1965)</u>. See also World-Wide Volkswagen Corp. v. Woodson, <u>444 U.S. 286, 291</u> (1980); Mathews v. Eldridge, <u>424 U.S. 319, 333</u> (1976); Zenith Radio Corp. v. Hazeltine Research, Inc., <u>395 U.S. 100, 110</u> (1969); Pennoyer v. Neff, <u>95 U.S. 714, 733</u> (1878). **Id**.

In addition to the above deprivation of the Constitutional rights of the

Eighth and Fourteenth Amendments, the prejudgment remedy applied in

this action for a contract dispute is contrary to the Supreme Court

decitions in its long history.

**<u>see</u> <u>De Beers Consol. Mines v. United States</u>**, 325 U.S. 212,222,223 (1945)

And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence. **_Id_**.

**<u>See</u>**, also **_<u>Grupo Mexicano De Desarrollo, S.A. v. Alliance Bond Fund</u>_**, 527

U.S. 308 (1999); n6 and n7.

As we stated in _<u>Adler v. Fenton, 65 U.S. 407, 24 HOW 407, 411, 412, 16 L. Ed. 696 (1891</u>_**)**. Our laws determine with accuracy the time and manner in which the property of a debtor ceases to be subject to his disposition, and become subject to the rights of his creditor. A creditor acquires a lien upon the lands of his debtor by a judgment; and upon personal goods of the debtor, by the delivery of an execution to the sheriff. It is only by these liens that a creditor has any vested or specific right in the property of his debtor. Before these liens are acquired, the debtor has full dominion over his property; he may convert one species of property into another, and he may alienate to a purchaser **_Id_**. n6.

> Several States have adopted the Uniform Fraudulent Conveyance Act (or its successor the Uniform Fraudulent Transfer Act), which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim. See generally P. Alces, Law of Fraudulent Transactions P5.04[3], p. 5-116 (1989). Insofar as Rule 18 (b) applies to such an action, the state statute eliminating the need for a judgment may have altered the common-law rule that a general creditor has no interest in his debtor's property. *Id*. n7.

Since day one of this action, May 8, 2000, Defendants due process have been violated. Indeed, it is a severe damageable violations, ended up by an actual damages to Defendant in the amount approximately fifteen million dollar, and actual damages to Co-Defendant in an amount approximately one million dollar, and extended by unfair trial to damage Defendants' daughter who is unable to sell her owned real estate property, which was purchased and owned by her.

This is United States Court obligated to adhere to Federal Rules promulgated by the Supreme Court; **La Buy v. Howes Leather Co**., 352 U.S. 249 (1957) (The Court of Appeals issued writs of mandamus requiring petitioner to vacate his orders of reference. Held: The Court of Appeals properly issued the writs of mandamus. Pp. 250-260). The Supreme Court affirmed mandamus is warranted where it was necessary to confine a lower court to an appellate tribunal's mandate, and where a district judge displayed a persistent disregard to the Rules of Civil procedure.

Defendant applied to the Second Circuit Court of Appeals for a mandamus, the Circuit denied review, however, the denial is not adjudication on the merits. This action shows injustice departure of Federal Rules cannot be justified under any set of facts or law.

1)      On May 9, 2000 Honorable Droney, U.S.D.J. Ordered "The defendants are ORDERED to restrain from transferring or otherwise disposing of their property out of the ordinary course of business pending said hearing" **Id**. p. 1 (Doc # 11). The order is contrary to FRCP 65(c), the order issued without ordering Plaintiff to post a bond or some type of security denies due process. The Court's Order relied on C.G.Stat Sec. 53-278(c), that provision of Connecticut Law specifically "per se" pronounced by the Supreme Court as unconstitutional, if it applied without posting a bond **see Connecticut v. Doehr**, 501 U.S.1 (1991).

> He doubted that the judge could reliably determine probable cause when presented with only the plaintiff's version of the altercation. "Because the risk of a wrongful attachment is considerable under these circumstances, we conclude that dispensing with notice and opportunity for a hearing until after the attachment, without a showing of extraordinary circumstances, violates the requirements of due process" 898 F. 2d, at 856. Judge Pratt went on to conclude that, in his view, the statute was also constitutionally infirm for its failure to require the plaintiff to post a bond for the protection of the defendant in the event the attachment was ultimately found to have been improvident.

2)  On May 10, 2000, the District Judge Ordered (Doc # 12) referring Plaintiff's motion for prejudgment remedy; Doc # 6 and Plaintiff's motion for disclosure of Property; Doc # 5 to Magistrate William I. Garfinkel, U.S.M.J., that order is contrary to 28 U.S.C. 636 (b)(1)(A), because the last two motions are injunctive relief, not in the province of the Magistrate jurisdiction, therefore, any order issued is a nullity; **Reynaga v. Cammisa**,

case number 91-15468 (9th Cir 1992), and **see** its comment citing Taylor v. Oxford, 575 F. 2d 152, 154 (7th Cir 1978). Accordingly, the Court's order (Doc # 12) is a reversible error, and any ruling related to must be vacated as a matter of law.

3)  On May 16, 2000, pursuant to the Court's Order Doc # 12, hearing was held before the Magistrate, immediately after the parties declared their appearance, and before any statement of either party. The Magistrate pronounced his predisposition against Defendants; **see** the transcript dated May 16, 2000, p. 3 line 10.

> The Court: Yes, Ms. Borger affidavit. And it is clear from that affidavit that some sort of PJR is warranted. I don't think there's really any question about it.

The Magistrate statement is a strong reflect of deep-seated favoritism to Plaintiff, and antagonism against Defendants. It reflects a predisposition; readiness; and willingness to rubber stamp whatever demands may be suggested by Plaintiff, **see United States v. John Doe**, docket number 02-1362 (2nd Cir. October 19, 2003).

> The record there reflected willingness to rubber stamp any suggestion made by the United States Attorney_an act inconsistence with the exercise of an informed discretion. **Id**. p. 2 line 19.

4)  On May 17, 2000 the Magistrate issued his memorandum of decision and very clearly permitting Defendant to conduct his business and to maintain

business and personal bank accounts. The Presiding Judge did not indorse the Magistrate decision in any respect.

5)  In the morning of May 18, 2000, contrary to the Magistrate order that Defendants are permitted to maintain business and business bank accounts, all bank accounts became garnished, and all Defendants' checks returned back unpaid. Defendant had to close his business on the spot. Defendant called the law clerk of the Magistrate Chamber and received no comments. Todate, Defendant's actual damages caused by closing his business exceeds fifteen million dollar. Defendant filed numerous motions for relief, all motions denied without opinion.

Defendant searched the Court Records repeatedly, and did not find except the memorandum of decision of the Magistrate dated May 17, 2000. Although Defendant filed with the District Court requesting relief, he could not obtain the evidence of the nuclear orders of attachment and garnishment in the amount of $ 18.5 million. It is only on May 4, 2004, almost four (4) years after the issuance of the Magistrate order, Defendant obtained the evidence. On May 7, 2004 Defendant provided the Court with the evidence evincing that the Magistrate issued orders without the knowledge of the Court.

On May 17, 2000, the Magistrate violated the Code of United States Judges and engaged in unilateral communications with Plaintiff's attorney David R. Schaeffer.

Mr. Schaeffer drafted on his own, on his computer eight (8) writs of garnishment including its memorandum and handed it to the Magistrate. The Magistrate executed it and handed it to Mr. Schaeffer, none was entered on the records, and Defendants was never notified. Mr. Schaeffer executed the garnishments promptly and effectuated closing Petitioner's business promptly. The non-authorized orders are as follows:

1. Writ of Garnishment to the value of $ 1,600,000 to Fleet Bank dated May 16, 2000.

2. Writ of Garnishment to the value of $ 1,600,000 to Hudson United Bank dated May 16, 2000.

3. Writ of Garnishment to the value of $ 1,600,000 to Aetna Life Insurance Annuity Company dated May 16, 2000.

4. Writ of Garnishment to the value of $ 1,600,000 to New England Financial Annuities dated May 16, 2000.

5. Writ of Garnishment to the value of $ 1,600,000 to American Express Financial Advisors, Inc. d/b/a IDS, dated May 16, 2000.

6. Writ of Garnishment to the value of $ 1,600,000 to VALIC dated May 16, 2000.

7. Writ of Garnishment to the value of $ 1,600,000 to The Equitable a/k/a The Equitable Life Assurance of the United States dated May 16, 2000.

8. Writ of Garnishment to the value of $ 1,600,000 to IDS Life Insurance Company, dated June 6, 2000.

The total of the non-authorized writs of garnishments is $ 12.8 million.

Defendants' fixed assets at the time of garnishment was not enough to absorb

these huge amounts, that in addition to the ex parte order of New Jersey

duplicate action for the same alleged cause of action. Defendant became seized

in the total amount of $ 18.5 million. That is to say Plaintiff unlawfully seized

every dollar Defendants had, and Defendant closed his business, by Plaintiff

filing his complaints in the two (2) Districts, the effect of the orders issued was

not only as an injunction, it had the same effect of a judgment. The attachments

and garnishments issued against Defendant and his wife Wafa Reyad, extended

to effectuate a lis pendence on the property purchased by and owned by his

daughter Dina R. Abousabe. Todate the following attachments are in place.


1. The Defendants' daughter real property            $ 1,200,000.00

Located at 1452-1454 River Road, Edgewater, NJ

2. The Defendant's wife own residence located at      $   500,000.00

2077 Center Ave # 22D, Fort Lee, NJ

3. The Defendant's insurance policy; Equitable        $   170,000.00

4. The Defendant's wife insurance policy; Equitable   $   165,000.00

5. The Defendant's insurance policy; IDS              $ 1,000,000.00

6. The Defendant's wife 401k; VALIC                   $    72,000.00

7. The Defendant's wife annuity; Equitable            $   124,000.00

8. The Defendant's wife annuity; Aetna                $    76,000.00

9. The Defendant's wife annuity; New England                                                    $      23,000.00

        TOTAL                                                                                            $  3,395,000.00


Defendant's total losses as of November 2004, caused by the unlawful orders


i)    Defendant's business                                                              $      10,000,000.00

ii)   Defendant's loss of income                                                 $        2,925,000.00

iii)  Defendant's Loss of investment                                         $            150,000.00

iv)  Defendant's Loss of Insurance coverage                         $        2,000,000.00

              TOTAL                                                                       $      15,075,000.00


The actual damages caused by the first writ of garnishment which garnished

Defendant's Fleet Bank account, which in effect closed his business. It is well

known that no business can be conducted in the absence of bank account.

Defendant was also deprived from any source of living provided that Plaintiff

does not have any interest in any of the seized assets. All the above damages

caused by the unauthorized writs of garnishment, executed without the

knowledge of the United States, and without notification to neither Defendant.

The writs of garnishments issued by the Magistrate and executed by Plaintiff's

attorney, David R. Schaefer. The Magistrate violated the Code of United States

Judges, and furtherly abused his power, and violated the duties of his Court, he

must be disqualified, and all his orders must be vacated. Plaintiff's named

attorney must be immediately disqualified and be punished for his crime for executing orders without the knowledge of the United States.

Defendant filed on September 7, 2004 with the District Court his motion to disqualify the Magistrate, on October 11, 2004. Judge Droney ordered referring the motion to the Magistrate. On February 1, 2005 the Magistrate denied the motion as moot and stipulates "in that the undersigned is no longer involved with this case", indeed, the Magistrate is no longer with this case, but his unauthorized orders are still in effect, and its damages are running.

**See**, **Michael Hathcock; Sandy Hathcock v. Novistar International** (Case number 94-1021, 4th Cir.) at III

> Section 455 (a) of title 28 of United States Code provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably questioned". As we have previously explained, "[t]he question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances" **Aiken County v. BSP Div. OF Envirotech Corp**., 866 F. 2d. 661, 679 (4th Cir. 1989) (quoting **Rice v. Mckenzie**), 581 F. 2d 1114, 1116, (4th Cir. 1978). On these facts, a reasonable person might justifiably doubt the district court judge's objectivity. . . .

> The Judge's **ex parte** contacts requesting the Hathcock's counsel to draft at least the factual basis of a default order, and possibly its legal conclusion as well, do not foster an impression of objectivity.

The Supreme Court Ruled vacating the orders issued by the disqualified judge, even after judgment has issued. **See Liljeberg v. Health Acquision Corp**. 486 U.S. 847, 848 (1988).

2. Vacatur was a proper remedy for the 455 (a) violation in the circumstances of this case. In determining whether a 455(a) violation requires vacatur under Rule 60 (b)(6)- which gives federal courts broad authority to grant relief from a final judgment "upon such terms as are just," provided that the motion is made within a reasonable time- it is appropriate to consider the risk of injustice of the particular parties, the risk of undermining the public's confidence in the judicial process. **Id**.

Judge Droney since August 2001 acted prejudicially against Defendant and favors Plaintiff, however, judicial decisions do not establish basis for recusal, unless the judicial decision is a predisposition that go beyond what is normal and acceptable.

**See**, also **Liteky** 510 U.S. 540 (1994) at 548, commenting on 28 U.S.C. 455 (a)

> Subsection (a), the provision at issue here, was an entirely new "catch all" recusal provision covering both "interest or relationship" and "bias or prejudice", **see**, **Liljeberg v. Health Services Acquision Corp**., 486 U.S. 847 (1988)- but requiring them all to be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice, but its appearance. Quite simply and quite universally, recusal was required whenever "impartiality might reasonably be questioned". **Id.**

Furtherly, **see Liteky** at 552

> A similar "plain Language" argument could be made, however with regard to 144 and 455 (b)(1): they apply whenever bias or prejudice exists, and not merely when it derives from an extrajudicial source. As we have described, the latter is invalid, because the pejorative connotation of the terms "bias" and "prejudice" demands that they be applied only to judicial predisposition that go beyond what is normal and acceptable. **Id**.

On May 7, 2004 -Judge Droney was provided with the documents evincing that the total attachments against Defendant is $ 18.5 million, and Plaintiff alleged

false claims is $ 243,849.78 as Plaintiff demanding it. It means that Plaintiff

obtained seventy-five (75) times of his false claims in attachments and

garnishments. This fact alone drives any reasonable person to conclude that

Judge Droney's prejudice against Petitioner is clear. Furtherly, Judge Droney

issued to the first time a prejudgment remedy against Petitioner in the amount of

$ 1.1 million as follows: 1) Plaintiff claims of damages   $ 243,849.78; 2)

Plaintiff's attorney's fee $ 355,783.20 provided that these fees for Plaintiff in the

District of Connecticut; District of New Jersey and the Third Circuit of Appeals;

and 3) $ 500,367.02 as punitive damages. It is a predisposition to garnish

Defendant for attorney's fee, and more clear predisposition to garnish

Defendants before final judgment for alleged punitive damages. It is injustice

precedent deteriorates the confidence of the Judicial System.


Judge Droney Denied Defendant's motion for recusal on February 25, 2005;

Denied Defendant motion to reopen proceeding to allow Defendant to

acknowledge the unauthorized eight (8) writs of garnishment issued un-

authorizedly by the Magistrate, which caused Defendant actual damages in the

amount of fifteen million dollar; and Denied Defendant's motion to correct the

records. Simply put, Judge Droney Denied Defendant due process to defend

himself, that Denial shows a deep-seated prejudice against Defendants, and

shows antagonism. It is impossible to any reasonable person to believe that a fair

trial can go through. Judge Droney must recuse himself and all his orders must

be vacated.

**See, Liljeberg v. Health Services Acquision Corp.** 486 U.S. 847, 848 (1988)

> A violation of 455 (a)- which requires a judge to disqualify himself in any proceeding in which his impartiality might be questioned- is established when a reasonable person, knowing the relevant facts, would expect that a judge know of circumstances creating an appearance of partiality, notwithstanding a finding that the judge was not actually conscious of those circumstances. To require scientor as an element of 455 (a) violation would contravene that section's language and its purpose of promoting public confidence in the integrity of the judicial system. **Id**. 848.

## PREJUDGMENT ATTACHMENTS ARE UNLAWFUL

Indeed, it is unlawful for a court to issue prejudgment remedy based on speculations. It is more unlawful that this Court denied Defendant's request for Plaintiff to post a bond despite Defendant's citation of **Mexicano**, supra. It is injustice to include anticipated attorney's fees in a prejudgment remedy, and it is denial of due process for a court to disregard a prejudgment remedy issued by another federal court for the same cause of action and only calculate attorney's fees in favor of Plaintiff. This Court denied any defense for New Jersey action, and the unlawful lis pendence on Defendants' daughter's property, and included anticipated attorney's fees in New Jersey District and Third Circuit Court of Appeals. It are denial of due process invalidate the entire action.

Plaintiff's falsely claims as presented to this Court is in the amount of $ 243,849.78, is a misleading statement, because it all stemming from a misleading calculations. It is improper for a litigant to intentionally present information in order to frustrate the Court, **see** Plaintiff's "exhibit # 40A"; 5th

column "Accrued Interest"; and 8th column "Interest received". According

to Plaintiff's statement, none of the mortgage loans was in foreclosure,

**See**, Tr. 4/6/04 p. 119 line 15-17


A That would pertain to the value of a property assuming it was in
foreclosure which was not the case on any of these loans.


And **see**, Tr. 4/7/04 p. 149 line 10-19


MR. SCHAEFFER: Yes, your honor. I guess we're making argument with
respect to the contents of the documents. If I could point out to the court
that the estimated loss, this is within days of finding out about the wide-
spread fraud, was estimated at 22 percent of the outstanding amount. This
is where they didn't know if people were going to purchase. So they were
looking at a worst case scenario what happens if we have to go to
foreclosure with respect to these loans.


The transcript stipulations above is clearly indicates that the prejudgment

remedy which devastated Defendants relied only on speculations of

foreclosures which never happened, and no bases for any estimates.

Despite the undisputable fact that Plaintiff unjudicially sold loans at discount,

Plaintiff's false claims of losses; 13th column "Loss", in the total of $ 322,553.37.

Simply put, Plaintiff's claim Accrued interest received at Pay off is $ 381,916.84,

provided that no loan was in foreclosure, is the evidence that Plaintiff is charging

Defendant a differential interest in the amount of $ 267,108.40. Plaintiff initiated

this action on a bad faith speculations, has no right for differential interest caused

by Plaintiff's seizure on these mortgage loans and furtherly sold it in nonjudicial

foreclosure without obtaining Court order to do so.

## **PLAINTIFF'S ACTION IS ESTOPPED BY CALIFORNIA ANTIDEFICIENCY**
## **LAWS**

Plaintiff's entire complaint is estopped by the application of California
Antideficiency Laws. Mostafa Reyad before this action commenced and during
this action, had no control on any of the 33 loans. Plaintiff sold all the loans on
their own without Court order, Plaintiff exercised their power of nonjudicial
foreclosure sale, as per para. 7 of the Credit Guaranty (Individual), and other
provisions stipulated in the Credit Facility Documents. Plaintiff failed to file within
the period of three (3) month mandated by **Cal. C. Civ. Proc. 580 (a),** an
application for deficiency in this Court, and did not institute an action for
deficiency in another court. Accordingly, Plaintiff waived their rights for any
deficiency for any loan sold; also Plaintiff waived their rights for attorney's fee
and any associated cost, as a matter of law. **See, Cadle Co. II v. Harvey** (2000)
83 Cal. App. 4th 927, 932, 933 [100 Cal. Rptr. 2d 150]

([1] Our analysis is controlled by well-established principles. The courts have
repeatedly recognized that the antideficiency laws embodied in section 580 (a)
through 580 (d) and 726 reflect a legislative policy that strictly limits the right to
recover deficiency judgments for the amount the debt exceeds the value of
security. *Brown v. Jensen (1953) 41 Cal. 2d 193, 197 [259 P. 2d 425]*. The
debtor cannot be compelled to waive the antideficiency protections in advance
*Freedland v. Greco (1955) 45 Cal. 2d 462, 467-468 [289 P.2d 463];Civ. Code
section 2953* because the antideficiency legislation was established for a public
reason and cannot be contravened by a private agreement *Valinda Builders, Inc.
v. Bissner* (1964) 230 Cal. App. 2d 106, 112 [40 Cal. Rptr. 735].) **Id**.

### *California Civil Code section 2953*
Any express agreement made or entered into by a borrower at the time of or in
connection with the making of or renewing of any loan secured by a deed or
trust, mortgage or other instrument creating a lien on real property, whereby the

borrower agrees to waive the rights, or privileges conferred upon him by Section 2924, 2924b, 2924c of the Civil Code or by Sections 580a or 726 of the Code of Civil procedure, **shall be void and of no effect**. The provisions of this section shall not apply to any deed of trust, mortgage or other liens given to secure the payment of bonds or other evidences of indebtedness authorized or permitted to be issued by Commissioner of Corporations, or are made by a public utility subject to the provisions of the Public Utilities Act.

**See** also, **Simon v. Superior Court (Bank of America, NT & SA) (1992) 4 Cal.**

**App.4 63, 70 [5 Cal. Rptr. 2d 428]**

(Thus section 580a, enacted before section 580d, limits the amount of a deficiency judgment after the real property security has been sold at a nonjudicial sale to the lesser of either the excess of indebtedness over the fair market value of the property or the excess of the indebtedness over the sale price. The section also provided, at the time of the subject foreclosure, that any action to recover a deficiency "must be brought within three months of the time of sale under such deed of trust or mortgage.);

Plaintiff is aware about California Antidefiency Laws before the action at the time they prepared the Credit Facility Documents, and contrary to the law, included in each "Guaranty", a waiver executed by each Defendant, **see** "Guaranty", p.2 para 7. Plaintiff abused the law during pretrial and attempt to obtain another waiver to be executed by Mostafa Reyad. Plaintiff's attorney David R. Schaefer submitted to Mostafa on or about August 20, 2000. "**AGREEMENT WITH RESPECT TO WAIVER OF ANTI-DEFICIENCY PROVISIONS OF THE UNIFORM COMMERCIAL CODE" See**, *Defendant's Exhibit # 6*. Defendant did not execute that waiver, However,  p.2 para 2. Show that Plaintiff had received all collaterals before the action, and **see**, IndyMac letter dated June 16, 2000; *Defendant exhibit # 7*; the letter does no have any question or comment about the complete accurate collateral for the 33 mortgage loans, because Plaintiff received all the collaterals complete and accurate prior to the action.

Without waiving any right or defense. Defendants are not liable for any deficiency for any loan out of the 33 mortgage loans securing WLCA's Credit Facility Documents. Defendants also are not liable for any attorneys fee consumed in prosecuting any mortgage loan sold, as well as any associated costs. It is undisputed fact that, Defendants granted without recourse Plaintiff first lien security interest in all the 33 mortgage loans, including the 33 notes, and other related documents, **see,** Plaintiff's Amended Complaint (Doc # 165) p. 4. para. 10-12. Thus Plaintiff has at all relevant times a blanket note, and 33 notes accompanied with 33 mortgage deeds as security. **See**, Black's Law Dictionary definition for "mortgage"; "A mortgage in ***an interest in land*** created by a written instrument providing security for the performance of a duty or the payment of a debt", and **see, Cal. C. Civ. Proc. Subsection 580 (a),**

 "Whenever a money judgment is sought for the balance due upon obligation for the payment of which a deed of trust or mortgage with power of sale upon real property or ***any interest therein*** was given as security".

Defendants' Legal Authority of this defense is **Cal. C. Civ. Proc. Section 580 (a), 580(d), 337 (1), and 726 (b)**. Plaintiff exercised their power of sale as stipulated in the credit facility documents, and sold 33 mortgage loans utilizing the private non-judicial foreclosure sale process. Accordingly, Pursuant to the said Legal Authority, Plaintiff have waived their rights for any deficiency for the sold mortgage loans, by not filing a motion in this Court, or filing application for deficiency in any other court within the stated three (3) month following the sale of each mortgage loan. **See Citrus State Bank v. McKendrick** (1989) 215 Cal. App. 3d 941, 949 [263 Cal. Rptr. 781]

(However, the language of section 580 (a) could not be clearer. It states that any action for a deficiency judgment "***must be brought within three months***", of the foreclosure sale. Given the mandate of section 580 (a), an action brought more than three months after the sale, as is the case here is subject to dismissal as untimely.);


 **Florio v. Lau** (1998) 68 Cal. App. 4th 637, 645 [80 Cal. Rptr. 2d 409] (For instance, creditors cannot obtain deficiency judgments for purchase money transactions or after nonjudicial foreclosure sale pursuant to a deed of trust. **See Code Civ Proc. 580 b, 58 (d).);** (Deficiency judgments generally are available after a judicial real property foreclosure sale, but with some restrictions. Under Code of **Civil Procedure section 726**, the judicial foreclosure statute, a deficiency judgment must be sought within three moths of foreclosure sale . . . .) **Id**.


**Life Savings Bank v. Wilhelm** (2000) 84 Cal. App. 4th 174,177, [100 Cal. Rptr.

2d 657]

(Section 726, subdivision (b) provides in part, that "[1]n the event that a deficiency is not waived or prohibited and it decreed that *any defendant is personally liable* for the debt, then upon application of the Plaintiff filed at any time within three months . . . . ) **Id**.


The "Guarantys" as part of the credit facility documents, includes waiver of

section 580 (d). **See** Credit Guaranty (Individual), executed by Defendants p.2.

para 7

*"Guarantor waives all rights and defenses arising out of an election of remedies of Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the Borrower by the operation of Section 580 (d) of the California Code of Civil Procedure or otherwise".*


Moreover, It is on August 15, 2000 at the hearing of this Court, at Bridgeport,

Connecticut, Mostafa Reyad asked Plaintiff; Why You are garnishing my wallet

and leave me with five million dollar?, Honorable Garfinkel directed Attorney

Schaeffer to respond. He answered, and stated because of the antideficiency laws of California, if we recorded the loans, we cannot sue for it, **see** transcript of August 15, 2000. In any event Pursuant to **section 726**, Plaintiff is estopped to claim a personal guaranty for all sold mortgage loans, due to the elapse of the three (3) months limitations. Defendants have no liability for any loan sold, and have no liability for attorney's fee or any other cost consumed in prosecuting these sold loans.

## PREJUDGMENT REMEDY ISSUED BASED ON PERJURED AFFIDAVIT

The prejudgment remedy issued by this Court on May 16, 2000, and the attachment and garnishment orders issued by New Jersey District, were based in its entirety on the perjured affidavits of Brian E. Ainslie (Doc # 10) and Maria Borger (Doc # 8). Maria Borger's affidavit was in support of the Dismissed plaintiff; IndyMac, Inc., accordingly it is a non-permissible evidence. Practically, providing it to the Court as Plaintiff's marked exhibits, or citing it in support of Mr. Ainslie's affidavit are precluded by res judicata.

**see**, Tr. 4/6/04 P. 16 line 16-21

*MR. SCHAEFFER: Well, your honor, what it is is what we premarked as Plaintiff's Exhibit 39 in the exhibit book that Mr. Reyad has and the declaration of Maria Borger which was filed with the Court as an affidavit on May 8, 2000. So those are the two documents that he relied on in preparing that estimate.*

Thus, Plaintiff relies on Plaintiff's Exhibit 39 and Maria Borger's inadmissible evidence. Furtherly, Plaintiff did not offer his exhibit 39. Accordingly Plaintiff does not have any evidence to support the perjured affidavit of Mr. Ainslie. This

affidavit is the only affidavit of the instant action, and this Court based its

prejudgment remedy on its contents, the same as New Jersey District. This

affidavit and the unlawful prejudgments in the total amount of $ 18.5 million

caused Defendant to close his business, and costed him an actual damage in the

amount approximately fifteen million dollar.


On May 8, 2000, Plaintiff initiated this action and filed, inter alia, Brian E. Ainslie's

affidavit (Doc #10) [hereafter the "affidavit"]. The affidavit p. 5 para. 13.


Based upon the review performed by IndyMac, IndyMac has determined that
several of Reyad's employees prepared and submitted these falsified documents
to IndyMac, 13. Furthermore, IndyMac has obtained preliminary property
valuation information indicating that the properties securing the mortgage loans
financed on Reyad's WLCA warehouse line are over-valued by an average of
22.27%.


The affidavit at p. 6 para. 15


WLCA estimates that it will lose at least 22.27% of the outstanding amount
advanced to Reyad. Based on the information reviewed to date, WLCA's loss is
at least $ 1,271,000, and WLCA believes there is probable cause to obtain a
judgment against the Reyads for this amount.


Simply put, the affidavit established the probable cause, based on the over-value

by an average of 22.27%, which according to Plaintiff in the amount $ 1,271,000.

Mr. Ainslie multiplied the 22.27 % of the outstanding loan amount of $ 5.7 million

to reach the amount of $ 1,271,000. Plaintiff could not support this perjured

information, he testified under oath in his affidavit under penalty of perjury.

Plaintiff's attorney defended Mr. Ainslie's affidavit, and repeated twice that he is

not sure that the affidavit was on original papers.

**See**, Tr. 4/7/04 P. 150 line 1-6

*And this is within _ _ I believe this affidavit was filed with the prejudgment _ _ the*
*request to the court. And I'm not sure, but was it on original papers? Part of Mr.*
*Ainslie affidavit, but I'm not sure.*

It does not need a sienter to say that without this perjured affidavit, a

prejudgment remedy would be ever issued, either in this Court or in the New

Jersey District. This false information entitle Defendants to be awarded all their

expenses including attorney's fees, and be awarded punitive damages.

**See**, FRCP, Rule 11 (b)(3)

> The allegations and other factual contentions have evidentiary support or,
> if specifically so identified, are likely to have evidentiary support after a
> reasonable opportunity for further investigation or discovery.

And **see**, Notes of Advisory Committee on 1983 amendments to Rule 11

> The amended rule attempts to deal with the problem by building upon and
> expanding the equitable doctrine permitting the court to award expenses,
> including attorney's fees, to a litigant whose opponent acts in bad faith in
> instituting or conducting litigation, **See**, e.g. Roadway Express, Inc. v.
> Piper, 447 U.S. 752 (1980); Hall v. Cole, 412 U.S. 1, 5 (1973).

Plaintiff established the false probable cause and its amount, pursuant to FRCP,

Rule 11 Defendants are entitled for the full amount of damages to Defendant in

the amount of approximately fifteen million dollar, and Co-Defendant in the

amount of one million dollar.

It is impossible for this Court to reach a fair judgment by setting aside
Defendant's motions related to this false affidavit, in fact Defendant raised this
issues for more than three years and ruling upon it, is still pending. Plaintiff after
he obtained the nuclear prejudgment remedy never respond to the issues of
over-valued properties, and sold the 33 loans by its value and no over-valuation
ever stated in anywhere.

Defendant at Trial, received from Plaintiff his exhibit 39, and Defendant
requested that exhibit to be his exhibit 19 and attached to it other Plaintiff's
documents. **See**  Defendant's Exhibit 19, p. 1 of 5 which is Plaintiff's Exhibit 39,
marked by red color "B" Estimated net realizable value (78%). There is no basis
for that estimate, if Plaintiff estimated 68% the difference will be 32% and so on,
it means that Plaintiff has nothing called property information valuation. It is
perjured informations only to obtain prejudgment remedy. It is fraud upon the
United States, Defendants are entitled to punitive damages.

## THE ACTION IS PRECLUDED BY RES JUDICATA

Plaintiff's Amended Complaint (Doc # 165); Plaintiff's original complaint (Doc #
1); Memorandum in support of application for ex parte prejudgment remedy and
restraining order (Doc # 7); and Brian E. Ainslie's affidavit (Doc # 10) affirm the
preclusion effect of res judicata as stipulated by the Second Circuit Ruling;
**Maharaj v. Bank America Corp**., docket number 96-7021 (October 17, 1997).

"'The doctrine of **res judicata**, or claim preclusion, provides that [a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action". **Federated Dep't Stores, Inc. v. Moitie**, 452 U.S. 394, 398 (1981). Simply put, the doctrine states that once a final judgment has been entered on the merits of the case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning "the transaction, or series of connected transactions, out of which the [first] action arose". **Restatement (Second) of Judgments** 24 (1) (1982).

In determining whether a second suit is barred by this doctrine, the fact that the first and second suits involved the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct is not dispositive. **S.E.C. v. First Jersey Sec., Inc.,** 101 F 3d. 1450, 1463 (2nd Cir 1996). Rather, the first judgment will preclude a second suit only when it involves the same "transaction" or connected series of transactions as the earlier suit; *that is to say, the second cause of action requires the same evidence to support it and is based on facts that were also present in the first*. Id. At 1464; **see** also, **Nevada v. United States**, 463 U.S. 110, 128-30 (1983) (requiring courts to first decide whether the "same cause of action" is being sued upon).'"

Careful reading to the Amended Complaint (Doc # 165) dated September 7, 2001, and the Original Complaint (Doc # 1) dated May 8, 2000 reveals that, Plaintiff has merged the Dismissed Count Two of the Original Complaint into Count One of the Amended Complaint. Plaintiff in the Amended Complaint cited all allegations of the dismissed count, its claims and its cause of action, and did not cite the bases of its claims and its cause of action which is the "Seller's Contract" and the "Seller's Guide", and **see** Doc # 7 at p. 5 it established the cause of action under the heading "**B. Reyad's Defaults Under the Credit Facility Documents**". Doc # 1 p. 6-9 para. 24-34, that dismissed Count, is the same Count one of Doc # 165. The same dismissed paragraphs 24-34 of Doc # 1, are stated again at p. 5-7 para. 16-19 Of Doc # 165.

**See** Doc # 10 p. 4 para. 11

Here, of the 33 loans presently financed with money borrowed from WLCA uder the Credit Facility documents, IMI initially offered to purchase 30 for Reyad. It is undisputed fact that WLCA and IMI are under the same control and

ownership since 1987. It is the same transaction or connected series of

transactions and it requires the same evidence to support it and is based on facts

that were also present in the first. Indeed, Plaintiff did not offer any evidence

except from IMI files. Plaintiff does not have a single word on the documents of

WLCA. In fact all parties did not raise any issue. IMI was dismissed pursuant to

FRCP Rule 12 (b)(6), **see** this Court's Order (Doc # 150) p. 25, foot note 23.

Dismissal by this rule is final adjudication on the merits, **see Exchange Nat'l**

**Bank of Chicago v. Touch Ross & Co.**, 544 F. 2d 1126, 1130-31 (2nd Cir 1976)

(Friendly, J.)("[J]udgment under Rule 12 (b)(6) are on the merits, with res judicata

effect . . . . "); **Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc**., 754 F. 2d

457, 462 (2nd Cir. 1985).

## RES JUDICATA AND 28 U.S.C. 455 (b)(3) DISQUALIFY THE SAME JUDGE

The principle of res judicata and 28 U.S.C. 455 (b)(3) have the statuary effect of

disqualification of the same judge who issued opinion in the related prior action

which claim of res judicata has been raised of. To be more clear, e.g. a district

judge may sit in the circuit court of appeal by designation, but the same judge

cannot sit in the same circuit to adjudicate a case he had rendered his or her

opinion. Judge Droney U.S.D.J. had rendered his judgment opinion and

dismissed IndyMac, Inc. on August 10, 2001. Statutorily, Judge Droney cannot

preside to rule on the same evidence of a prior action, he issued judgment upon.

**See**, 28 U.S.C. 455 (b)(3)

> Where he has served in governmental employment and in such capacity participated as counsel, advisor or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy.

and **see** Section 455(e), it stipulates in part

> No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b).

In this unique instant action, Judge Droney must statutorily disqualify himself as a matter of law. **See**, **United States v. Outler**, 659 F. 2d 1306, 1312-13 (5th Cir. 1981) (stating that recusal under section 455 (b)(3) "when the two proceedings have a common, single transaction or event at issue").

In the instant action, and during its long duration, no single evidence ever offered by Plaintiff except the false evidence of the dismissed plaintiff IndyMac, Inc. Res judicata must apply and the entire complaint must be dismissed as a matter of law.

## PLAINTIFF'S CUTPA CLAIMS ARE INAPPLICABLE AND VOIDED

The contract underlying this action has the California choice of law. Plaintiff's claim of CUTPA is inapplicable. It is well established that choice of law renders the District of Connecticut applies the same laws as the District of California. The State Law of Connecticut in its entirety is not applicable to this action, also the

Court would not apply Connecticut law and reverse its judgment ruling dated

August 10, 2001 (Doc # 150), or the Court may evade the law of contract.

In any event Plaintiff's CUTPA claims are voided by the operation of the three

years jurisdictional limitations. A plaintiff, in order to file his CUTPA claim in

Connecticut State Court, he must comply with CUTPA statute; C.G.S. Subsection

42-110g(c).

> Upon the commencement of any action brought under subsection (a) of
> this section, the plaintiff shall mail a copy of the complaint to the Attorney
> General and the Commissioner of Consumer Protection and upon entry of
> any judgment or decree to the Attorney General and the Commissioner of
> Consumer Protection.

The records of the action shows, that, Plaintiff has mailed to the first time the

amended complaint to the Connecticut General Attorney and to Connecticut

Commissioner of Consumer Protection on June 17, 2004, **see** Doc # 402. It is

more than four full years, and the statute of limitations governs CUTPA is a

jurisdictional three years, **see** C.G.S. 42-110 (g)(f).

> An action under this section may not be brought more than three years
> after the occurrence of a violation of this chapter.

Plaintiff failed to comply with the requirements of CUTPA statute within the

Jurisdictional three years. Plaintiff's excuse that was oversight is unacceptable

defense, **see Bill Butler Associates v. New England Savings Bank** 42 Conn.

Sup. 198, 201 (1991).

Nevertheless, General Statutes Section 42-110 g(c), for example,
mandates that a private plaintiff mail a copy of his complaint and judgment
to the attorney General.

**See** also **Atlantic Richfield Company v. Canaan Oil Company** 202 Conn. 234,

235 (1987).

The Trial court did not err in limiting the jury's consideration of W Co.'s
CUTPA claims to act which occurred within three years of the filing of the
counterclaim, the period of limitations prescribed by statute (42-110g[f]) for
CUTPA claims is three years.

And **see** **Anthony S. Fichera et al v. Mine Hill Corporation et al**, 207 Conn.

204,205 (1988).

2. The plaintiffs' claim that the statute of limitation (52-595) governing
cases involving fraudulent concealment of the existence of a cause of
action was applicable here was unavailing; since CUTPA violations are
defined to include deceptive acts, it is evident that the legislature intended
the limitation period of 42-110g(f) to be controlling.

**See** also **Avon Meadow Condominium Associates, et al v. Bank of Boston**

**Connecticut** 50 Conn. App. 688, 699-700 (1998).


The Plaintiffs finally claim that the trial court improperly applied the three year
statute of limitations as set forth in 42-110g (f) *fn9 to the third count of the
amended complaint alleging a violation of CUTPA. We do not agree.

Our Supreme Court has addressed this issue in **Ecker v. West Hartford**, 205
Conn. 219, 231-33, 530 A. 2d 1056 (1987): "In deciding whether a time limitation
contained within a statute is subject to waiver, we must determine whether the
limitation is substantive or procedural in nature. **See Moore v. McNamara**, 201
Conn. 16, 22-23, 513 A.2d 660 (1986); Orticelli v. Powers, [supra, 197 Conn. 15].

"A statute of limitations is generally considered to be procedural, especially
where the statute contains only a limitation as to time with respect to a right of
action and does not itself create the right of action. **Jones Destruction, Inc. v.
Upjohn**, 161 Conn. 191, 195, 286 A. 2d 308 (1971)."**Collucci v. Sears,
Roebuck & Co**., 585 F. Supp. 529, 532 (D. Conn. 1984). **Moore v. McNamara**,
supra, 22. Where the limitation is deemed procedural and personal it is subject to
being waived unless it is specifically pleaded because the limitation is considered

merely to act as a bar to a remedy otherwise available. **See Moore v. McNamara**, supra [22]; **Orticelli v. Powers**, supra [15]; L.G. **Defelice & Son, Inc. v. Wethersfield**, 167 Conn. 509, 511, 356 A. 2d 144 (1975); **Hillier v. East Hartford**, 167 Conn. 100, 106, 355 A. 2d 1 (1974).

Where, however, a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then the remedy exists only during the prescribed period and not thereafter. **See Moore v. McNamara**, supra [201 Conn. 22-23]; **Orticelli v. Powers**, supra [197 Conn. 15]; L.G. **Defelice & Son, Inc. v. Wethersfield**, supra [167 Conn. 511]; Hillier v. East Hartford, supra [167 Conn. 106]; **Diamond National Corporation v. Dwelle**, 164 Conn. 540, 547, 325 A. 2d 259 (1973). In such cases, the time limitation is not to be treated as an ordinary statute of limitation, but rather is as a limitation on the liability itself, and not of the remedy alone. **Vecchio v. Sewer Authority**, 176 Conn. 497, 504-505, 408 A. 2d 254 (1979); **see American Masons' Supply Co. v. F. W. Brown Co**., 174 Conn. 219, 224, 384 A. 2d 378 (1978); **Hillier v. East Hartford**, supra [106]; **DeMartino v. Siemon**, [90 Conn. 527, 528-29, 97 A. 765 (1916)]; **Cofrancesco v. Smith**, [29 Conn. Supp. 139, 141-42, 275 A. 2d 608 (1971)]; 22 Am. Jur. 2d 633, Death 35. The Courts of Corporation have repeatedly held that, under such circumstances, the time limitation is a substantive and jurisdictional prerequisite, which may be raised at any time, even by the court sua sponte, and may not be waived. See Moore v. McNamara, supra, 23; **Orticelli v. Powers**, supra [15]; American Masons' Supply Co. v. F. W. Brown Co., supra [224]; **L.G. DeFelice, Inc. v. Wethersfield**, supra [511]; **Diamond National Corporation v. Dwelle**, supra [547]; **Wilburn v. Mount Sinai Medical Center**, 3 Conn. App. 284, 288, 487 A. 2d 568 (1985)." (Emphasis added.)

Accordingly, we hold that the three year limitation contained in 42-110g (f) is jurisdictional and was properly applied by the trial court to the third count. **Id**. **50 Conn. App. 699-700**

Plaintiff's CUTPA claims are voided by the operation of the jurisdictional three year statute of limitations.

## PLAINTIFF OFFERED NON-CREDIBLE WITNESSES' TESTIMONY

Plaintiff on November 18, 2003 provided a list of witnesses includes 21

witnesses. At Trial Plaintiff called 6 witnesses, and called Mostafa Reyad.

Plaintiff did not provide even a single genuine document, except a copy of what

they called it the Credit Facility Documents, inwhich Defendants did not object. Plaintiff provided documents fabricated by the dismissed Plaintiff namely, IndyMac, Inc., and did not offer any original document for visual determination of its genuiness. Defendant requested the original documents, and on April 7, 2004 Plaintiff falsely claimed that he has the original documents. Neither Defendant nor the Court reviewed any original document. Furtherly, Defendant applied to the Court for a request to see the originals, the Court denied Defendant request, contrary to FROE, Rule 1002 "To prove the content of writing, recording, or photograph, the original writing, recording, or photograph is required". Plaintiff provided copies of documents obtained from old files bearing Defendant's company forms and altered its contents. These documents were not required in any of the disputed loans.  Prior to the action. IndyMac, Inc., has purchased 30 loans out of the disputed 33 loans, 7 of them full documentations and 23 as reduced documentations. IndyMac, Inc. intern to resell the 23 reduced loans for a less profit than the 7 full documentations loans. It is well known in the mortgage industry that if the holder of the loan can convert the reduced documentation to full documentation, he would make additional six percentage gain. IndyMac underwriting team whom they work for nominal salary and commission of produced production were anticipating that profit, when they were caught either by their auditors or by the buyers of these loans, IndyMac, Inc. initiated the action, but they did the mistake like any criminal. IndyMac, Inc. prepared Plaintiff's exhibit 39 to defend the perjury claims against Mr. Ainslie and provided in the exhibit the "Doc Type", which is the evidence that, that the 23 loans were

not required to include the forged documents, unless the loans to be converted

from reduce to full, these documents IndyMac, Inc. has presented it at Trial in

copies forms to avoid its examination.


***It should be noted that Plaintiff never objected to Defendant's defenses***

***related to Reduced documentations. The transcript shows that Defendant***

***repeated that defense numerously and Plaintiff never objected nor made***

***any comment.***

IndyMac, Inc. were successful to provide forged evidence to only 10 loans out of

the 30 loans, and provided Defendant with evidence that 3 loans out of the said

10 loans deterring their false claims. Plaintiff's conclusion in Post-Trial

memorandum requesting to be awarded $ 243,849.78. But, Plaintiff offered

evidence in the amount of $ 66,407.57 and no more. Plaintiff unprofessionally

asking this Court implicitly to hold his theory for wholesale actual damages.

Furthermy, asking this Court to rely on the testimony of the perjured witness Mr.

Ainslie, and to evade the contract laws, and this Court to hold that, there is no

need for evidence. Plaintiff unprofessionally inserted p. 4 **Questo v. Dorado**, 136

Cal. App. 2d 332,336 [Cal. App. 1955], that case relied on Cal. C. Civ. Proc. Sec.

1870, and that section had been repealed almost half a century ago, however,

the case is misplaced and no relevancy or analogy to the instant action.


Moreover, Plaintiff who did not adhere to the requirements of Connecticut

CUTPA citing **McKeown Distributors, Inc. v. Gyp-Crete Corp**., 618 F. Supp.

632,643 n. 5 (D.Conn. 1985)(Cabranes, J.). Defendant could not reach this case,

however, it is erroneous decision contrary to the U.S. Supreme Court decisions

and contrary to the laws of the Second Circuit, and contrary to Connecticut

General Statutes which does not govern this action, **see, Mastrobuono v.**

**Shearson Lehman Hutton, Inc.** 514 U.S. 52 (1995) (Thus, the choice-of-law

provision covers the right and duties of the parties); **Valley Juice Ltd., Inc. v.**

**Evian Waters of France, Inc**., docket number 94-7813,94-7817,95-7709 (2nd

Cir. 1996), supra at p. 3 herein

and **see** the case cited by Honorable Droney on August 10, 2001, **Pepe v. GNC**

**Franchising Inc.**, 750 A. 2d 1167, 1169 (Conn. Super 2000).

Moreover, the selection of Pennsylvania as the forum state is not contrary to a
fundamental policy of Connecticut with respect to the first, second and fifth
counts of the complaint. The public policy of Connecticut on this issue has been
precisely articulated by the legislature. Section 42-133g (a), read in conjunction
with Section 42-133f (f), clearly provides that a forum waiver is invalid with
respect to "an action for violation of sections 42-133e to 42-133g, inclusive . . . ."
If the legislate had intended the public policy against forum selection to extend to
other forms of action, such as common law contract and CUTPA claims, it could
easily have done so. It did not. The dismissal of the first, second and fifth counts
will not be contrary to Connecticut public policy. **Id**.

## BRIAN AINSLIE INCREDIBLE TESTIMONY

Plaintiff filed exhibit "H" "Plaintiff's List of Witnesses"; Joint Trial Memorandum

dated November 18, 2003, first witness on the list Brian Ainslie, and referred to

his resume dated March 19, 2001. The resume does not refer to experience in

mortgage underwriting, and states nothing relates to. The resume only shows his

expertise in warehouse lending, Defendant confronted Mr. Ainslie on 4/6/04,and

stated to the Court **see** Tr. 4/6/04 p. 168 line 9-13.

MR. REYAD: Mr. Ainslie is answering regarding credit files. Mr. Ainslie does not work in credit files. Does not know what is the meaning of credit files. He's Analyst. So he is testifying on other behalf which I don't accept testifying for someone else.

Mr. Ainslie did not respond to Defendant's statement above, however, Mr. Ainslie testified; **see** Tr. 4/7/04 p. 6 line 4-5.

A. Prior to that I had had an occasion to do some underwriting for IndyMac on mortgage loan files.

Furtherly, Mr. Ainslie answered Defendant, **see** Tr. 4/7/04 p. 13 line 6-12.

A. Today I do not work in underwriting
Q. No. In the past ten years, did you work in underwriting?
A. In the past ten years I had occasion to underwrite mortgage loans for IndyMac
Q. You work, how long is that
A. That was probably a period of about six months.

According to Mr. Ainslie's statement using the words "some underwriting" "occasion", "probably" and "six month", definitely determines that, Mr. Ainslie is not in the position to testify in mortgage underwriting files, and all his testimony relates to credit files must be stricken Mr. Ainslie cannot be a credible witness in this action. Mr. Ainslie testified in response to Defendant, **see** Tr. 4/7/04 p. 14 line 18 to p. 15 line 3.

Q. Mr. Ainslie, from your own experience, what is the reference to the word no income?

A. No income means no income is provided in the loan file.

Q. It means that we put any income or we do not write any income?

A.  There is no reference to income in the loan file

Q. What is the meaning of reduced

A. Reduced documentation?

Q. Yes

A. Is you state the income in a loan file

Mr. Ainslie responded to Defendant **see** Tr. p. 15 line 14-15

A. No stated asset. Stated income and reduced documentation I believe are the same, one is the same.


Mr. Ainslie non-reliable testimony, if it is not stricken in its entirety is the evidence that, that the 23 reduced loans specified as reduced on Plaintiff's Exhibit 39, affirm that there is no requirement to verify employment or bank accounts, and all evidence must be stricken as a matter of evidence.


**PRABHAT KUMAR TESTIMONY IS INADMISSIBLE**

Although, Defendant contents that Mr. Kumar should be considered as expert witness, but all his testimony is meaningless and must be stricken. Mr. Kumar could not verify which documents were in the files. He testifies that one is correct and the other is altered. No one asked him to verify by visual determination. Now, it is only the Trier of the facts to determine by visual examination. Indeed, he can determine that all credit reports submitted by Federal Mortgage are the correct copies.

## ALL BANK REPRESENTATIVE'S TESTIMONIES ARE INADMISSIBLE

All 4 Bank representatives testimonies are inadmissible, no one of them was verifying from original document, it may be the decision of this Court if the Court agrees to examine the documents by itself, and if the Court agrees, visual comparison will determine that IndyMac underwriters who created those verifications. Pursuant to Federal Rules of Evidence Comparing the handwriting color of the ink and quality of papers is the only determinable evidence.

## PLAINTIFF OFFERED FALSE EVIDENCE

Plaintiff filed with this Court "Plaintiff's List of Exhibits" dated November 18, 2003, includes 127 exhibits, and offered at trial only 45 exhibits. Defendant preserved all his above legal defenses, including that Plaintiff is not entitled to offer evidence. The Court has the discretion to strike any document or evidence.

A.  Exhibits 1-10, Defendants did not object

B.  Exhibit 28 "Personal Financial Statement of Mostafa Reyad and Wafa Reyad". The form was provided to IndyMac, Inc. as it reads, and IndyMac, Inc. has been dismissed in 2001. Accordingly, it is inadmissible evidence and it evolves the res judicata; **Maharaj**, supra, Pp. 34-35.

C.  Plaintiff exhibits 32-39 were not offered by Plaintiff. Defendant offered the 8 exhibits in support of his res judicata defense, the Court acknowledged that exhibit as Defendant's Exhibit 25. All the 8 exhibits were produced by

IndyMac. Exhibits 32-38 dated prior to June 2000. To avoid confusion,

IndyMac refers to IndyMac, Inc., the dismissed Plaintiff. IndyMac, Inc. was

dismissed in 2001 for the inclusion of forum selection clause selecting

California forum, in the "Seller Contract". The "Seller Contract" is governed

by the "Seller Guide". The 7 QC 32-38 have the common phrases.

**THE ABOVE REFERENCED LOAN WAS PURCHASED BY INDYMAC**

**UNDER THE PRIOR APPROVAL UNDERWRITING PROGRAM AND AS**

**SUCH WAS UNDERWRITTEN BY INDYMAC PRIOR TO PURCHASE.**

**Despite this prior approval, all IndyMac Seller/Servicer Guide
requirements and representations and warranties apply**
**And**
**Please note that our enumeration of the reason(s) for repurchase
above is not intended to be exclusive and other reason(s) may exist
which we have not specified at this time.**

Thus all QC findings based on violation(s) of IndyMac, Inc. Seller/Serivcer

Guide. To that extend, Plaintiff claim that these loans would not be

purchased by other investor is a false claim, because all the loans have

been either refinanced or sold, and there is no evidence to the contrary. It

is also the evidence that the original two Plaintiffs, IndyMac Mortgage

Holdings, Inc. and IndyMac, Inc. are involved in the same transaction or

series of connected transactions, if one dismissed, the other is barred by

res judicata.

1.  Exhibit 32 (QC Loan # 62770 Dellasala Jr.), although it shows no

    findings, IndyMac purchased that loan; 40A, and instead of making

    payment to Defendant $ 2,509.70. IndyMac purchased the loan and

Plaintiff on 40A stating a loss of $ 3,770.44 and prejudgment interest $ 1,233.40.

2.  Exhibit 33 (QC Loan # 624775 Elseedy), although IndyMac stated vague issues. Plaintiff credited to Defendant $ 4,175.48.

    a.  IndyMac issue that borrower is related to employer, has no impact on anything whatsoever, even if it is correct or incorrect.

    b.  IndyMac issue that subject property does not appear owner occupied is completely vague in the absence of evidence, and even if it is correct, it does not evolve any wrongdoing.

3.  Exhibit 34 (QC Loan # 655311 Zbylut), borrower refinanced 9/19/2000; 40A. IndyMac issue that account balance stated $ 46, 787.66 and Fleet Bank verified $ 16,787.66, and the borrower was required to bring in $ 24,657 to close the transaction. Plaintiff exhibit 39 at the fifth column from the let "Doc Type" shows "Reduced", it means Federal Mortgage and any subsequent holder rely only on borrower's statement on his application, **see** page 3 Defendant's Exhibit 24, borrower signed after reading that statement of 18 U.S.C. 1001, et seq., borrower signed in the presence of his attorney. Plaintiff's Exhibit # 39 shows, the loan was sold as Reduced utlilizing a higher interest rate without verification of employment or bank account. Defendant and or his company did not include bank account verification. It is only IndyMac, Inc. underwriting team who added the document of bank verification to resell the loan at a higher price for a higher profit.

4. Exhibit 35 (QC Loan # 651934 Antoine), although it shows no findings, IndyMac instead purchasing the loan on 4/5/2000 and pay Defendant $ 5,627.50.  IndyMac purchased the loan on 12/29/2000 claiming a false loss of $ 999.68, and at Trial claiming prejudgment interest in the amount of $ 327.02. IndyMac owes Defendant $ 5,627.50 as of 4/5/2000.

5. Exhibit 36 (QC Loan # 611728 Giraldo). IndyMac claims that the gift check # 10676 in the amount of $ 42,5000, has not been cleared, they have gained full access to the bank account this check was drawn from using their automated system. The system allows for check verification by check number and dollar amount. Indeed, the gift check was drawn by another person and not by Mr. Giraldo. That admission is violation of the Federal privacy act 1974, to break into the records of third party. If IndyMac broke the law, Defendant will not break the law. It is well known to every homeowner, purchaser and seller that in closing real estate transaction,  that, the closing attorney must requires certified funds, not personal checks, and a copy of that certified funds is included in the closing package. Here, exhibit 36 verified the closing attorney, Donald R. Kiefer located at 79 E. Putnam Avenue, Greenwich, CT. The exhibit does not show that IndyMac called or wrote to the attorney. Every closing attorney is insured to IndyMac and to WLCA by Title Insurance Company for each specific closing, and that insurance is a condition precedent for WLCA to initiate the wiring

funds. IndyMac's storey must be rejected. IndyMac instead of paying

Defendant $ 17,293.22, they claim a false loss $ 38,084.49 and

additional $ 9,587.64 in prejudgment interest.

6.  Exhibit 37 (QC Loan # 602203 Moazed). Mr. Moazed refinanced the

loan on 11/15/2000. The exhibit shows that IndyMac raised two issues

a.  IndyMac claiming that the loan file did not contain a copy of the

preliminary Title report. Indeed, the file contains as a condition

precedent, a Title Insurance policy which supercedes the

preliminary report. It is well established by Federal and State

Laws that lenders not to participate, nor interfere with Title

records and it is only the closing attorney who makes the Title

research, preliminary Title report and work with the Title

Insurance Company. If IndyMac is correct, they may have a

claim against the Title Insurance Company, and not with

Defendant. IndyMac claims relied on Sitex Property Reports,

and Experian report is misplaced, because Defendant has no

access to the former report, and the Title Insurance Company

issued title Insurance Policy. Moreover, Plaintiff exhibits 82 and

83, each at p. 10 * * EXPERIAN/FAIR ISAAC, shows no

information, and p. 11 each report shows the address of 367 W.

Hill Road, which is the subject property. Neither the exhibit, nor

Plaintiff offered at Trial the alleged Sitex report, or any other

evidence to support their false claim.

b.  IndyMac claims, they has obtained a copy of the original credit

report that was prepared by Credit Research, Inc. and the credit

report that was supplied by the Defendant was altered showing

Empirica        509        642

Experian        512        621

Beacon      Not available    635

The same document reads "The above reference loan has been

purchased by IndyMac. It is affirmation that IndyMac ran a

separate credit report on their system and obtained a similar

credit informations. Plaintiff claims that Plaintiff's exhibit 82 was

submitted by Federal Mortgage Co., and Plaintiff's exhibit 83 by

Credit Research. Because there is no evidence which is which,

Federal Rules of Evidence "FROE", Rule 901 (b)(3)

"Comparison by Trier or expert witness" must apply. Defendant,

is requesting that, the Honorable Judge to compare the two

exhibits 82 and 83.   **See** also notes on FROE 901 (b)(3)

[Precedent supports the acceptance of visual comparison as

sufficiently satisfying preliminary authentication requirements for

the admission in evidence *Brandon v. Collins*, 267 F. 2d 731

(2nd Cir. 1959), *Wausau Sulphate Fibre Co. v. Commissioner of*

*Internal Revenue*, 61 F. 2d 879 (7th Cir 1932); *Desimone v.*

*United States*, 227 F. 2d 864 (9th Cir 1955).] Judge Droney can

see and determine without any reasonable doubt that exhibit 82

is the correct report and exhibit 83 is altered. It is very clear that 83 was copied repeatedly to change its contents and 82 do not show that, more visual comparision shows:

(i)     Multiple copies to change the report; it moved the numbers of the report information at p. 1 and caused the numbers not to be fitted in each square.  No computer will does that. The report no., date received, prepared by and repositories are not fitted, is an evidence that exhibit 83 has been altered by IndyMac.

(ii)    Compare the thickness of the letters printed on exhibit 82, which all has consistent thickness. Exhibit 83 shows different thickness. Compare Employment Information p. 1 "In writing Only", and the thickness of each letter in it with any similar letter on the same p. 1, e.g. the letter "I" in American Express and Capital One is thicker than letter "I" in Employment Information on the same page, also letter "G" in "writing" and in "Long Beach A", each one is different. Comparing to exhibit 82, all letters have the same thickness. Visual comparison is the evidence that exhibit 82 is the correct report provided by Defendant and 83 has been altered by Plaintiff.

Upon cross-examination by Defendant, Mr. Kumar respond, **see** Tr. 4/6/04 p. 97 line 12-14.

A.    What we have provided to them. This one provided, I don't

know, IndyMac has the other one. So I don't know how they

got that. Whatever we have provided them.

Mr. Kumar response to the Court **see** Tr. 4/6/04 p. 98 lime 9-18

THE WITNESS: Actually, the system broke. So I requested

Ms. Rowena to provide me what we have the report and my senior

has provided before.

THE COURT: So you didn't print that out again from your

company?

THE WITNESS: No, Because the system broke. We are

using the new system.

Thus, Mr. Kumar is making only comparison to two reports and both provided to

him by Plaintiff, and he does not know which is which.

Furtherly, upon further redirect examination by Ms. Moffet, Mr. Kumar respond

**see** Tr. 4/6/04 p. 104 line 14-18

A.  Right. When credit report is pulled it's sitting in their system. They can

view it, they can print it, but they can't alter it.

Q.  As far as you know?

A.  As far as I Know?

Thus, the expert witness affirmed that Defendant can't alter the reports, and Plaintiff's attorney Rowena A. Moffett attacking the knowledge of her expert witness. Simply put, if Plaintiff is correct, how Mr. Moazed refinanced his home by better interest rate within six month? In this instant, the only avenue for the Court to proceed is the visual comparison by Judge Droney and his Honor will determine that exhibit 82 is the correct report and exhibit 83 is the altered report. Furtherly, although Defendant contents that Mr. Kumar is an expert, his testimony based upon that reports which both provided by Plaintiff makes it impossible to be reliable, and must be considered as inadmissible evidence. The amount due to Defendant of Moazed loan is $ 19,006.16

7. Exhibit 38 (QC Loan # 599162 Zuiewski), IndyMac claims that the first two pages of the appraisal report are not in file. The same exhibit reads "The above referenced loan was purchased by IndyMac under Prior Approval Underwriting Program and as such was underwritten by IndyMac prior to purchase". The statements on the same page conflicting with each other, if the file was underwritten prior to purchase, it means the file was complete, and it  is conflicting with the statement of missing two pages.

IndyMac claims that Bank Verification was fraudulent. Defendant agrees that it is fraudulent and was inserted in file by IndyMac. It is simple, visual comparison shows Plaintiff's exhibits 62-71 all drawn by a computer system marked Genesis, which is the system Defendant

ever has. But Plaintiff's exhibit 72 is drawn on an unknown computer system never included with Defendant at any time. Moreover, the exhibit shows that Ms. Zuiewski's signature does not match the signature in the bank. It is evidence that someone not relating to Federal Mortgage created the document, because her signature on the authorization is maintained in her file. Ms. Zuiewski refinanced her loan on her own for a lower interest rate with the same People's Bank and cashed out another $ 100,000. The borrower was not required to verify money in banks, and Defendant did not verify with Peoples Bank, **see** Plaintiff's Exhibit 39, it is reduced document type, as Defendant repeatedly explained to the Court during Trial, and Plaintiff never objected. The amount due to Defendant from Zuiewski is $ 12,742.80.

### CHART  NUMBER I.

Based on Defendant's exhibit 25, Defendant is entitled to the moneys at the time of delivering the 7 loans outlined in Plaintiff's exhibits 32-38 as follows:

| Name | Amount |
|------|--------|
| 1. Dellasal, Jr. | $ 2,509.70 |
| 2. Elseedy | $ 4,175.48 |
| 3. Zlybut | $ 3,729.14 |
| 4. Antoine | $ 5,627.50 |
| 5. Giraldo | $17,293.22 |
| 6. Moazed | $19,006.16 |
| 7. Zuiewski | $12,742.80 |
| total due atinception | $65,084.00 |
| Interest* | $25,092.94 |
| TOTAL | **$90,176.94** |

*Interest calculated using/the same mathematical factor "0.385547" as Plaintiff's Exhibit 40A

The records of this Court shows that Plaintiff was successful to acknowledge

certain exhibits against the following named borrowers:

| | |
|---|---|
| 1. Perez | 2. Lyon |
| 3. Ortiz | 4. Marlewski |
| 5. Zbylut * | 6. Champagie |
| 7. Kirby | 8. Silva |
| 9. Zuiewski * | 10. Moazed * |

Defendant provided evidence obtained from premarked Plaintiff's premarked

exhibits in defense for Zbylut, Zuiewski and Moazed, and Plaintiff withdraw his

evidence against McEnroe and Flores, and withdrawn Plaintiff's Exhibits 84 and

86.

## **CHART NUMBER II**.

This chart illustrates all Plaintiffs' claims as per Plaintiff's Exhibit 40A, despite any

defense offered by Defendant as follows:

| Name | Loss | Prejudgment Interest |
|---|---|---|
| Perez | (12,094.43) | (3,568.69) |
| Lyon | (1,258.81) | (435.93) |
| Ortiz | (24,642.12) | (7,271.11) |
| Marlewski | 931.29 | |
| Zbylut | 450.39 | |
| Champagne | (3,073.73) | (906.96) |
| Kirby | (8,542.33) | (2,520.57) |
| Silva | 592.52 | |
| Zuiewski | 6,400.42 | |
| Moazed | (7,816.37) | (2,651.14) |
| TOTAL | (49,053.17 | (17,354.40) |

Thus, total due to Plaintiff according to his false evidence is
**$ 66,407.57**

## CHART NUMBER III

The evidence provided at Trial presented by Plaintiff, and the evidence provided

by Defendant out of Plaintiffs premarked exhibits as follows:

| | |
|---|---|
| Chart I. Due Defendant | $ 90,176.94 |
| Chart II. Due from Defendant | $(66,407.57) |
| Net due to Plaintiff's admitted Evidence | **$ 23,176.94** |

Plaintiff admitted that he is holding Defendant's cash collateral $ 78,703.59 which

he calculated interest $ 30,963.93.

## CHART NUMBER IV

| | |
|---|---|
| Chart Number III due to Defendant | $ 23,769.37 |
| Defendant Cash Collateral | $ 78,703.59 |
| Interest on Collateral | $ 30,963.93 |
| Due to Defendant | **$ 133,436.69** |

Defendant illustrated above, that, even if the Court accepted all what Plaintiff

Presented accordingly to Plaintiff's provided evidence. To that extend Plaintiff

owes the amount of $ 133,436.69 due to Defendant. The disputed loans are 33

loans, and the evidence stated above is for 14 loans. There is no specific

evidence to be provided from any party. The remaining 19 loans, Plaintiff falsely

claiming losses, and no evidence were provided, however, Mr. Ainslie explained

to the Court, the mechanism of Warehouse Lending. **See**, Mr. Ainslie respond to

the Court Tr. 4/6/04 p. 43 line 10-18.


THE COURT: Can you just take me through a sample loan? Say it's a hundred

thousand dollar loan, how this all works with the purchaser and paying the

premium.

THE WITNESS: We get a funding request from Mr. Reyad. The purchaser is going to pay _ _ it's typically in percentages. So a hundred, two percent, or a hundred two thousand for this loan. We advance 98,000. We obtain $ 2,000 from Mr. Reyad through his operating account. We advance that $ 100,000.

Mr. Ainslie above testimony, he explained to the Court, that, Defendant most of the time has about 4 percent of the loan amount, and Defendant receive that money after selling to the investor and paying back WLCA. **See**, Tr. 4/6/04 p. 43-46.

Defendant claimed the amount of $ 288,315 is unlawfully retained by Plaintiff. If justice would not agree with all defenses stipulated in this above conclusion of law, the Court must agree for the above 4 charts, and would award Defendant's profits from his 19 loans as follows:

## CHART V

| | |
|---|---|
| 1. Drazel | 1,928.25 |
| 2. Barran | ( 95.60) |
| 3. Tahir | ( 189.77) |
| 4. Bakry | ( 813.08) |
| 5. Smorczewski | (3,553.04) |
| 6. Abreu | 361.63 |
| 7. Browne | 6,703.20 |
| 8. Browne | 2,691.28 |
| 9. Mishall | 9,338.61 |
| 10.Nyakana | 7,748.72 |
| 11.Wilkinson | 1,806.80 |
| 12.Babenski | 8,848.68 |
| 13.Tarzia | 22,412.00 |
| 14.Calderon | 5,507.08 |
| 15.Casella | 5,832.04 |
| 16.Flores | 7,958.80 |
| 17.McEnroe | 10,848.24 |
| 18.Tarzia | 0 |
| 19.Jaku | (81,675.31) |
| Due to Defendant at inception | 5,658.53 |
| Interest * | 2,181.62 |
| Total | **7,840.15** |

## CHART VI

| | |
|---|---|
| Chart IV due to Defendant | $ 133,436.69 |
| Chart V due to Defendant | $    7,840.50 |
| Total Net to Defendant | **$ 141,277,19** |

**CONCLUSION**

Defendants are entitled to a judgment in their favor, against Plaintiff in the following amount:

1. Due to Defendant per evidence  $    141,277.19

2. Actual losses to Mostafa Reyad  $ 15,075,000.00

3. Actual losses to Wafa Reyad    $   1,000,000.00

**TOTAL DUE TO DEFENDANT    $  16,216,277.19**

Defendants are also entitled to be awarded punitive damages for Plaintiff's malicious prosecution as stated in their counterclaims.

The Defendant                           The Co Defendant
Mostafa Reyad                           Wafa Reyad


By: _____      By: _____
    Mostafa Reyad                        Wafa Reyad
    2077 Center Ave # 22d                2077 Center Ave # 22D
    Fort Lee, NJ 07024                   Fort Lee, NJ 07024
    Day Phone # 203-325-4100             Home Phone # 201-585-0562
    Home Phone # 201-585-0562
    E-Mail: reyad@optonline.net


## **CERTIFICATE OF SERVICE**


The undersigned certifies that on the captioned date he has mailed the following:
each of them a true and correct copy.


1. Kevin J. O'Conner, Esq.
   U.S. Attorneys Office
   157 Church Street
   New Haven, CT 06510

2. David R. Schaeffer, Esq.
   271 Whitney Avenue
   New Haven, CT 06511