# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B. | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 3:00CV835(CFD) |
| | : | |
| MOSTAFA REYAD and WAFA REYAD, | : | |
|     Defendants. | : | |

## MEMORANDUM OF DECISION

       Plaintiff IndyMac Bank, F.S.B. ("IndyMac") brought this diversity of citizenship action[1] against Mostafa and Wafa Reyad.[2]  IndyMac asserted a breach of contract claim against the Reyads, specifically that Mostafa Reyad breached certain Credit Facility Documents, and that both Mostafa and Wafa Reyad are liable as a guarantors of those agreements.  IndyMac also alleged that Mostafa Reyad violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et. seq.  Mostafa Reyad asserted counterclaims for: (1) false pretenses against the United States; (2) false pleadings; (3) monies due claimant; (4) abuse of process; (5) vexatious litigation; (6) breach of fiduciary duty; (7) theft; (8) civil conspiracy; (9) intentional infliction of emotional distress; (10) negligent infliction of emotional distress; and (11) loss of consortium.  Wafa Reyad asserted counterclaims for: (1) abuse of process; (2)

---

[1]IndyMac is a Delaware corporation with its principal place of business in California. Defendants Mostafa and Wafa Reyad are citizens of New Jersey.

[2]Mostafa and Wafa Reyad are husband and wife.  When this opinion refers to "Reyad," it refers to Mostafa Reyad.  IndyMac, Inc. ("IMI") was also a plaintiff at the time this action was filed.  IMI is a wholly-owned subsidiary of IndyMac that purchases mortgage loans on the secondary market.  In a ruling filed August 13, 2001, the Court dismissed the counts brought by IMI on the basis of a forum selection clause.  See doc. # 150.

vexatious litigation; (3) intentional misrepresentation; (4) defamation; (5) intentional infliction of emotional distress; and (6) loss of consortium.  All parties asserted defenses to the claims against them.

The following are the Court's findings of fact and conclusions of law following a bench trial.[3]

## I.    Findings of Fact

In December 1996, Mostafa Reyad entered into a Master Revolving Loan and Security Agreement ("Loan Agreement"), a Promissory Note and a Variable Terms Letter ("Letter") with Independent Lending Corporation d/b/a Warehouse Lending Corporation of America ("WLCA").[4]  The Loan Agreement, Promissory Note, and Letter are collectively referred to as "Credit Facility Documents."  Through the Credit Facility Documents, WLCA agreed to lend Reyad money under a "warehouse" line of credit that he would use to fund qualified residential mortgage loans.  Reyad agreed to repay WLCA, within specified time periods, principal and

---

[3]In the course of this litigation, the Court entered a Temporary Restraining Order ("TRO") against the defendants, restraining them "from transferring or otherwise disposing of their property out of the ordinary course of business."  An order for pre-judgment remedy of $1,600,000 was initially entered against each of the defendants.  That order was subsequently reduced to $1,100,000 for Mostafa Reyad, and $786,527.86 for Wafa Reyad.  See doc. # 374.

[4]Through the following corporate transactions, Indymac Bank F.S.B. is the successor in interest to WLCA.  In 1994, WLCA, which was a Delaware company, changed its name to Independent Lending Corporation.  In 1997, Independent Lending Corporation merged with CWM Mortgage Holdings, Inc., and CWM Mortgage Holdings, Inc. changed its name to INMC Mortgage Holdings, Inc.  The following year, INMC Mortgage Holdings changed its name to IndyMac Mortgage Holdings, Inc., and also used the trade name Warehouse Lending Corporation of America.  In 2000, IndyMac Mortgage Holdings changed its name to IndyMac Bancorp, Inc.  Finally, later that year, the assets held by IndyMac Bancorp., Inc. were assigned to IndyMac Bank F.S.B., the plaintiff here.  See also the findings regarding whether IndyMac is the proper party plaintiff, infra.

interest borrowed against the line of credit.  Reyad also granted a lien for a security interest to WLCA on the mortgage loans funded from the warehouse line of credit and originated by Reyad. In addition to the obligations stemming from the Credit Facility Documents, the Reyads each entered into a Credit Guaranty agreement, guarantying payment on all obligations to WLCA under the prior agreements.

As part of the Credit Facility Documents, Mostafa Reyad agreed to supply accurate and complete information regarding the mortgage loans funded by the credit facility.  According to the terms of the agreements, a default could occur under a variety of circumstances, including Reyad's failure to provide accurate and complete information to IndyMac, as well as Reyad's failure to repay a loan on the warehouse line of credit within forty days.  Reyad agreed that he would pay IndyMac's attorney's fees should IndyMac be required to take action to protect its rights under the agreements, as it has in this case.

The Credit Facility Documents did not provide for an expiration date; however, the agreements were modified by letters between the parties, renewing them on November 10, 1998. The agreements were again renewed on November 11, 1999 to expire on February 11, 2000, and on March 6, 2000 to expire April 30, 2000.

While IndyMac advanced the warehouse line of credit to Reyad, it did not ultimately purchase the mortgages that Reyad had with property owners.  Rather, those mortgages were transferred to other investors in the secondary mortgage market.  Both IndyMac and those investors relied on the credit information provided by Reyad in determining whether to fund and purchase those mortgages, and the prices paid for the mortgages by the investors.  At the time of the filing of this litigation, Reyad had borrowed approximately $5,700,000 to fund thirty-three

mortgage loans.  One of the multiple investors that Reyad sold mortgages to using the warehouse

line of credit was IndyMac, Inc., formerly Independent National Mortgage Corporation, an

affiliate corporation of Plaintiff IndyMac Bank F.S.B.  In late April 2000, IndyMac, Inc.

performed a quality control audit and identified misrepresentations in loan files that were

submitted by Reyad.  These misrepresentations were widespread in the loan files and included

apparent fraudulent representations and documents, as discussed below.

A number of the credit scores for mortgage applicants were altered to provide a

significantly better credit history and overall credit score than was merited.  Reyad's company,

Federal Mortgage Company,[5] was provided with computer software that it could use to access

credit reports for viewing and printing by Credit Research, Inc.  The credit reports at issue were

initially generated by Credit Research, Inc., but were then altered by Reyad or employees under

his direction to remove negative credit information such as delayed payments on debts and to add

beneficial credit information such as additional mortgages in good standing.  Ultimately, the

credit scores produced by Credit Research, Inc., which provide crucial information to lenders,

were altered by Reyad to become significantly higher.

In addition to credit reports, Reyad (or employees under his direction), altered many

verification of deposit ("VOD") forms which were used to indicate how much money a

prospective borrower had on deposit at a bank.  VOD forms were altered and forged to indicate

that borrowers had more money on deposit than existed.  For example, the records submitted by

Reyad for one borrower indicated that he maintained a checking account at People's Bank with a

---

[5]Reyad operated his mortgage loan originating business under several names, but
principally as Federal Mortgage Company, a "d/b/a.".

balance of $14,601.98. No such account existed in that borrower's name, however, and the

account had previously been closed. The VOD form for the same borrower indicated that he

maintained a savings account with a balance of approximately $23,100.00. That account was

actually a business account with a balance of $1,093.24. That VOD form was forged by Reyad

or his employees at his direction. The VOD forms for other borrowers were also altered by

Reyad to indicate significantly higher bank account balances than actually existed. In another

instance, a VOD form for a borrower indicated that her checking and savings balances were

$27,982.06 and $194,371.45 respectively, when in fact the balances were actually $685.54 and

12,285.64. Similar forgeries occurred on the VOD forms of at least three other borrowers. In at

least one other case, information about a borrower's employment and income was also altered to

be more attractive to secondary purchasers.

The Court finds that Reyad himself, or those under his direction, forged and altered many

documents that were submitted to IndyMac in connection with the thirty-three mortgages. Many

of the thirty-three loans obtained by Reyad through his IndyMac warehouse line of credit were

based on applications that included false representations, forgeries, and alterations. Reyad

additionally failed to repay advances on the warehouse line of credit as provided for in the Credit

Facility Documents. All but one of the thirty-three loans were not repaid within the prescribed

forty day period. In one instance, Reyad refinanced the loan with another investor and, instead of

repaying IndyMac, kept the money – approximately $58,467 – for himself.

Reyad also provided IndyMac with a Personal Financial Statement in February 2002 that

contained a variety of material inaccuracies. In that statement, Reyad indicated that he did not

have any outstanding or pending litigation, claims, contingencies, judgments, liens, defaults with

creditors, or tax delinquencies.  In fact, Reyad owed approximately $42,000 on a settlement agreement with a loan investor.  The statement also indicated that Reyad co-owned a cooperative apartment in New Jersey with his wife, when in fact he was not a title owner of the property. Reyad also indicated on the financial statement that he did not have any outstanding mortgages on that property.  There were two mortgages, worth $110,000 on the property at that time.  Reyad also misrepresented his rental income from other properties that he claimed he owned, when one property was actually owned by his son.

Finally, on May 11, 2000, two days after the TRO entered and in violation of that order, Wafa Reyad transferred her property in Greenwich, Connecticut, as well as her interest in a property in Westchester, New York, to her son, David Sharif Reyad.

## II.     Conclusions of Law

### A.     Plaintiff's Claims

#### 1.     Breach of Contract

##### i.     Credit Facility Documents

According to the terms of the Loan Agreement, California law governs any action for breach of contract arising from those agreements.[6]  In California, "[a] breach of contract claim

---

[6]A Court sitting in diversity must apply the choice-of-law rules of the forum to determine which state's law applies.  Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003), citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Connecticut has adopted the Restatement (Second) of Conflicts of Laws finding that:

> [P]arties to a contract generally are allowed to select the law that will govern their contract, unless either: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the

requires proof of (1) the existence of the contract, (2) performance by the plaintiff (or excuse for nonperformance), (3) a breach by the defendant, and (4) damages." <u>Porges ex rel. United States v. RQ Constr., Inc.</u>, 79 Fed. Appx. 957, 958-959 (9th Cir. 2003), <u>citing</u> <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal. App. 4th 731, 745, 108 Cal. Rptr. 2d 23 (2001).

The first element, existence of the contract, has been satisfied by the plaintiff.  According to California statutory law, "[a] contract is an agreement to do or not to do a certain thing."  Cal. Civ. Code § 1549 (2006).  Such an agreement existed at the time of the alleged breaches in this case.  The original loan agreement between IndyMac and Reyad did not contain an expiration date, and subsequent renewals provided that it was in existence at the time that IndyMac conducted its quality control audit in April 2000 and discovered evidence of Reyad's prior breaches of their agreements.  As to the second element, the Court is satisfied that IndyMac, by providing approximately $5,700,000 for thirty-three loans, performed under the agreement.  The plaintiff has also provided sufficient evidence to establish the third element, a material breach by Reyad.  There is substantial evidence that through the acts of Reyad and by those under his direction, numerous material misrepresentations, forgeries, and alterations were made on documents provided to IndyMac, in violation of the terms of the Credit Facility Documents. Each of those violations constitutes a breach of the Credit Facility Documents, particularly the warranties of the borrower in paragraphs 10(l) and 10(n) of the Loan Agreement and events of default under paragraph 13(b) of the Loan Agreement.  Also, Reyad failed to repay all but one

---

chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

<u>Elgar v. Elgar</u>, 238 Conn. 839, 850 (Conn. 1996).  In this case, the Court concludes that according to this standard, it is appropriate to apply California law.

loan within the appropriate time period, in violation of paragraph 13(a) of the Loan Agreement and retained for himself the proceeds from the Jaku refinancing.

The plaintiff has also sufficiently proven that it has suffered damages, satisfying the fourth element of a breach of contract claim.  The Court credits the testimony of Brian Ainslie, a former financial analyst for the IndyMac credit department, regarding IndyMac's losses on the loans accurately detailed in Plaintiff's Exhibit 40A.  Specifically, IndyMac suffered: (i) losses on loans purchased by IndyMac or its affiliated entities with the consent of Reyad, at prices agreed to by Reyad, which were less than the amount owed on the warehouse line of credit with respect to those loans; (ii) losses due to Reyad's retention of funds due to IndyMac when the loan was paid off by the borrower, which funds were the property of IndyMac but were never paid to IndyMac; (iii) losses suffered when IndyMac sold some or all of the remaining loans to third parties at prices less than the amounts owed on the warehouse line with respect to those loans; and (iv) losses suffered when the mortgage loans were paid off by the residential borrower and IndyMac suffered a loss due to unpaid interest or other fees and costs.  IndyMac has also incurred substantial attorney's fees as result of its response to Reyad's breaches of the Credit Facility Documents.   According to those agreements, Reyad is liable for the payment of those fees, as well as compensatory damages.[7]

---

[7]According to California law, the measure of damages arising from a breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300 (2006).  The Court also finds that IndyMac properly mitigated its damages here.

### ii.      Credit Guaranties

The Credit Guaranty agreements entered by Mostafa and Wafa Reyad are also governed by California contract law.   Through the Credit Guaranty agreements, both of the Reyads guaranteed the payments due to IndyMac according to the Credit Facility Documents.  In the agreements, the Reyads waived their right to have IndyMac proceed first against the borrower, and their right to notice of non-performance under the Credit Facility Documents.  Because the Court has determined that Mostafa Reyad breached the Credit Facility Documents, both he and Wafa Reyad are jointly and severally liable for that breach through the Credit Guaranties.  The Reyads are also responsible for IndyMac's reasonable attorney's fees and costs incurred in enforcing the Credit Guaranties.


### 2.      CUTPA

IndyMac asserts that Reyad violated CUTPA, Conn. Gen. Stat. § 42-110b(a), in his dealings under the warehouse line of credit.  CUTPA is a remedial statute that proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "CUTPA is to be construed in accord with interpretations by the Federal Trade Commission and by the federal courts of the Federal Trade Commission Act." Fabri v. United Technologies Int'l., Inc. 387 F.3d 109, 119 (2d Cir. 2004). Accordingly, Connecticut courts have applied the so-called "cigarette rule" used by the Federal Trade Commission.  Glazer v. Dress Barn, Inc., 274 Conn. 33, 82 (2004).  The cigarette rule requires the consideration of:

(1) Whether the practice, without necessarily having been previously considered

unlawful, offends public policy as it has been established by the statutes, the
common law, or otherwise – whether, in other words, it is within at least the
penumbra of some common law, statutory, or other established concept of
unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous;
[and] (3) whether it causes substantial injury to consumers.

Id.[8] All three criteria are not required to be met.  Id.  Rather, "a violation of CUTPA may be

established by showing either an actual deceptive practice . . . or a practice amounting to a

violation of public policy."  Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 106

(1992) (citations omitted).

    In general, a breach of contract is not alone sufficient to establish a CUTPA violation.  A

breach of contract, without more, cannot support a CUTPA violation.  Bowmont Corp. v.

Krombacher Brauerei Bernhard Gmbh & Co., 2003 U.S. Dist. LEXIS 16606 (D. Conn. 2003).

Substantial aggravating circumstances must surround the breach of contract for CUTPA to be

violated.  Smithfield Assocs. v. Tolland Bank, 2003 Conn. Super. LEXIS 278 (Conn. Super. Ct.

2003).  Connecticut courts have determined that "a misrepresentation is a deceptive act that can

constitute an aggravating circumstance that would allow a simple breach of contract action to be

treated as a CUTPA violation."  LESMSD, LLC, et al. v. R&J Properties, LLC, et al., 2005

Conn. Super. LEXIS 3259, at *18, citing Dunleavey v. Paris Ceramics U.S.A., 2005 Conn.

Super. LEXIS 970, at * 31.

    Because the breaches of contract in this case involved numerous instances of intentional

_____

    [8]As Connecticut Supreme Court Justice Katz noted in Glazer, "[r]eview of [federal]
authorities indicates that a serious question exists as to whether the cigarette rule remains the
guiding rule utilized in federal law." Id. at 83 n.34, citing American Financial Services Assn. v.
Federal Trade Commission, 767 F.2d 957, 969-70 (D.C. Cir. 1985), cert. denied, 475 U.S. 1011.
Because it was not squarely at issue in Glazer, the Connecticut Supreme Court did not adopt a
new standard for evaluating CUTPA claims. Id.  The Court will therefore follow the traditional
cigarette rule in evaluating IndyMac's claim.

misrepresentation, CUTPA was violated.  According to the discussion above detailing the manner in which Reyad breached the Credit Facility Documents and his Credit Guaranty Agreement, there is sufficient evidence for the Court to find that each element of the cigarette rule is satisfied.  As to the first factor, whether Reyad's conduct was unfair in the context of existing law, or otherwise, the Court concludes that by intentionally altering, forging, and misrepresenting information on mortgage applications and related documents, Reyad acted unfairly under existing contract law and not according to "general sensibilities."  As to the second factor, the Court concludes that Reyad's intentional and willful dishonesty was immoral, unethical, oppressive, or unscrupulous.  Finally, as to the third factor, the Court concludes that Reyad's business practices regarding the warehouse line of credit and IndyMac caused substantial injury to IndyMac.

Therefore, defendant Mostafa Reyad also is liable for compensatory damages as IndyMac has suffered an "ascertainable loss," and attorney's fees under CUTPA.[9]

### 3.  Affirmative Defenses

Defendant Mostafa Reyad appears to have asserted various defenses, including res judicata and collateral estoppel, violation of California statutes, and failure to state a claim upon which relief can be granted.   As an initial matter, the Reyads did not plead all of their defenses in their amended answers, as required by Federal Rule of Civil Procedure 8(b).  Second, even if the defenses were appropriately before the Court, the Reyads did not present evidence as to the defenses at trial.  The Court, therefore, concludes that the Reyads are not entitled to the defenses

---

[9]No liability under CUTPA is found as to Wafa Reyad.

they have asserted as to the breaches of contract or CUTPA claims.

As to Mostafa Reyad's defense that IndyMac is not the proper party plaintiff, the Court makes the following findings.  The Loan Agreement was "by and between Independent Lending Corporation, a Delaware corporation, doing business as Warehouse Lending Corporation of America ("Lender"), and Mostafa Reyad, a sole proprietor, doing business as Federal Mortgage Company of Connecticut (the "Borrower")."  At the time it entered into the Loan Agreement, Independent Lending Corporation (which had legally changed its corporate name from Warehouse Lending Corporation of America, Inc., effective October 5, 1994) was properly registered to do business under the trade name of Warehouse Lending Corporation of America. Thereafter, as a result of a series of mergers and properly registered name changes, Independent Lending Corporation ultimately changed its name to IndyMac Mortgage Holdings, Inc., one of the initial named plaintiffs in this action.  IndyMac Mortgage Holdings, Inc. also was properly registered to do business under the trade name of Warehouse Lending Corporation of America. The Court finds, therefore, that the initial named plaintiff, IndyMac Mortgage Holdings, Inc., was entitled to enforce the obligations of the Credit Facility Documents against Mostafa Reyad.  See Texaco Ref. & Mktg., Inc. v. Delaware River Basin Comm'n, 824 F. Supp. 500, 507 (D. Del. 1993) (a statutory merger results in a combination of two corporations, with the surviving corporation attaining the property, rights, and privileges of the absorbed corporation, as well as retaining its own property, rights and privileges), aff'd, 30 F.3d 1488 (3d Cir. 1994); Argenbright v. Phoenix Finance Co., 21 Del. Ch. 288, 292 (Del. Ch. Ct. 1936) (when a consolidation or merger has taken place, the old corporations have their identity absorbed into that of the new corporation or the one into which they were merged); see also Heit v. Tenneco, Inc., 319 F. Supp.

884, 887 (D. Del. 1970) (all assets of the merged corporation, including any causes of action which might exist on its behalf, pass by operation of law to the surviving company).[10]

Accordingly, the Court concludes that IndyMac Mortgage Holdings, Inc. (one of the two original named plaintiffs in this action, and the predecessor in interest to the current plaintiff, IndyMac Bank, F.S.B.) did business as Warehouse Lending Corporation of America and it was the proper party to bring this case against defendants.


### B.    Defendants' Counterclaims

The Reyads have each asserted counterclaims.  Mostafa Reyad claimed: (1) false pretenses against the United States; (2) false pleadings; (3) monies due claimant; (4) abuse of process; (5) vexatious litigation; (6) breach of fiduciary duty; (7) theft; (8) civil conspiracy; (9) intentional infliction of emotional distress; (10) negligent infliction of emotional distress; and (11) loss of consortium.  Wafa Reyad asserted counterclaims for: (1) abuse of process; (2) vexatious litigation; (3) intentional misrepresentation; (4) defamation; (5) intentional infliction of emotional distress; and (6) loss of consortium.  At trial, the defendants did not present sufficient evidence to support their burdens of proof as to those claims.  Specifically, the defendants did not present testimonial evidence of witnesses.  While they did submit exhibits, those exhibits do not provide sufficient proof of these claims.  The Court concludes that because the defendants have not provided sufficient evidence to prove their counterclaims by a preponderance of the evidence,

---

[10] Although the Loan Agreement provides that it is governed by California law, "California law recognizes that the continuing legal existence of a corporation depends on the law of the state of incorporation."  CM Record Corp. v. MCA Records, Inc., 168 Cal. App. 965, 967 (Cal. App. Ct. 1985).

the plaintiff prevails as to these claims.

### III.    Damages Award

The Court concludes that Plaintiff IndyMac shall be awarded $243,849.78 in compensatory damages and losses under CUTPA.[11]  Prejudgment interest shall also be awarded at the rate of 10 percent per year accrued through the date of judgment.[12]  The amount of prejudgment accrual through April 6, 2004 was $69,622.37.  Interest has continued to accrue at a rate of $66.81 per day since that time, for a total of $125,876.43 as of July 26, 2006.

The Court concludes that punitive damages for Mostafa Reyad's CUTPA violations are also appropriate.[13]  CUTPA provides that, "[t]he court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."  Conn. Gen. Stat. § 42-110g.[14]  No punitive damages are awarded against Wafa Reyad.

---

[11]That amount reflects the damages claimed by IndyMac in Exhibit 40A ($322,553.37) minus cash retained by IndyMac ($78,703.59).

[12] Because California law applies in this diversity of citizenship action, the Court will apply that state's pre-judgment interest statute.  See supra n.2.  California law provides that, "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."  Cal. Civ. Code § 3289(b) (2006).  Because the contracts in this case were governed by California law, the Court shall apply that statute in calculating the appropriate measure of damages to be awarded to the plaintiff.

[13] Punitive damages for breach of contract are prohibited by California law.  See Cal. Civ. Code § 3294 (2006).

[14] "The standard for awarding punitive damages under the CUTPA is whether the evidence reveals "wanton and malicious injury, evil motive and violence" such that "a reckless indifference to the rights of others or an intentional and wanton violation of [Plaintiffs'] rights" is apparent.  New Colt Holding Corp. v. RJG Holdings of Fla., Inc., 312 F. Supp. 2d 195, 233 (D. Conn. 2004) citing Gargano v. Heyman, 203 Conn. 616, 622, 525 A.2d 1343, 1347 (1987).  The

The Court also concludes that attorney's fees shall be awarded in this case under CUTPA as to Mostafa Reyad.  The parties shall submit memoranda addressing the appropriate amount of punitive damages and attorney's fees owed.


**IV.      Conclusion**

Based on the evidence presented at trial, Mostafa and Wafa Reyad are liable for damages for breach of contract and Mostafa Reyad is liable for violation of CUTPA.

SO ORDERED this _26th_ day of July 2006, at Hartford, Connecticut.


  /s/ CFD_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

Court finds that the conduct of Mostafa Reyad meets this test.