UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| INDYMAC BANK, F.S.B., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:00CV835(CFD) |
| | : | |
| v. | : | |
| | : | |
| MOSTAFA REYAD and WAFA REYAD, | : | AUGUST 7, 2007 |
| | : | |
| Defendants. | : | |
| | : | |

### PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR EXEMPTIONS AND IN SUPPORT OF CROSS MOTION FOR TURNOVER ORDER

Plaintiff IndyMac Bank, F.S.B. ("Plaintiff" or "IndyMac") submits the instant memorandum in opposition to Defendants' Motion for Exemptions dated July 16, 2007 (doc. # 511), in which Defendants seek to exempt from execution all of Defendants' liquid assets. For the reasons discussed further below, Defendants have failed to meet their burden of demonstrating that any of the subject assets are properly exempt from execution. Accordingly, Defendants' Motion for Exemptions should be denied, and the Court should order that the disputed assets be turned over to Plaintiff immediately for execution.

Further, Plaintiff has learned that Defendants somehow have managed to liquidate assets worth over $200,000 that were subject to Writs of Garnishment issued at the outset of this case. Plaintiff has filed a separate motion concurrently herewith requesting, pursuant to Conn. Gen. Stat. §§ 52-356b and 52-381, that the Court order that those garnishees turn over to Plaintiff the value of the assets that were released to Defendants in violation of the prejudgment remedy ordered in this case. As discussed

**HEARING REQUIRED PURSUANT TO C.G.S. §§ 52-361b(d), 52-367b(f) AND 52-356b.**

below, because the garnishees improperly distributed to Defendants non-exempt assets

that were held subject to Writs of Garnishment, said garnishees are directly liable to

Plaintiff for the payment of such sums improperly distributed, plus Plaintiff's costs

incurred in connection with the instant motion.[1]

I.     ASSETS SUBJECT TO EXECUTION

Following is a brief summary of the various assets upon which Plaintiff has to

date sought to execute its Judgment in this matter.

| Asset | Owner/ Beneficiary | Purchase Date/ Funding information[2] | Status |
|---|---|---|---|
| The Equitable Life Assurance Society of the U.S. ("Equitable") Nonqualified Annuity Contract # 98 501 734 | Annuitant: Wafa Reyad | • 3/25/98<br>• Initial deposit of $20,000, followed by monthly $5,000 contributions until PJR issued in May 2000 | • Writ of Garnishment served in May 2000<br>• Cash value a/o 7/31/07 =$148,336.66<br>• *Exemption claimed* |
| New England Life Insurance Company ("New England") Nonqualified Annuity Contract # V435143 | Annuitant: Wafa Reyad | • 4/7/99<br>• Invested $18,000 in 1999 and $4,500 in the first four months of 2000 | • Writ of Garnishment served in May 2000<br>• $26,280.50 forwarded to marshal in response to execution[3]<br>• *Exemption claimed* |

[1] At this time, it is unclear how Defendants were able to liquidate the subject assets despite the issuance of Writs of Garnishment. IndyMac reserves its rights to move that Defendants be held in civil and/or criminal contempt should the information uncovered in connection with these execution proceedings demonstrate that such relief is warranted.

[2] Documentation evidencing the referenced funding information is attached hereto as **Exhibit 1**.

[3] The marshal is holding all contested funds levied pending this Court's ruling on Defendants' claimed exemptions.

| | | | |
|---|---|---|---|
| American Express IDS Life Insurance Company ("American Express") Nonqualified Annuity Contract # 9300-05963622 | Annuitant: Wafa Reyad Beneficiary: Mostafa Reyad | • 3/25/97<br>• Invested:<br>$24,000    1997<br>$12,000    1998<br>$28,000    1999<br>$  5,000    2000 | • Writ of Garnishment served in May 2000<br>• Last reported value a/o 5/06 =$79,778.27<br>• Account liquidated in June 07<br>• *No exemption claimed* |
| Aetna Life Insurance and Annuity Company ("Aetna") Nonqualified Annuity Contract # 5625307900032 | Annuitant: Wafa Reyad | • 3/26/99<br>• Invested:<br>$60,000    1999<br>$8,500    2000 | • Writ of Garnishment served in May 2000<br>• Last reported value a/o 5/06 =$77,411.03<br>• No response to execution<br>• *No exemption claimed* |
| Variable Annuity Life Insurance Company ("VALIC") Annuity Contract # 4550744 | Annuitant: Wafa Reyad | • Originally opened in 1989; exchanged for enhanced annuity contract in 1997; replaced with third annuity contract in 1998<br>• It appears from the funding information that has been provided that plan contributions in excess of the statutorily exempt annual limits were made | • Writ of Garnishment served in May 2000<br>• In June 2003, Mrs. Reyad borrowed $50,000 from the Plan and has defaulted on loan<br>• Cash value a/o 8/1/07 =$117,610.11<br>• alleged to be 26 U.S.C. § 457(b) retirement plan of The Borough of Fort Lee, New Jersey<br>• *Exemption claimed* |
| Fleet ("Bank of America") Bank Account | Account holder: Mostafa Reyad | | • Writ of Garnishment served in May 2000<br>• $748.74 forwarded to marshal in response to execution<br>• *Exemption claimed* |
| Hudson United ("TD BankNorth") Bank Account | Account holder: Wafa Reyad | | • Writ of Garnishment served in May 2000<br>• $407.36 forwarded to marshal in response to execution<br>• *Exemption claimed* |

| | | | |
|---|---|---|---|
| Equitable Life Insurance Policy # 86 097 685 | Owner: Mostafa Reyad Insured: Mostafa Reyad Beneficiary: Wafa Reyad | • Register Date: 11/13/86<br>• Issue Date: 7/28/98<br>• Monthly premium payments of $193.00 | • Writ of Garnishment served in May 2000<br>• Equitable failed to place hold on account<br>• Face amount of policy=$100,000<br>• Mr. Reyad withdrew $25,000 on 1/25/02, and additional $3,689.12 on 3/20/06<br>• Remaining cash surrender value a/o 7/31/07 =$2,793.32<br>• *Exemption claimed* |
| Equitable Life Insurance Policy # 86 108 388 | Owner: Wafa Reyad Insured: Wafa Reyad Beneficiary: Mostafa Reyad | • Register Date: 12/18/86<br>• Issue Date: 12/18/86<br>• Monthly premium payments of $ 132.00 | • Writ of Garnishment served in May 2000<br>• Face amount of policy =$100,000<br>• Cash surrender value a/o 7/31/07 =$27,820.52<br>• *Exemption claimed* |
| Total Value of Assets | | | $559,875.63 |

The foregoing assets constitute all of the liquid assets with any value that Defendants have disclosed to date.[4]  Notably, Defendants acquired and funded the majority of the above assets during the period from 1997 through May 2000 (when the prejudgment remedy was issued in this case), the same period of time during which Defendant Mostafa Reyad's fraudulent conduct at issue in this action occurred.  During 1997, 1998, 1999 and the four month period between January 1, 2000 and April 30, 2000, it appears that the Reyads "invested" the following amounts in the annuity and life insurance contracts identified above:

---

[4] Defendants own a cooperative apartment in New Jersey, which they claim has no equity.  Plaintiff is still investigating this asset.

| 1997 | $ 27,900 |
|------|----------|
| 1998 | $ 80,900 |
| 1999 | $169,900 |
| 2000 | $ 34,300 |
| Total | **$313,000**[5] |

Yet, based upon Defendants' respective Social Security Statements dated May 3, 2000 (attached hereto as **Exhibit 2**), Defendants did not earn anywhere near enough to support these investments.  Mrs. Reyad's wages for 1997, 1998 and 1999 were $22,813, $24,243, and $26,685, respectively.  According to Mrs. Reyad's Benefits Statements for the years 1997, 1998 and 1999 prepared by the New Jersey Division of Pensions and Benefits (attached hereto as **Exhibit 3**), Mrs. Reyad contributed $9,698, $10,797 and $12,000 to a plan or plans offered through her employer.  As discussed further below, these contributions well exceed the statutorily permitted maximum salary deferrals in effect during the relevant years.

Mr. Reyad's overall reported Social Security wages were even less than his wife's during this time.  Mr. Reyad's 1997 wages were $47,285.  Mr. Reyad reported no social security income for 1998.  As of the date of the referenced Social Security Statement, his 1999 wages had not yet been recorded.  Overall, Mr. Reyad's average income from 1978 through 1998 was $6,793.

---

[5] In addition to the foregoing investments, Mostafa Reyad procured on July 15, 1997 an American Express IDS Life Insurance Term Policy for $1,000,000, for which the monthly premium payments were $361.69.  Mr. Reyad is the insured under this policy and his children are the primary beneficiaries.  This policy has no cash value, however, the Reyads also continued to make monthly payments under this policy throughout the period 1997-May 2000.  See **Exhibit 4** hereto.

Thus, it appears from the foregoing information that, during the same time that Mr. Reyad was engaging in the fraudulent conduct found by this Court, the Reyads were making contributions and premium payments under the above annuity and life insurance contracts that were not supportable by the income they reported to the Social Security Administration.  Indeed, Mr. Reyad admitted at his deposition that the annuities at issue were funded by monies withdrawn from Federal Mortgage Company of Connecticut—the company through which Mr. Reyad defrauded IndyMac in this case. See Tr. 5/26/00 Dep. Mostafa Reyad, at 90-92, 112-113 (attached hereto as **Exhibit 5**) (testifying that during the period of 1997-April 2000, Mostafa Reyad paid Wafa Reyad $10,000 per month from Federal Mortgage Company to fund annuities).

## II.    ASSETS IMPROPERLY RELEASED TO DEFENDANTS

All of the assets identified above were subject to Writs of Garnishment issued and served at the outset of this action.  Notwithstanding this fact, it appears that, incredibly, Defendants have obtained loans and other distributions from certain of the garnished assets totaling approximately $240,000.00.  Defendants' actions in this regard, in defiance of the prejudgment remedy ordered by the Court, have significantly undermined the security obtained by IndyMac at the outset of this action.  The following garnishees have (improperly, in Plaintiff's view, and without Court order) disbursed to Defendants assets subject to Writs of Garnishment in this action.

A.    American Express Annuity.

American Express was duly served with a Writ of Garnishment in this action on June 7, 2000.[6]  Thereafter, American Express advised Plaintiff's counsel that a hold had been placed on Wafa Reyad's annuity account in accordance with the Garnishment, and that the cash value of the account as of 6/12/02 was $62,886.69.  In May 2006, in response to Plaintiff's counsel's request for updated cash value information (advising that the Garnishment remained in full force and effect), American Express confirmed that the cash value of the annuity at that time was $79,778.27.

Following entry of Judgment in this matter on April 30, 2007, Plaintiff caused American Express to be served with an Execution on June 27, 2007.  See 7/20/07 Marshal's Return of Service (doc. # 514) ("Marshal's Return").  Surprisingly, American Express responded to the Execution with a letter dated June 28, 2007 stating: "Please be advised that we have searched our records and have found that the account(s) in the above taxpayer's name is inactive.  Therefore, no monies are available and we are unable to comply with the garnishment."  Upon further inquiry, Plaintiff's counsel orally was advised on July 3, 2007 by a representative of American Express that, pursuant the request of one or both of Defendants, all of the funds in the garnished account were electronically wired to a bank account of Defendant Wafa Reyad on June 23, 2007.  Despite repeated requests for explanation, American Express has refused to provide further information or replace the improperly withdrawn funds.

---

[6] The referenced documents relating to service of the Writ of Garnishment and Execution upon American Express are attached hereto as **Exhibit 6.**

B.     Aetna Annuity.

Aetna was duly served with a Writ of Garnishment on May 17, 2000.[7]  On July 9

2002, Aetna confirmed its receipt of the Writ of Garnishment, and advised that it had

garnished Wafa Reyad's annuity contract, with a cash surrender value of $55,598.08 in

response thereto.  In June 2006, in response to Plaintiff's counsel request for updated

cash value information, Aetna advised Plaintiff's counsel that the cash surrender value

for the subject policy as of 6/7/06 was $77,411.03.

Aetna was served with an Execution in this matter on June 28, 2007.  See

Marshal's Return.  Despite several requests by Plaintiff's counsel's office, Aetna never

responded to the subject Execution.  On August 3, 2007, the undersigned counsel

advised Aetna's in-house legal counsel in writing that, if Aetna did not respond to the

Execution immediately, Plaintiff would be requesting a turnover order from the Court.

On August 6, 2007, the undersigned counsel was contacted by outside counsel for

Aetna, who requested additional time to respond to the Execution.  Aetna's counsel was

not able to confirm whether Aetna still retained the funds that were held subject to the

Writ of Garnishment.  Thus, it is unclear at this time whether Aetna has disbursed the

funds that were supposed to be held subject to Garnishment.  Given Aetna's lack of

response to date, coupled with the fact that Defendants did not seek to exempt this

asset from execution (as is the case with the American Express annuity that has been

improperly disbursed), Plaintiff strongly suspects that Defendants have managed to

obtain disbursement of Wafa Reyad's Aetna annuity as well.

---

[7] The referenced documents relating to service of the Writ of Garnishment and
Execution upon Aetna are attached hereto as **Exhibit 7.**

C.    VALIC Annuity.

VALIC was duly served with a Writ of Execution on May 18, 2000.[8]   On July 30, 2002, VALIC confirmed that it had placed Wafa Reyad's annuity account on administrative suspension since June 2000 in response to the Garnishment, that "the suspension remains in place pending further direction from the Court", and that the surrender value of the account as of 7/29/02 was $91,990.17.  In response to Plaintiff's request for updated information, VALIC advised on November 12, 2003 that the value of the subject annuity account had significantly decreased to $60,903.79.  When Plaintiff's counsel inquired as to the reason for the decrease, VALIC informed Plaintiff's counsel on November 19, 2003 that Wafa Reyad requested and was granted a loan of $50,000 (the maximum permissible amount) in June 2003.  Plaintiff's counsel immediately advised VALIC that such a distribution absent Court authorization was impermissible, and requested that VALIC replace the full value of the annuity that had been Garnished.  VALIC thereafter apparently retained outside counsel concerning this matter, who advised Plaintiff's counsel by letter dated December 5, 2003, for the first time that VALIC maintained that the subject annuity was exempt from garnishment.

VALIC was served with an Execution in this matter on June 28, 2007.  See Marshal's Return.  To date, the parties have not resolved the dispute over the

_____

[8] The referenced documents relating to service of the Writ of Garnishment and Execution upon VALIC are attached hereto as **Exhibit 8.**

improperly disbursed funds.[9]  VALIC's counsel has advised that the value of the subject VALIC annuity as of 8/1/07 is $117,610.11.[10]

       D.       <u>Equitable Life Insurance Policy.</u>

      Equitable was duly served with a Writ of Garnishment on May 17, 2000.[11]  On June 11, 2002, Equitable confirmed that it had placed a hold on two accounts—Wafa Reyad's Equitable annuity and life insurance policies with cash values of $96,374.21 and $16,200.88, respectively.  In October 2006, Plaintiff's counsel noted reference to a third Equitable policy in one of Defendants' filings in a different court, and inquired of Equitable whether such an account existed and if so, whether it had been held subject to Plaintiff's Garnishment.  On December 6, 2006, Equitable confirmed that it had overlooked a life insurance policy owned by Mostafa Reyad when Equitable initially responded to the Garnishment.  Notably, Mostafa Reyad had taken two loans against the policy since the Garnishment, the first on January 25, 2005 in the amount of $25,000; and the second on March 20, 2006 in the amount of $3,689.12.  The remaining cash surrender value of the policy as of 7/31/07 is $2,793.32.  Equitable has agreed to replace the loans improperly distributed to Mostafa Reyad, and to turn over all funds subject to execution immediately upon the Court's adjudication of Defendants' Motion for Exemptions.

---

[9] On August 2, 2007, Plaintiff served a subpoena on VALIC requesting, <u>inter alia</u>, historical funding and distribution information concerning the annuity.  VALIC has not yet provided said information.

[10] It is unclear whether the stated value includes the $50,000 loan, which remains outstanding, or whether the total account value is a greater amount, taking into consideration the outstanding loan.

[11] The referenced documents relating to service of the Writ of Garnishment and Execution upon Equitable are attached hereto as **Exhibit 9.**

E.     Remedy.

Because these assets properly were subject to Writs of Garnishment served at the outset of this case, Plaintiff requests, pursuant to Conn. Gen. Stat. §§ 52-356b and 52-381, that the Court order that American Express, Aetna and VALIC turn over to Plaintiff the value of the assets that were improperly released to Defendants in violation of the prejudgment remedy ordered in this case, and that said garnishees be required to reimburse Plaintiff for its costs incurred in connection with the instant motion.  Because Equitable has agreed to replace the improperly distributed funds and to turn over all assets subject to execution following this Court's ruling on Defendants' Motion for Exemptions, Plaintiff does not seek a turnover order or the award of costs with respect to Equitable at this time.

Connecticut law authorizes the requested remedy.  Conn. Gen. Stat. § 52-356b, entitled "Court order for transfer of specified property or evidence", provides in relevant part: "If a judgment is unsatisfied, the judgment creditor may apply to the court for an execution and an order in aid of the execution directing the judgment debtor, or any third person, to transfer to the levying officer . . . possession of specified personal property that is sought to be levied on . . . ."  Conn. Gen. Stat. § 52-356b(a).  Similarly, Conn. Gen. Stat. § 52-381, entitled "Liability of garnishee; scire facias", provides, inter alia, that if a garnishee has disposed of property of the debtor after being served with a writ of garnishment, or otherwise fails to turn over such assets upon execution, such garnishee shall be liable to satisfy such judgment out of his own funds, with costs.[12]

---

[12] While § 52-381 suggests that a separate action be instituted to obtain the referenced relief, the passage in 1983 of the Postjudgment Remedies Act, Conn. Gen. Stat. § 52-350a, et seq., obviated the need to proceed in such a manner.  The Connecticut

American Express, Aetna and VALIC, having improperly released funds to Defendants despite the issuance and service of Writs of Garnishment, must be required to replace such funds and turn over same to Plaintiff in response to the Writ of Execution issued in this case. See, e.g., Marine Midland Bank, N.A. v. Schlesinger, 820 F. Supp. 667, 669-672 (D. Conn. 1993) (finding garnishee directly liable for decline in value of garnished securities account during pendency of action); Fleet Bank Conn., N.A. v. Carillo, 240 Conn. 343, 345 (Conn. 1997) (affirming issuance of turnover order enforcing bank execution). Moreover, said garnishees should be required to reimburse Plaintiff for its costs, including reasonable attorney's fees, incurred in connection with this motion. See, e.g., Loewe v. Savings Bank of Danbury, 236 F. 444, 453 (2d Cir. 1916) (finding garnishee liable for the payment of dividends assigned to third parties during pendency of garnishment, plus interest and costs), aff'd, 242 U.S. 357 (1917).

---

Supreme Court made this fact clear in Hospital of St. Raphael v. New Haven Savings Bank, 205 Conn. 604 (1987), explaining:

> Under our law of garnishment as it existed until the 1983 enactment of the Postjudgment Remedies Act, General Statutes § 52-350a, et seq., the customary procedure for adjudication of a disputed garnishment was either a writ of scire facias under General Statutes § 52-381; or an action for a declaratory judgment under General Statutes § 52-235a. . . . Under the new act, disputes about the validity of a garnishment may be adjudicated in a hearing in supplemental proceedings that are ancillary to the underlying action. See General Statutes § 52-356c.

Hospital of St. Raphael, 205 Conn. at 607, n.3; see also Vidal Realtors of Westport, Inc. v. Harry Bennett & Associates, Inc., 1 Conn. App. 291, 293 (1984) (acknowledging that the Postjudgment Remedies Act is a comprehensive treatment of the subject of garnishments, noting "[t]he ancient and honorable writ of scire facias has been dying a lingering death in Connecticut for some time").

## III.     DEFENDANTS' EXEMPTION CLAIM[13]

In their latest motion, Defendants seek to exempt from execution all of the liquid

assets disclosed by Defendants that have any value.  Specifically, Defendants claim

that the above referenced VALIC, Equitable and New England contracts are exempt

from execution, purportedly relying upon Connecticut, New Jersey and California asset

protection laws.[14]  Defendants also claim, without citing to any legal authority or

providing any evidence, that their respective bank accounts at Bank of America and TD

BankNorth and their automobiles are exempt from execution.  As discussed further

below, Defendants have not met their burden of establishing that the contested assets

are exempt from execution under the applicable statutory framework. See Clark v.

Wilbur, 913 F. Supp. 463, 467-68 (D. W. Va. 1996) (acknowledging that it is well settled

that the burden is on the judgment debtor to establish entitlement to claimed exemption)

(citing cases); Ford Motor Credit Co. v. Christani, 1998 Conn. Super. LEXIS 469, at * 3

(Conn. Super. Ct. 1998) (placing burden on judgment debtor to prove the exempt

character of funds); 31 Am. Jur. 2d Exemptions § 350 (2002) ("A debtor claiming an

---

[13] Defendants erroneously contend that this Court lacks jurisdiction to adjudicate this matter due to the pendency of Defendants' appeal of the underlying Judgment.  As this Court recently found in connection with its decision denying Defendant Mostafa Reyad's motion seeking to stay enforcement of the Judgment, the filing of an appeal does not automatically stay execution on the judgment.  See 12 James Wm. Moore, Moore's Federal Practice § 62.02[1], at 62-8 (3[d] ed. 2006); see also SEC v. Tome, 1987 U.S. Dist. LEXIS 3269, 4-5 (D.N.Y. Apr. 3, 1987) at *4-5 (ordering post-judgment asset discovery during pendency of appeal, expressly noting "the district court's power to act in aid of execution of its judgment is not impaired by the filing of an appeal") (citing cases).

[14] Defendants do not seek exemption for the above referenced American Express and Aetna annuity contracts, presumably because Defendants successfully liquidated those assets despite the issuance and service of Writs of Garnishment directed to those accounts at the outset of this action.

exemption generally has the burden of proving that his claim comes within the exemption provisions").

A.    Governing Law.

With respect to the applicable law, Fed. R. Civ. P. 69, which governs federal execution proceedings, expressly provides that "proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable."  Fed. R. Civ. P. 69(a) (emphasis added).  Thus, Connecticut law governs Defendant's exemption claims, notwithstanding that Defendants reside in New Jersey.  See Chicago, Rock Island & Pac. Ry. Co. v. Sturm, 174 U.S. 710, 717 (1899) (stating "exemption laws are . . . part of the remedy and subject to the law of the forum"); Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 83 (2d Cir. 2002) (applying law of the forum state to determine whether assets are subject to enforcement and thus available to judgment creditors); see, e.g., Clark v. Wilbur, 913 F. Supp. 463, 467 (D. W. Va. 1996) (applying exemption law of the forum state despite fact that assets upon which execution was sought were located in another state, stating "[t]he mandate requiring resort to the law of the state where the district court is held applies to questions relating to whether assets are exempt from collection"); Johns v. Rozet, 826 F. Supp. 565, 567 (D.C.D.C. 1993) (in ruling on claim that IRA was exempt from execution, applying the District of Columbia's exemption laws pursuant to Rule 69(a), despite fact that Defendant lived and planned to retire in California); Marine Midland Bank v. Surfbelt, Inc., 532 F. Supp. 728, 729 (W.D. Pa. 1982) (applying forum state's

law in determining whether IRA account was exempt from execution, notwithstanding that contract upon which liability was based contained New York choice of law provision, because "the law of the forum governs questions of exemption").

B.    Connecticut's Statutory Exemptions.

Contrary to Defendants' assertions, the Connecticut law relied upon by Defendants does not protect the subject assets from execution in this matter.

1.    Nonqualified Annuities.

Conn. Gen. Stat. § 52-321a exempts certain retirement assets from the claims of creditors.  In relevant part, Conn. Gen. Stat. § 52-321a(a)(1) exempts "any trust, custodial account, annuity or insurance contract established as part of a Keogh plan or a retirement plan established by a corporation which is qualified under Section 401, 403, 404 or 409 of the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended."  Conn. Gen. Stat. § 52-321a(a)(5) further exempts "any pension plan, annuity or insurance contract or similar arrangement not described in subdivision (1) or (2)[15] of this subsection, established by federal or state statute for federal state or municipal employees for the primary purpose of providing benefits upon retirement by reason of age, health or length of service."  Importantly, Conn. Gen. Stat. § 52-321a does not list a non-qualified annuity plan as an asset that is exempt from the claims of

---

[15] Conn. Gen. Stat. § 52-321a(a)(2) exempts individual retirement accounts qualified under Code Section 408.

creditors.[16]  Defendants fail to cite to any statutory provision, and Plaintiff is aware of none, which exempts non-qualified annuities from claims of creditors.

With the exception of the VALIC annuity, discussed below, all of the other annuities appear to be non-qualified annuities in that there is no evidence to suggest that they were funded through a federally tax qualified retirement plan or a retirement plan established by federal or state statute for federal, state or municipal employees. The certificate of coverage and/or benefit statements for the annuities issued by Equitable and Aetna explicitly state that they are non-qualified annuities.  There is no indication of any employer involvement in the procurement of these annuity contracts or the New England or American Express annuity contracts, or the making of contributions to any of these contracts.  See **Exhbit 10** hereto.  Indeed, as discussed in Section I, supra, the evidence demonstrates that the subject annuity contracts were purchased using funds from Federal Mortgage Company of Connecticut during the time period that Mostafa Reyad engaged in the fraudulent conduct that was at issue in this matter. Thus, there is absolutely no basis upon which to conclude that the Equitable, New England, American Express or Aetna annuities are exempt from execution. Accordingly, Defendants' Motion for Exemptions should be denied and the garnishees ordered to turn over the garnished funds.

---

[16] Pursuant to Internal Revenue Code (the "Code") Section 403(a), a qualified annuity plan involves the purchase of an annuity contract for an employee by the employer (or through the employer) which contract must meet many of the requirements that a qualified retirement plan established pursuant to Code Section 401(a) must meet.  See 26 U.S.C. § 404(a)(2).

2.      Bank Accounts and Automobiles.

Defendants fail to cite to any statutory provision, and Plaintiff is aware of none, which exempts from execution Defendants' bank accounts.[17]  Although not relied upon by Defendants, Conn. Gen. Stat. § 52-352b, which lists the property of natural persons that is exempt from execution, does exempt from execution one motor vehicle to the value of $1,500.  See Conn. Gen. Stat. § 52-352b(j).  Defendants have provided the Court with no evidence to support their claim that their respective automobiles have a fair market value equal or less than $1,500.  Absent such proof, Defendants' claimed exemptions in this regard should be overruled.

3.      VALIC Annuity.

With respect to the VALIC annuity contract, Defendants maintain that this contract was issued as the funding vehicle for the Borough of Fort Lee, New Jersey Section 457(b) Plan (the "Plan"), and is therefore exempt from execution as a qualified retirement plan.  Beyond a self-serving letter to Defendants from VALIC's counsel, Defendants have offered no documentary evidence supporting this claim.  Assuming, arguendo, that Defendants offer evidence demonstrating that the establishment and operation of the Plan has been consistent with the requirements of Code Section 457(b), the VALIC annuity contract could be deemed exempt from the claims of

---

[17] Conn. Gen. Stat. § 52-367b(c) exempts from execution, up to the maximum value of $1,000, "electronic direct deposits that are readily identifiable as exempt federal veterans' benefits, Social Security benefits . . . supplemental security income benefits or child support payments . . . [that] were made to the judgment debtor's account during the thirty-day period preceding the date that the execution was served on the financial institution".  There is no evidence that the funds in the levied bank accounts contained these types of electronic deposits.

creditors under Conn. Gen. Stat. § 52-321a(a)(5) as an annuity established by federal statute for municipal employees for the primary purpose of providing benefits upon retirement.

Defendants, however, have provided information that raises serious questions about whether the specific VALIC annuity contract issued for the benefit of Mrs. Reyad was operated in accordance with the provision of Code §457(b).  Specifically, Mrs. Reyad's Personal Benefit Statements for plan years ending December 31, 1996, 1997, 1998 and 1999 (attached hereto as **Exhibit 3**) suggest that Mrs. Reyad was permitted to contribute amounts well in excess of the contribution limits that were in place during 1996, 1997, 1998 and 1999.  The maximum deferrals permitted under Section 457(b) Plans during the relevant years were the lesser of $7500[18] or 33 1/3 % of the participant's "includible compensation"[19] for the taxable year.  See Reg. 1.457-2(e) (in effect during relevant period, attached hereto as **Exhibit 11**).  Mrs. Reyad's includible compensation in 1996, 1997, 1998 and 1999 was approximately, $13,501, $17,110, $18,317 and 20,014, respectively.[20]  Using this estimate of Mrs. Reyad's includible compensation, the maximum permissible contributions that she could have made were $4,500 in 1996, $5,703 in 1997, $6,106 in 1998 and $6,671 in 1999.  Notwithstanding these maximum contribution limitations, Mrs. Reyad's Personal Benefit Statements

---

[18] This amount was increased to $8,000 for the 1998 and 1999 plan years.

[19]  "Includible compensation" is defined as gross compensation less the amount that is deferred into the Section 457(b) plan.  Includible compensation is generally equivalent to 25 % of participant's gross compensation.  See Reg. 1.457-2(e)(2) and Reg. 1.457-2(m) (first example).  See **Exhibit 11**.

[20] These amounts were determined by using the salary amounts reported to the Social Security Administration (**Exhibit 2**) and assuming that the maximum contribution that Mrs. Reyad could make during this period was equal to approximately 25% of her gross income.

indicate that she made contributions of $8,477, $9,698, $10,797 and $12,000 in 1996, 1997, 1998 and 1999, creating excess deferrals of $3,977, $3,897, $4,691 and $5,196 during those years.

Since the making of the excess contributions is not permitted by federal statute, see 26 U.S.C. § 457(b), any such contributions and the earnings related thereto should not be entitled to the protection afforded by Conn. Gen. Stat. § 52-321a(a)(5).[21]  It should be noted that under the current Code Section 457 Regulations, any such excess deferrals and their related earnings are required to be distributed to the plan participant in order for the 457(b) Plan to retain its eligible status.  See Reg. 1-457-4(e)(1) (currently in effect, attached hereto as **Exhibit 12**).  Accordingly, any excess deferrals and the related earnings should not be afforded the protection of Conn. Gen. Stat. § 52-321a, and they should be deemed subject to Plaintiff's execution.

4.      Life Insurance Policies.

Defendants rely upon two statutes in support of their claim that the cash value of their respective Equitable life insurance policies should be exempt from execution. Neither serves to protect the subject assets from exemption in the instant matter.[22]

---

[21] By way of analogy, the preamble to the recently issued final regulations regarding 403(b) plans addresses the situation where deferrals in excess of the Code Section 415 limits are made under a 403(b) plan.  "The final regulations retain the rule in the 2004 proposed regulations that if [an amount in excess of the 415 limit] is made to the contract that otherwise satisfies the requirements of section 403(b), then the portion of the contract that includes the excess will fail to be a section 403(b) contract (and instead will be a contract to which Section 403(c), relating to nonqualified annuity contracts, applies) and the remaining portion of the contract that includes the contribution that is not in excess of the section 415 limitations is a section 403(b) contract."  See **Exhibit 13** hereto, at 18-19.

[22] Although not cited by Defendants, Conn. Gen. Stat. § 52-352b(s) apparently would exempt from execution Defendants' respective interests, not to exceed $4,000, in an unmatured life insurance contract of which they are the insured.

Conn. Gen. Stat. § 38a-453, entitled "Rights of creditors of insured against beneficiary", provides in relevant part:

> The beneficiary of any life insurance policy, being a person other than the insured, …shall be entitled to the proceeds of the policy as against the representatives or creditors of the insured, unless the policy was procured or the designation of a beneficiary was made with intent, express or implied, to defraud creditors."

Conn. Gen. Stat. § 38a-453(a).

Thus, as indicated by the title of the statute and by its own terms, the statute is limited to life insurance policies only.  It has no application to annuities or bank accounts.  Further, the statute protects only *beneficiaries* of mature life insurance policies against claims of judgment creditors of the insured.  Cf. Kulmacz v. New York Life Ins. Co., 39 Conn. Supp. 470, 475 (1983) (discussing priority of claims against proceeds of life insurance policy following insured's death); Conn. Gen. Stat. § 52-352(b)(s) (providing exemption, up to $4,000, for unmatured life insurance policies against claims of creditors of insured).  Thus, Conn. Gen. Stat. § 38a-453(a) does not serve to insulate the insured from claims by a judgment creditor against the cash value of such policies during the insured's life, as is the case here.[23]

Similarly, Conn. Gen. Stat. § 38a-454, also cited by Defendants, does not exempt the challenged contracts from execution.  This statute provides that "[p]roceeds of life insurance policies and annuities may be held in trust," and may be exempted "from the claims of creditors of beneficiaries *other than the policyholder*." Id. (emphasis

---

[23] Even if this statute somehow were applicable in the instant case, it nevertheless would not protect Defendants' subject assets, as there is ample evidence to establish that the policies were procured "with the intent, express or implied, to defraud creditors", at least insofar as Defendants funded said policies with monies fraudulently obtained from Plaintiff.  See Section I, supra.

added).  Once again, this statute is designed to protect *beneficiaries* (other than the policyholder) against claims of creditors.  This statute permitted the creation of a spendthrift trust with the proceeds of a life insurance policy or annuity.  Cf. Hildreth Press Emp. Fed. Credit Union v. Connecticut General Life Ins. Co., 30 Conn. Supp. 513, 515-517 (1972) (analyzing elements of spendthrift trust and protection of trust funds of beneficiary from garnishment by creditor), cert. denied, 163 Conn. 643.  There is no evidence to suggest that the policies at issue create a spendthrift trust on behalf of a beneficiary other than the policyholder.  In fact, all of the annuities at issue are maintained by and for the benefit of the purchaser, namely Wafa Reyad.  Accordingly, Conn. Gen. Stat. § 38a-454 does not apply.  Additionally, this statute is inapplicable because Plaintiff's claims in this action are, in fact, against the policyholder of said annuities and life insurance policies, and not against "beneficiaries other than the policyholder".

## IV.     CONCLUSION

WHEREFORE, for the reasons discussed above, Plaintiff respectfully requests that (i) that Defendants' Motion for Exemption be denied, (ii) that the Court order that the disputed assets be turned over to Plaintiff immediately for execution, and (iii) that Garnishees American Express, Aetna and VALIC be ordered to turn over to Plaintiff the value of the non-exempt assets improperly distributed to Defendants, and that said garnishees be ordered to reimburse Plaintiff for its costs incurred in connection with the instant motion.[24]

---

[24] Plaintiff will submit evidence of its costs, including attorney's fees, at the requisite hearing on Plaintiff's motion for turnover order.

PLAINTIFF INDYMAC BANK, F.S.B.


By: *s/Rowena A. Moffett*
     David R. Schaefer (ct04334)
     Rowena A. Moffett (ct19811)
     BRENNER, SALTZMAN & WALLMAN LLP
     Its Attorneys
     271 Whitney Avenue
     P.O. Box 1746
     New Haven, CT  06507-1746
     Tel. (203) 772-2600
     Fax. (203) 562-2098
     Email: dschaefer@bslwlaw.com
            rmoffett@bswlaw.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and accurate copy of the foregoing was served by

United States first-class mail and by electronic mail this 7th day of August, 2007 upon:

Mostafa Reyad
2077 Center Ave
#22D
Fort Lee, NJ  07024
reyad@optonline.net

Wafa Reyad
2077 Center Ave
#22D
Fort Lee, NJ  07024
reyad@optonline.net.

This is to further certify that a true and accurate copy of the foregoing was served

by United States first-class mail this 7th day of August, 2007 upon:

Variable Annuity Life Insurance Company
c/o Joshua Cohen, Esq.
Day Pitney LLP
One Audubon Street
New Haven, CT  06511

American Express IDS/Ameriprise Financial
c/o Gene Kodadek, Esq.
Ameriprise Financial
70100 Ameriprise Financial Center
Minneapolis, MN  55474

Aetna/ING Life Insurance and Annuity Company
c/o Melicent B. Thompson, Esq.
Litchfield Cavo LLP
40 Tower Lane, Suite 200
Avon, Connecticut 06001-4222

9Z2159.DOC

AXA Equitable Life Insurance Company
c/o Christopher E. Torkelson, Esq.
Sterns & Weinroth
50 West State Street
Suite 1400
P.O. Box 1298
Trenton, NJ  08607-1298

_s/Rowena A. Moffett_
Rowena A. Moffett (ct19811)